20

1   notices?

2       A    Yes.

3       Q    Would you describe what you did, if

4   anything, to prepare for today's deposition?

5       A    I met with our attorney.

6       Q    Without telling me any

7   conversations that you had with counsel, did

8   you have conversations with anyone else in

9   preparation for today's deposition?

10      A    Our corporate attorney at the

11  office.

12      Q    Okay.  Other than in-house counsel,

13  did you speak with anybody else about today's

14  deposition?

15      A    Awhile back there was another

16  attorney involved, prior to having in-house

17  counsel.

18      Q    Did you speak with any of the

19  employees at EMG in preparation?

20      A    No.  I did not.

21      Q    Did you review any document in

22  preparation for today's deposition?

23      A    Yes.

**EXHIBIT**

3

1          Q     Can you tell me where those

2     documents are located?  Are these documents

3     at EMG?

4          A     EMG documents.

5          Q     To the best of your knowledge have

6     all non-privileged documents that are in

7     EMG's possession been produced to us?

8          A     Could you define non-privileged?

9          Q     Documents that don't have any

10    communication with your counsel involved,

11    more specifically, the ones that have been

12    listed on the notice of deposition as being

13    documents requested.

14               MR. BOLOTIN:  I'm going to object

15    to that.  The determination as to what

16    documents have and haven't been produced

17    rests with counsel and not with this witness.

18               But I will represent that all non-

19    privileged materials that are responsive to

20    the document request answer to this subpoena

21    have been produced.

22               MS. UPTON:  Okay.

23               I would like to mark this as

22

1          Exhibit 3.

2                    (Whereupon Jarosinski Deposition

3                     Exhibit Number 3 was marked for

4                     identification)

5               BY MS. UPTON:

6          Q    If you would take a look at what's

7     been marked Exhibit 3.  These are the

8     documents that counsel just represented as

9     the responsive documents, and if you could

10    look through them and let me know if those

11    are the documents that you have reviewed.

12         A    There is more than one set?

13         Q    This is what was produced as EMG's

14    file.  There are duplicate documents, but

15    that is how the file was presented.

16         A    This looks like the file.

17              MS. UPTON:  We're going to mark

18    this as Exhibit 4.

19                    (Whereupon Jarosinski Deposition

20                     Exhibit Number 4 was marked for

21                     identification)

22              BY MS. UPTON:

23         Q    I'm showing you what has been

1    marked as Exhibit 4.  These are documents

2    that counsel produced this morning,

3    indicating to me that these are field notes,

4    or a file kept separately by Ms. Terepka.

5           Did you have an opportunity to

6    review these before this morning?

7       A    Yes.  I did review these.

8       Q    Other than the documents that are

9    marked as Exhibit 3 and these documents that

10   have been marked as Exhibit 4, did you have

11   an opportunity to review any other documents

12   relating to the facts that have been raised

13   in this case?

14           MR. BOLOTIN:  Objection.  You can

15   answer.

16           THE DEPONENT:  No.  This is all I

17   have reviewed.

18           BY MS. UPTON:

19      Q    Looking now at what has been marked

20   as Exhibit 2, the notice of deposition, and

21   specifically at pages 4, 5, and 6, I'm going

22   to ask you as you have been designated a

23   30(b)(6) designee for these areas of inquiry,

24

1    have you been designated as a 30(b)(6)

2    representative for topic 1?

3        A    Yes.

4        Q    To shorten this, have you been

5    designated as a 30(b)(6) with regard to

6    topics 1 through 18?

7            Take a moment to look at it.

8        A    Yes.

9            MR. BOLOTIN:    That is subject to

10   objection to any specific area or question

11   regarding any particular area.

12           BY MS. UPTON:    No objections have

13   been raised thus far to any of the topics, so

14   we'll go through them and see if any present

15   themselves.

16       Q    And just again for purposes of

17   clarification, with regard to these 18

18   topics, did you speak to anyone at EMG that

19   was not counsel in relation to any of these

20   topics?

21       A    Yes.

22       Q    Can you tell me who and with regard

23   to which area of inquiry?

25

1       A       Beth Prochaska.

2       Q       Could you spell that name please?

3       A       P-R-O-C-H-A-S-K-A.

4       Q       And who is that?

5       A       She is the operations assistant.

6       Q       What is an operations assistant?

7       A       She supports the entire operations

8   unit from an administrative perspective,

9   running reports and tracking.

10      Q       Which topic did you discuss with

11  Ms. Prochaska?

12      A       Just in relation to collecting any

13  documents that were asked to be provided.

