United States District Court

District of Massachusetts

Case No. 04-11411-NMG


Berwind Property Group, Inc. and
Newton Investors Limited Partnership

v.

Environmental Management Group, Inc.


May 20, 2005

Expert Witness Report of

Paul L. Kelley, P.E.
Simpson Gumpertz & Heger Inc.
41 Seyon Street
Building #1, Suite 500
Waltham, MA  02453
(781) 907-9000

## INTRODUCTION

According to the Complaint filed in the United States District Court, District of Massachusetts, on May 28, 2004, by attorneys for the Plaintiffs Berwind Property Group, Inc. and Newton Investors Limited Partnership, the Complaint arises out of a contract between Plaintiff Berwind Property Group, Inc. and Defendant Environmental Management Group, Inc. d/b/a EMG, pursuant to which EMG was to perform a property condition evaluation of certain improvements to real property in Newton, Massachusetts. The plaintiffs assert that EMG knowingly and willfully misrepresented the scope of work it would perform and the qualifications of the person who would perform the work at the time it induced Berwind to enter into the Contract, that EMG and its personnel were grossly negligent in the evaluation of the property, and that the plaintiffs have incurred substantial costs and expenses in excess of what would have been incurred if EMG had performed the services within the industry-accepted due diligence standard.

## ASSIGNMENT

Simpson, Gumpertz & Heger Inc. was retained by the law firm of Hinckley, Allen & Snyder LLP and the plaintiffs to provide consultation and to assist with analysis of the property that is the subject of this action, as they shall request, with regard to the above referenced case. Simpson, Gumpertz & Heger Inc. will also be prepared to provide testimony at deposition and trial regarding the analysis performed and the conclusions reached should that be requested. Simpson, Gumpertz & Heger Inc. was asked to analyze the experience of EMG's personnel who conducted the property condition evaluation, to analyze the procedure by which EMG performed the property condition evaluation, and to analyze the report provided by EMG reflective of the property condition evaluation performed. Simpson, Gumpertz & Heger Inc. was also asked to quantify the total losses incurred by the plaintiffs as a result of EMG's failure to perform within the industry-accepted due diligence standard.

Simpson, Gumpertz & Heger Inc., their shareholders, directors, and employees are independent of the parties to this litigation. Plaintiffs Berwind Property Group, Inc. and Newton Investors Limited Partnership are responsible for payment of our fees. Fees for our services are based upon the actual time expended on the engagement at the standard hourly rates for the individual assigned. Paul L. Kelley, the engineer, providing this analysis is being compensated at an hourly rate of $225.00.

## DATA AND OTHER INFORMATION CONSIDERED AND WORK PERFORMED

In preparation of my opinions in this matter, I have done the following:

- Reviewed the information about the subject building in the SGH files that was collected during two past assignments on this project, including, without limitation, a 17 August 1993 Structural Engineering Corporation report entitled "Existing Condition Survey Report of Martin Mill Parking Garage, 1210 Washington Street, West Newton, MA" and a 3 February 1997 memorandum from myself to David Lepore reporting on a visual assessment of the garage.

- Visited the building as part of this investigation on at least three occasions.

- Reviewed the 6 April 1999 Environmental Management Group, Inc. ("EMG") report entitled "Property Condition Evaluation of 1220 Washington Street, 1210-1230 Washington Street, Newton, Massachusetts 02165" (the "Report").

- Reviewed the 2 March 1999 agreement between Berwind and EMG.

- Attended the depositions of Patrick Jaroninski and Sandra Hoffman, both of EMG.

- Reviewed the deposition transcript of Michael Collins of EMG.

- Reviewed several property condition assessment protocols, including ASTM 2018-99 and ASTM 2018-01.

- Reviewed several articles and books that address inspection of concrete structures and parking structures.

- Reviewed the 17 November 2004 requisition from CCI, Inc., a concrete repair contractor, to Berwind for structural and waterproofing repairs made to the garage in 2004 with a contract value of $721,068 (which sum does not include engineering costs).

- I understand that the following definitions may apply to this dispute:

  Negligence is "the failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation; and conduct that falls below the legal standard established to protect others against unreasonable risk of harm, except for conduct that is intentionally, wantonly, or willfully disregardful of others' rights."

  Gross negligence is "an act or omission respecting legal duty of an aggravated character, as distinguished from a mere failure to exercise ordinary care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. It is a reckless disregard for the consequences affecting the property of others."

## CONCLUSIONS

The evaluation of the garage structure in EMG's 6 April 1999 Report, prepared by Ms. Hoffman and reviewed by Mr. Collins, omits significant open and obvious indications of structural distress, including serious topside cracking around columns, severe sagging of elevated structural decks, and indications of significant ongoing corrosion of reinforcing steel. The report also fails to note the open and obvious lack of deck membranes, and fails to discuss the importance of deck membranes in garages, despite Hoffman's deposition testimony that she knows, in the absence of waterproofing on a concrete garage slab, "water penetrating the slab can cause corrosion on the reinforcing steel, and the corrosion expands causing concrete to fail, and you have spalled concrete and you can have severe damage to the parking garage, to the structure, if it's not addressed." (Hoffman Dep., pp. 199-200). In fact, nothing in the EMG Report conveys

to the client the seriousness of the structural issues and waterproofing deficiencies present in the garage. None of these conditions required measurement, calculation and/or testing to detect. These conditions were, in fact, observed by SGH and Structural Engineering Corp. personnel prior to 1999 and, I understand, by other engineers (Daigle Engineers Inc./Edwards & Kelcey) since 1999, even when such professionals were not engaged to conduct a general survey of the Premises. This opinion is based on my previous and recent inspections of the garage and my review of the above documents/testimony.