14      Q       Did you speak with anyone else?

15      A       Lisa Flannery.

16      Q       Who is Lisa Flannery?

17      A       F-L-A-N-N-E-R-Y.   She is the client

18  services manager.

19      Q       What does the client services

20  manager do?

21      A       Client services works very closely

22  with our sales division and works closely

23  with our clients in providing support

26

1    throughout the project, or projects.

2        Q      And when you say she provides

3    support, in what way?

4        A      Administrative support.  Her staff

5    works very closely with the sales division.

6        Q      In terms of getting clarifications

7    from the client?

8        A      Clarifications from client and the

9    contract.  They prepare the proposals.

10       Q      When did you speak with Ms.

11   Flannery?

12       A      I spoke with her yesterday.

13       Q      Did you speak with her on more than

14   one occasion about this?

15       A      No.

16       Q      What was the substance of the

17   conversation with her yesterday?

18       A      Just in relation to the files, the

19   client services file, which houses the

20   contract.

21       Q      What was the purpose of the

22   conversation?

23       A      Just to discuss the actual

1     proposal.

2          Q     Had she worked with anyone at

3     Berwind in creating the proposal?

4          A     I can't answer that.  I don't know

5     that answer.

6          Q     Can you tell me why you went to Ms.

7     Flannery to ask about the proposal?

8          A     I had just asked her in terms of

9     the, I just had more policy-type questions

10    relating to the proposal and the acceptance

11    and authorization page.

12         Q     But you don't know whether she had

13    any relationship to the Berwind proposal in

14    this matter?

15         A     I only know of the folks that were

16    named on the documents that would have

17    typically worked with the client and the

18    regional vice president.

19         Q     What else did you discuss with Ms.

20    Flannery?

21         A     Nothing else.

22         Q     What did she tell you about this

23    particular proposal?

1      A    Just that that was the complete

2  file that we would have on hand.

3      Q    Did she tell you anything else

4  about the proposal, other than this was a

5  complete version of it?

6      A    No.

7      Q    Did you speak with anyone other

8  than Ms. Prochaska and Ms. Flannery?

9      A    No.

10     Q    Looking at page 8 of the notice of

11  deposition in which it lists the documents

12  that had been requested, I'd like to go

13  through each request for production and ask

14  some questions about that.

15       With regard to item number 1, "All

16  documents which evidence, constitute, or

17  reflect communications between Berwind and

18  EMG, which refer to, reflect or discuss the

19  project," has EMG provided all responsive

20  documents which currently exist, to the best

21  of your knowledge?

22     A    Yes.

23     Q    Where are these documents stored?

42

1   work within their specific regions.

2       Q       What region is the Boston office

3   in?

4       A       The Northeast region.

5       Q       I'm sorry, you may have mentioned,

6   how many regions are there?

7       A       Ten regions right now.

8       Q       Can you tell me approximately how

9   many property condition evaluation

10  assignments the Boston office of EMG

11  performed between 1996 and 1999?

12      A       No, I can't tell you that.

13      Q       Can you tell me how many property

14  condition assignments involved a structural

15  analysis of concrete parking structures

16  between 1996 and 1999?

17      A       Well, we've performed thousands and

18  thousands of reports around the country and I

19  can't tell you specifically what projects

20  we've performed what assessments on.

21      Q       Is there somebody at EMG who could?

22      A       Short of looking through every

23  project, we wouldn't know specific scopes of

43

1    work or what we performed on individual

2    projects without doing that research.

3        Q    You have no computer database that

4    allows you to type in Boston and property

5    condition assessment and determine how many

6    were performed in the Boston area in a three

7    year period?

8        A    We can look at the number of

9    projects that we performed a property

10   condition assessment on in the Boston area,

11   yes.

12       Q    But you yourself can't tell me how

13   many were done between 1996 and 1999?

14       A    No.

15       Q    Do you have a computer search

16   capability that you could type in parking

17   garage assessment and determine how many

18   parking garage assessments were done in that

19   time period in that region?

20       A    No, we don't have a service that's

21   named parking garage assessment.

22       Q    I understand you don't have a

23   service, but do you have term search

45

1  documents?

2      A    No.  We have from the project

3  manager position, or what are you talking

4  about?  What documents?

5      Q    For example, if they get a

6  checklist and they want to check off various

7  systems or structures, or various components

8  of a given building, is there a master list

9  that they check from?

10     A    Yes, a field checklist.

11     Q    Is there a building checklist?

12     A    Well, that would include the field

13 because it would include site, the building

14 systems, and any other information that they

15 would be collecting out of the property.

16     Q    So can you tell me whether EMG

17 performed any property condition evaluations

18 in the New England region between 1996 and

19 1999 of a building that involved a concrete

20 parking structure?