The evaluation of immediate and short-term repair budgets for the garage presented in the 6 April 1999 EMG Report, prepared by Ms. Hoffman and reviewed by Mr. Collins, of $1,500 and $26,000, respectively, were grossly inadequate measures of the maintenance needs of the garage at the time of EMG's 1999 inspection. This inadequate budget deprived Berwind of the knowledge that might have caused it to seek a discount in the purchase price or to walk away from the deal if the adjustment was not made. This opinion is based on my previous and recent personal inspections of the garage, my previous estimates of repair needs at the garage, and the actual costs of necessary repairs implemented in 2004 ($721,068 plus engineering costs) based on SGH repair documents.

Neither the "Other Structures" format used by EMG to present its findings on the garage, nor the general report format used to report EMG's findings on the office buildings are suitable instruments for guiding the assessment and reporting of the special "wear-and-tear" problems common to garage structures, especially in road-salt-intensive New England. The "Other Structures" report format is much less detailed than the general report format. The general report format is, itself, similar to standard property condition assessment protocols for typical enclosed buildings. And while the general report format would still have been inadequate for use in evaluating a garage, use of even a general report format would have, at least, required more in-depth appraisal by Ms. Hoffman, EMG's on-site inspector, including assessment of the levelness or deflection of the garage's structural elements and/or unusual movement of these elements that should have triggered an observation that the garage structure was performing poorly and required special expert assessment. In fact, the 6 April 1999 EMG Report makes note of "no significant signs of deflection or movement" (Report, pg. 19) in the general format report for the office building, while Ms. Hoffman, in her deposition states that she did not even look for slab deflections in the garage (Hoffman Dep., pg. 182). This opinion is based on my experience with similar work, including the development of inspection protocols.

Ms. Hoffman did not have the education, EMG-supplied training, or work experience necessary to make a useful assessment of the condition and repair needs for a parking garage structure in New England. This is based on my review of her work product, my attendance at her deposition, my own professional experience, and my supervision of other professionals engaged in similar work.

It is my opinion that EMG, Ms. Hoffman and Mr. Collins were negligent in their failure to report the structural distress and lack of slab waterproofing in the garage. It is my opinion that Ms. Hoffman was grossly negligent in her failure to look for and make note of open and obvious deficiencies in the garage while knowing that Berwind was going to rely on her report of such deficiencies (or lack thereof) in its decision to purchase the property. It is my opinion that Mr. Collins was grossly negligent in signing off on the

Report while knowing that Ms. Hoffman was not qualified to perform the services, while knowing that no qualified person (i.e., a structural engineer and/or an individual with appropriate structural training in garages) had performed the services, and while knowing that EMG had a qualified person on staff, while also knowing that Berwind was going to rely on this Report in making the determination to purchase the property. It is also my opinion that EMG's assignment of Ms. Hoffman to perform a condition assessment of a reinforced concrete garage in New England, and its failure to provide specialized inspection and reporting protocols for a garage structure, constituted gross negligence. This is based on my review of the depositions of the EMG personnel noted above, the 2 March 1999 agreement between the parties, and the 6 April 1999 Report which as a whole indicate to me that EMG could never have provided a useful property condition assessment (which assessment was to be the partial basis of Berwind's capital planning considered as part of its decision to purchase the property) of the Garage (located as it was in New England) with the personnel and resources it assigned to the project.

We reserve right to supplement this report, as discovery is ongoing and as a Motion to Compel is pending against EMG

**QUALIFICATIONS OF EXPERT**

I am a Principal at Simpson Gumpertz & Heger Inc., a consulting engineering firm, and I have been employed at SGH for over 26 years. I am currently Regional Head of Structural Engineering, which covers the structural engineering work in the Boston, New York City, and Washington D.C. offices. I am a registered engineer in Massachusetts, New Jersey, and Vermont.

I have broad experience in the design, investigation, assessment, and repair of structures especially concrete structures. I am a member of numerous professional organizations, including active professional involvement in the American Concrete Institute and the International Concrete Repair Institute. I am a frequent speaker on a wide variety of engineering topics and have given dozens of presentations to professional groups on concrete, concrete structures, and property condition assessments. I have written extensively on property condition assessment standards and concrete repair and restoration issues. I am very familiar with all elements of industry accepted due-diligence practice. My Curriculum Vitae, which contains a list of papers I have authored, is attached, as is a list of those cases in which I have previously provided expert testimony.

Respect submitted,

*Paul L. Kelley*

Paul I. Kelley, Principal
O:\DATEFILE\2005\Kelley, Paul\PLK60-L.ras.doc