21     A    Not without going in and looking at

22 every, opening up every project and pulling

23 the files and looking within each of the

46

1   projects that we performed to see whether

2   there was a parking garage included or not.

3           MS. UPTON:   I'm going to object and

4   we're going to have to suspend, just so you

5   know, at the end of the day.  We requested a

6   30(b)(6) witness who would be able to testify

7   as to --

8           MR. BOLOTIN:   It's not possible.

9   He made the point very clearly, they cannot

10  do it, a 30(b)(6) witness who can testify as

11  to what is available as far as the corporate

12  knowledge.  Corporate knowledge is not that

13  they have knowledge of every structure in a

14  three year period, nor is it relevant.

15          So you can go ahead and suspend,

16  but I object to that.  I object to the no

17  responses to request.  I don't think it's

18  relevant, nor do I think it's reasonable to

19  require this company to go through every

20  report that it did in a period of time in

21  order to find something that's not related to

22  the project at issue.

23          MS. UPTON:   Well, the experience of

47

1    the firm and the experience of the personnel

2    is relevant to the issue.

3         MR. BOLOTIN:  Well, the experience

4    of the personnel, the personnel are coming to

5    testify.  The experience of the firm is not

6    relevant because whether or not another

7    person did a parking garage in Maine four

8    years earlier is not a relevant circumstance.

9         MS. UPTON:  Well, we didn't ask for

10   Maine, we're asking for Boston, the same

11   region.

12        MR. BOLOTIN:  Well, Maine is the

13   same region.

14        MS. UPTON:  If he can narrow it to

15   Boston, great, but if we can do it by region

16   and that's easier for them to do it by

17   region, I'm just noting on the record that

18   he's unable to testify on a topic as a

19   30(b)(6) that we requested.

20        MR. BOLOTIN:  That's to say, again,

21   we're designating a person, that doesn't mean

22   that there's anybody that can testify to that

23   and that's the point.  We're not required to

1    create information, nor are we required to go

2    and do an overly diligent search to respond

3    to things that we don't believe are relevant.

4        This is an individual who can

5    respond on behalf of the corporation to the

6    corporation's knowledge and that's who is

7    here.

8        BY MS. UPTON:

9       Q   So you're representing that the

10   corporation has no institutional knowledge as

11   to the projects that it performed between

12   1996 and 1999 with regard to property

13   condition evaluations in the Boston area

14   involving a parking garage; is that correct?

15      A   Not in a database and not with

16   firsthand knowledge. Again, it would be a

17   review of every single report to see whether

18   there was a parking garage involved.

19      Q   What factors are considered in

20   determining which employee will conduct any

21   given property condition evaluation?

22      A   The factors that are utilized are

23   availability of staffing members, the

70

1    that request.

2        Q    Who said to send a mechanical

3    engineer?

4        A    It was in the paperwork that went

5    to our field management division.

6        Q    Who prepared that?

7        A    I can't speak to exactly who

8    prepared that document, but that would be

9    prepared between our client services division

10   and/or the technical relationship manager.

11       Q    Was EMG aware of the reason for the

12   assessment in this matter?

13       A    Yes.

14       Q    And what was that?

15       A    The paperwork says acquisition.

16       Q    Okay.  The proposal states that

17   it's for the client's proposal to acquire a

18   long term hold; is that correct?

19       A    Yes.

20       Q    Looking at page 22 of the proposal,

21   paragraph 8, which states, "Professional

22   liability.  EMG's liability, and that of its

23   officers, directors, employees, agents and

71

1    subcontractors, to the client or to any third

2    party, due to any negligent professional

3    acts, errors or omissions, or breach of

4    contract by EMG, shall be limited to an

5    aggregate of $50,000.00, or EMG's total

6    charges for its services, whichever is

7    greater."

8            Did I read that correctly?

9        A    Yes.

10       Q    It goes on to state, "If the client

11   requests higher limits of professional

12   liability, EMG agrees to increase the

13   aggregate limit, up to a maximum of

14   $1,000,000.00, upon client's written request

15   at the time of acceptance of the proposal,

16   provided the client agrees to pay an

17   additional consideration of 10 percent of

18   EMG's total charges, or $500,00, whichever is

19   greater."

20           Did I read that correctly?

21       A    Yes.

22       Q    Okay.  Who dealt with Berwind from

23   EMG when Berwind first requested the

```
 1    proposal?

 2         A    It appears that Matt Dillis was the

 3    employee that worked with Berwind.

 4         Q    And what is Matt Dillis's position?

 5         A    He's no longer with EMG but he was

 6    regional vice president.

 7         Q    Do you know where he is now?

 8         A    I believe he's in Boston.  I'm not

 9    sure where.

10         Q    When did he leave EMG?

11         A    I don't know the exact date.

12         Q    Approximately?

13         A    Two years ago, three years ago.

14         Q    And did you speak with him in

15    preparing for today's deposition?

16         A    No, I didn't.

17         Q    Do you know whether he had any

18    discussions with anyone at Berwind with

19    regards to this paragraph of the proposal?

20         A    No, I don't.

21         Q    Is there anybody else at EMG who

22    would have any knowledge as to whether there

23    were any communications between Berwind and
```

73

1  EMG about this paragraph of the proposal?

2      A     If they would have discussed it,

3  that would typically have been on the RFP and

4  that's how this would be implemented.  We

5  would put that into our paperwork and then

6  increase the liability.  So the account

7  managers would if that would have taken

8  place.

9      Q     Can you show me in the documents

10  that have been produced what your version of

11  the RFP is?

12          Okay.

13          Can you tell me where on the RFP it

14  would be indicated if the client was

15  requesting the additional liability provision

16  or if they had a question about it?

17      A     I can't answer that personally

18  because I don't really deal with these

19  documents, so I can't answer where they would

20  put that on this document.

21      Q     If someone had a question about

22  that provision, however, would it be listed

23  on this document somewhere?

74

1        A       Typically information regarding the

2    proposal to be prepared would be listed in

3    this document.

4        Q       Is there anywhere else that it

5    would be indicated?

6        A       I don't know.  I mean I don't see

7    any specific location on this particular

8    document.  So I can't answer that question.

9        Q       If the client did request it, how

10   it would be indicated on this form?

11       A       I don't know that answer.

12       Q       Who would know?

13       A       The regional vice president or an

14   account manager.

15       Q       And in 1996, who was the regional

16   vice president?

17       A       Matt Dillis for this project.

18       Q       And who was the account manager?

19       A       It looks like there were a couple

20   of folks who worked on this.  Barbara Wojcik,

21   W-O-J-C-I-K, would have been the regional

22   account manager.

23               At times projects also went to a

77

1    Q    The contract is essentially the

2    proposal with an acceptance and authorization

3    form at the back; is that correct?

4    A    Yes.

5    Q    Did it adopt all of the terms and

6    conditions in the proposal?

7    A    Yes.

8    Q    The contract included an enhanced

9    property condition evaluation?

10    A    Yes.

11    Q    And, again, with regards to

12    paragraph 8, page 22 of what is now defined

13    as the contract, looking at the acceptance

14    and authorization page, is there a page where

15    Berwind would have indicated if it wanted

16    that extra liability coverage?  A block to

17    check off, or a spot to indicate that they

18    want that?

19    A    I don't see anything here.  I'm not

20    aware of what the process is in client

21    services for that.

22    Q    So if Berwind had intended to or

23    wanted to, how would they have indicated

78

1    that?

2         A    I can't answer that question.

3         Q    Is there anyone at EMG who can?

4         A    An account manager or a regional

5    vice president.

6         Q    Okay.  And at the time that was

7    Barbara Wojcik.

8         A    Wojcik.

9         Q    Or Mr. Dillis.

10        A    Yes.

11             MS. UPTON:  Off the record for a

12    second.

13                  (Off the record)

14             BY MS. UPTON:

15        Q    Looking again at the contract,

16    earlier you had mentioned to me that there is

17    a non-enhanced property evaluation; is that

18    correct?

19        A    Yes.

20        Q    And this was an enhanced property

21    condition evaluation.

22        A    Yes.

23        Q    Does the liability provision exist

80

1    modified based on the client's needs or is

2    this the standard enhanced property condition

3    evaluation that EMG does for every enhanced

4    property condition evaluation?

5        A    There's a template for our services

6    and then it gets modified based on our

7    client's specific requirement.

8        Q    Going back to deciding who would

9    perform a property condition evaluation,

10   could you tell me what factors were

11   considered in terms of sending Sandra Terepka

12   to work on this particular property condition

13   evaluation?

14       A    Not specifically.  Not having

15   worked on this project, I can't.  I can't,

16   no.

17       Q    Is there anybody at EMG who can?

18       A    Again, it would be the team,

19   meaning the regional vice president, the

20   account manager, the field manager and the

21   technical relationship manager which would

22   all make that determination based on the

23   requirements of the client.

82

1       A    Mike Collins.

2       Q    So he was the technical manager.

3  I've also seen him identified, correct me if

4  I'm mistaken, as the program manager?

5       A    For equity services, yes.

6       Q    Are those two separate jobs?

7       A    No.  His job as program manager

8  would also, and I'm not sure if it's exactly

9  program manager, would include working on

10 projects and with clients as well.

11      Q    And do you know who was the field

12 manager at the time this contract was entered

13 into?

14      A    No, I don't.

15      Q    Is there a way to determine who

16 that was?

17           (Pause to review documents)

18           THE DEPONENT:  Not from the

19 paperwork that I have here.

20           BY MS. UPTON:

21      Q    Is there any way to determine from

22 something that may be in EMG's files?

23      A    You could probably find out who was

1    managing the division at the time, yes.

2            MS. UPTON:  I would like to see if

3    we can find out who that was.

4            MR. BOLOTIN:  When we take a break,

5    we'll make an effort to do that.

6            BY MS. UPTON:  It needn't be done

7    today.

8       Q    So if I understand you correctly,

9    Barbara Wojcik, Michael Collins and the field

10   manager at the time would have been the team

11   who made the determination which person to

12   assign to this contract; is that correct?

13      A    Yes.

14      Q    Okay.  And do you know whether her

15   degree in mechanical engineering was a factor

16   in her being chosen?

17      A    Yes, based on some piece of

18   paperwork in here.

19      Q    And can you show me what that piece

20   of paper was that referenced sending a

21   mechanical engineer?

22            (Pause to review documents)

23            THE DEPONENT:  On the marketing

1    A    Yes.

2    Q    Okay.

3    MR. BOLOTIN:  Are you sure of that?

4    I'm just asking if you're sure whether or not

5    that's Barbara Wojcik filling that out, if

6    you know.

7    THE DEPONENT:  The process is that

8    the account manager would fill this out, but

9    there's a chance that a RVP would fill this

10   out and send it in to our field management

11   position.

12   BY MS. UPTON:

13   Q    Do you know whether sending a

14   mechanical engineer was a contract

15   requirement?  That is to say that a client

16   states, I want a mechanical engineer to go

17   out, or does the client indicate they would

18   like an MEP analysis done?

19   A    I can't speak to that.

20   Q    Would Barbara Wojcik be able to

21   speak to that?

22   A    She may be able to.

23   Q    Would Michael Collins be able to

1      Q      Do you know whether prior to 1999

2   she had ever performed a property condition

3   evaluation involving a parking garage

4   structure similar to the one on the Newton

5   property?  And by that I mean a cast in place

6   concrete parking garage.

7      A      I don't know that.

8      Q      Is there anyone at EMG who would?

9      A      She may.

10     Q      She may?

11     A      Yes.   They do a lot of assessments

12  so she probably would have a better

13  recollection than anyone else.

14     Q      Is there anybody other than Ms.

15  Terepka?

16     A      That would know whether she had?

17  Not offhand without doing the research that I

18  talked about earlier.

19     Q      Do you know how many property

20  condition evaluations she's performed?

21     A      No, not offhand.

22     Q      Is there a way to determine that?

23     A      We could go into our databases and

91

1    search for the number of assessments that

2    she's performed.

3            MS. UPTON:  We're going to request

4    that that be done because that was part of

5    the 30(b)(6).

6            MR. BOLOTIN:  Again, there's no

7    obligation for them to start doing additional

8    research.  You have an individual who's

9    available to identify what work Ms. Terepka

10   did, that's Ms. Terepka, and she is being

11   produced.

12           So before insisting that someone

13   who has less ability to answer a question  be

14   obligated to do so, why don't we complete Ms.

15   Terepka's deposition and find out.

16           MS. UPTON:  Well, we can.  But

17   there have been no objections to the subpoena

18   and to the topics listed in the subpoena.

19   This gentleman has been produced as the

20   witness for the corporation.  These are

21   topics that we deemed to be relevant.  To the

22   extent you want to object to them in court,

23   that's fine.

1          But I'm saying on the record at the

2    moment that we are looking for a corporate

3    disclosure for how many projects that she has

4    done for this corporation of this nature,

5    this type of project.

6          I'll be happy to ask Ms. Terepka,

7    but I am also looking for a corporate

8    representation to the extent she can't

9    remember then the corporation should be able

10   to report on how many she has done for this

11   corporation.

12          MR. BOLOTIN: If you wish to send

13   an interrogatory, I'm happy to have the

14   corporation to do the work. But I don't

15   believe that the appropriate forum for this

16   is to say that a 30(b)(6) representative is

17   required to do that.

18          MS. UPTON: Well, you may not

19   believe it's appropriate but you didn't

20   object to the subpoena.

21          MR. BOLOTIN: Whether I objected to

22   the subpoena or not, I'm producing a witness

23   who's able to speak as best as anyone can

1    without doing specific research.  And there's

2    no requirement --

3         MS. UPTON:  No, you're wrong.  The

4    case law does require them to --

5         MR. BOLOTIN:  To have reasonable

6    basis for responding.

7         MS. UPTON:  No, to actually do the

8    research.  And I will be happy when we get

9    back to Boston to fax you over the case law

10   that requires them to do sufficient research

11   to answer the questions.  So I'm on the

12   record that I am seeking this information.

13        I'll be happy to ask Ms. Terepka,

14   but I would like a corporate representation

15   for how many projects Ms. Terepka has done

16   for this corporation of this specific type.

17        I'm not asking for everything that

18   she's ever done, I'm asking for direct

19   history prior to working on this project,

20   which I'm entitled to.  It's not

21   objectionable.  It is totally relevant.

22        MR. BOLOTIN:  Now I'm really not

23   sure what you're asking for.  I believe that

112

1    A    We could most likely find that out.

2    Q    I would like to find that out, if

3    possible.

4         And with regard to the

5    environmental site assessment, was the person

6    who performed that also responding to the

7    same team of Barbara Wojcik, Michael Collins

8    and the field manager?

9    A    Yes.

10   Q    Okay.  Who made the determination

11   that Mr. Collins would be the project manager

12   or technical manager?

13   A    Could you clarify?  For this

14   project?

15   Q    For this project, yes.

16   A    I can't answer that without having

17   been directly involved.

18   Q    Is there someone at EMG who can

19   testify as to how he became involved in the

20   project, other than Mr. Collins?

21   A    Not that I know of offhand.

22   Q    Did Matt Dillis respond to a

23   supervisor who would have been his immediate

113

1   supervisor?

2        A    He would have had a manager yes, a

3   sales manager.

4        Q    Do you know who that was in 1999?

5        A    I don't know offhand.

6        Q    Can we find out who that was?

7        A    Yes, I'm sure we can find that out.

8        Q    I'd like to find out who that was

9   at the time.

10           And would that manager have

11   maintained any files that had to do with this

12   project or would he have reviewed any files

13   that had to do with this project?

14       A    All files that had to do with this

15   project, again, would have been in the

16   contract file from a sales perspective.

17       Q    But at the time it was taking place

18   would he have reviewed the file at the time?

19       A    I can't answer that.

20       Q    Again, I'd like to find out who

21   Matt Dillis's supervisor was at the time.

22           Do you know what factors would have

23   been considered in deciding whether to assign

114

1    Mr. Collins to this project?

2        A    He would have been potentially the

3    manager of the equity services I think we

4    mentioned earlier, program manager.  So that

5    would be one reason why he would be involved

6    on this project.

7        Q    Do you know if he has an

8    engineering degree?

9        A    I believe he's an architect.

10       Q    So a project manager can be either

11    an architect or an engineer but would not

12    need to be both?

13       A    Correct.

14       Q    Had he worked at EMG as a project

15    manager prior to becoming a program

16    supervisor?

17       A    I can't answer that.  I don't know.

18       Q    Do you know whether he ever

19    performed property condition evaluations for

20    EMG?

21       A    I don't know that answer either.

22       Q    What is his position now?

23       A    He is technical director of project

118

1    correct?

2        A    No, that's the area on this

3    document, yes.

4        Q    Okay.  Prior to conducting the

5    property condition evaluation did EMG take

6    any other steps to determine whether there

7    were any deficiencies in the property?

8        A    I wasn't involved in the project.

9        Q    Is there any way to find out?  Is

10   there anyone at EMG who would know?

11       A    I would say Sandra or Mike.

12       Q    Does the pre-survey enquire in any

13   way as to whether the owner had obtained

14   proposals to perform any repairs or

15   replacement work?

16       A    It states here, is any part of the

17   property under construction.

18       Q    And the answer is no?

19       A    Correct.

20       Q    But it doesn't enquire about any

21   recent repairs?

22       A    Not from what I see here.

23           MR. BOLOTIN:  Do you want to look

123

1              THE DEPONENT:  I have a question.

2      What time do you think we should take a break

3      for lunch?

4              MS. UPTON:  One o'clock.  Do you

5      want to break now?

6              MR. BOLOTIN:  When you hit a

7      natural stopping point.

8              MS. UPTON:  If you're ready to

9      break --

10              THE DEPONENT:  No, it's fine.

11              BY MS. UPTON:  I just have a couple

12      more and that would be a good place to break.

13      Q      Looking at Exhibit 8, with regard

14      to the property questionnaire, is there any

15      enquiry as to whether the property has been

16      inspected that's to be identified sometime in

17      the prior three years or so?

18      A      I don't see anything on this form.

19      Q      And prior to conducting the

20      property condition evaluation, did EMG take

21      any other steps to determine whether the

22      building had been inspected sometime in the

23      prior three years?

1          A      I don't know whether they did or

2     not.

3          Q      Is there any way to determine that?

4          A      If we were provided reports, and

5     that's something that we ask for in the

6     contract and also during our interview

7     process, and they would have been listed in

8     the report.

9               MS. UPTON:  This is actually an

10    okay place to stop before we get into the

11    document checklist.

12                    (Off the record)

13               BY MS. UPTON:

14         Q      When we left off I was just about

15    to ask you to take a look at what's been

16    marked as Exhibit 8, I believe, the property

17    condition assessment document and information

18    checklist.

19               MR. BOLOTIN:  It's Exhibit 9.

20               BY MS. UPTON:  Is that Exhibit 9?

21    I apologize.

22         Q      And this is the form I believe you

23    indicated gets sent to the client upon the

149

1    Q    Would EMG expect an evaluator to

2    make notation of the slab finish?

3    A    The general condition.

4    Q    And what do you mean by general

5    condition?

6    A    What they're observing on a general

7    basis throughout the space that they're

8    walking through.

9    Q    I'm still hoping for a little more

10   clarification.  My understanding is from your

11   prior testimony that in this particular

12   instance it is your understanding that Ms.

13   Terepka walked the entire garage, unlike the

14   principal building where she did --

15   A    Tenant spaces.

16   Q    The tenant spaces.

17   A    If there were.  It's kind of a

18   representative sampling.

19   Q    Representative sampling.  Thank

20   you.

21        In this particular instance she was

22   able to walk the garage, right?

23   A    I don't know.  I wasn't there to

1    know if she walked the entire garage.

2         Q    But with regard to your definition

3    of a general condition, would it be your

4    understanding that the evaluator, in looking

5    at a garage wouldn't look at a representative

6    sampling but would look at the entire floor

7    slab?

8         A    Walk through the floors, yes.

9         Q    And with regard to a review of a

10   garage structure, you've got both a top side

11   and an underside on each given floor.  Would

12   the evaluator be expected to look at the

13   underside of the slab, as well as looking

14   down on the slab, or the ceiling?

15        A    What was exposed, yes.

16        Q    Okay.  Would EMG expect an

17   evaluator to review for the presence and

18   condition of a sealer or waterproofing coat

19   in a garage?

20        A    I don't know specifically whether

21   that would be a specific question that they

22   would ask.

23        Q    Is it something not that they would

166

1    to be made.

2              Is there any indication as to

3    whether Berwind was advised that this

4    estimate was subject to review by the

5    structural engineer?

6         A    I can't answer that.  I don't know

7    that answer.

8         Q    Is there anyone at EMG who would be

9    able to?

10        A    Mike Collins or Ms. Terepka, if

11   they had those conversations.

12        Q    Would concrete delamination be

13   something that EMG would deem to be a

14   significant physical deficiency that should

15   be identified?

16             MR. BOLOTIN:  I'm just going to

17   object, asked and answered.  But go ahead.

18             THE DEPONENT:  Again, project

19   managers, in doing this scope of work, would

20   take their sometimes observation and

21   certainly recommendation and take it to a

22   point and then realize that somebody else

23   should come in and look at this prior to

167

1    giving an owner or potential owner the full

2    scope of what would need to be done based on

3    the issues that were raised in the report, or

4    any report. I'm talking in general.

5           BY MS. UPTON:

6        Q    It's my understanding that you

7    testified earlier that EMG does have

8    structural engineers on staff?

9        A    We do.

10       Q    Do you know whether when Ms.

11   Terepka made the recommendation that a

12   structural engineer be retained, whether any

13   mention was made to Berwind that EMG could do

14   the follow on work?

15       A    Certainly in the report it was.

16   I'm not aware of conversations because I

17   wasn't involved in the project at the time.

18       Q    Do you know whether a structural

19   engineer from EMG reviewed the report before

20   it was signed?

21       A    I don't know that.

22       Q    Is there anyone at EMG who would

23   know that?

171

1    supervisor to make sure that the report is

2    internally consistent?

3         A    The program supervisor would look

4    at the report for consistency and any

5    information that he may have or questions he

6    may have of the project manager. That's part

7    of the report review.

8         Q    And if he has any questions, does

9    he make handwritten notations on the report

10   and give that back to the evaluator with the

11   questions, or is there an email exchange or

12   is it done over the phone?

13        A    It could be multiple. It could be

14   all three, or just a phone conversation or an

15   email, like you said, any one of those.

16        Q    Looking again at what's been marked

17   as, I believe Exhibit 10, in the bottom email

18   from Matt Dillis to Ms. Wojcik on March 2nd

19   the last line says, "Please review the

20   proposal CAR for the Melrose Hotel for any

21   questions on scope, reliance language and

22   production instructions."

23             First of all, you told me before

172

1        what CAR refers to but could you repeat it?

2            A      Yes.   Customer action request.

3            Q      And could you tell me what that is?

4            A      That's a document that is prepared,

5        that comes out in multiple forms, which we

6        have lots of copies in these documents, which

7        have all the specifics about the property,

8        the client, the reason for the assessment,

9        the scope, the protocol, property specific

10       information dates, all of the information

11       that we need to start processing the reports

12       through the system.

13           Q      And do you know what the scope of

14       the Melrose Hotel assignment was?

15           A      I don't know specifically.

16           Q      Who at EMG would know that?

17           A      We'd have to go back and research

18       and look.

19           Q      Okay.  I would like to find out who

20       that is.

21               MR. BOLOTIN:  We can certainly see

22       if we can obtain a copy of the proposal and

23       CAR for the Melrose Hotel.

175

1     Q     Then looking at the mail that is

2  right above that from Stefanie Moore to Matt

3  Dillis and Barbara Wojcik, she writes about

4  halfway across the sentence, "This is an

5  enhanced property condition evaluation.  It

6  should also be referred as such throughout

7  the proposal, especially in the greeting

8  paragraph, notation and on the acceptance and

9  authorization page."

10          Did I read that correctly?

11    A     Yes.

12    Q     Can you tell me what the

13  significance of Ms. Moore's statement is?

14    A     I can't specifically say why she

15  sent this, but she was telling Barb to ensure

16  that we make reference to the enhanced

17  property condition evaluation in all the

18  locations where we reference a property

19  condition evaluation so we're consistent in

20  the proposal.

21    Q     And would I be correct in

22  interpreting that to mean this is going to be

23  an enhanced PCE, as opposed to the standard

1       A       Yes.

2       Q       In 1999 at the time that the

3   contract was entered into, did EMG have on

4   its staff someone who was, I don't want to

5   say an expert, but somebody who specialized

6   in assessments of garages or other concrete

7   structures of that kind?

8       A       I don't know.  I can't answer that

9   question.

10      Q       Is there somebody at EMG who could?

11      A       I'm not sure if there is or not.

12              MS. UPTON:  If we can find out if

13  they had somebody in 1999 who is familiar

14  with the assessment of garages.

15              MR. BOLOTIN:  I will find out if

16  there is somebody who can even answer that

17  question necessarily without going through

18  the resumes of every person who happened to

19  be hired.

20              Again, as we pointed out, this is a

21  national corporation with a lot of people so

22  it's not a simple matter of just clicking

23  into a database.  But I will check on the see

180

1   if there's someone who knows that.

2          BY MS. UPTON:

3      Q     Along the same lines, if you know

4   whether in 1999 there was somebody who was

5   retained for the purpose of or was

6   particularly proficient in the analysis of

7   concrete protection, reinforcement,

8   remediation?

9      A     Retained as an employee or retained

10  as a sub-consultant?

11     Q     Retained as an employee. Did EMG

12  have somebody on staff?

13     A     I don't know.

14     Q     Okay. If we could find that out.

15          Looking at these prior contracts,

16  is there any way to determine the type of

17  evaluation that was done?

18     A     Could you clarify?

19     Q     Sure. with regard to the contracts

20  that are listed on Exhibit A that were

21  performed for Berwind, is there any way to

22  determine whether these were property

23  condition evaluations or whether they were

1    contracts.   When we work with a client the

2    scope of work is what changes throughout the

3    process.

4              But the terms and conditions, and

5    reliance language and production instructions

6    are typically standard with a client when we

7    perform multiple projects for them.

8         Q    Do you know why the Melrose Hotel

9    is specified with regard to this contract, as

10   opposed to any of the other contracts listed

11   in Exhibit A?

12        A    No, I don't.

13        Q    Okay.   Is there anyone at EMG who

14   would?

15        A    I'm not sure who worked on that

16   proposal to know.   Certainly the staff that

17   worked on this project may know why that was

18   referenced.

19        Q    With regard to the list of

20   contracts that has been marked as Exhibit A,

21   do you know whether any of those contracts

22   between Berwind and EMG contain the

23   limitation of liability provision that's at