1995 WL 1146824 (Mass.Super.)
Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
Patrick CHIACCHIA et al.,
v.
LYCOTT ENVIRONMENTAL RESEARCH, INC.
No. 912358C.
Sept. 15, 1995.

FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT

*1 Plaintiffs brought the present action alleging breach of contract, negligence, negligent misrepresentation, and violation of G.L.c. 93A stemming from defendant's alleged malpractice in conducting an environmental assessment of a site in Uxbridge, Massachusetts. On plaintiffs' common law claims, the jury returned a verdict in favor of defendant. In deference to the jury's verdict, the court rendered judgment for defendant on the G.L.c. 93A claim.

Plaintiffs filed a motion for reconsideration, on the ground that the court was not constrained to rule in favor of the party that had prevailed on the common law claims but could make an independent assessment and, if warranted, grant judgment on the G.L.c. 93A claim in a manner inconsistent with the jury's verdict. That motion for reconsideration was granted. On reconsideration, the court renders its findings of fact and rulings of law on Count IV of plaintiffs' Amended Complaint as follows.

Findings of Fact

Plaintiff Patrick Chiacchia is a resident of Uxbridge, Massachusetts. At the time of the events at issue in this case, he was in the business of renovating real estate. Plaintiff James Kinkead, formerly of Massachusetts, resides in Florida. At the time of the events at issue in this case, Kinkead owned and operated a computer company and was also engaged in buying, selling and managing real estate. Kinkead is represented in this action by his trustee in bankruptcy, Richard Erricola.

Defendant Lycott Environmental Research, Inc. (Lycott) is a Massachusetts corporation with a usual place of business in Southbridge, Massachusetts. Lycott holds itself out to the public as a professional environmental engineering firm, capable of and experienced in performing environmental site assessments.

In the summer of 1986, one Stanton Bubbins approached plaintiff Chiacchia to solicit his interest in buying the Waucantuck Mill in Uxbridge. At the time, the property was owned and occupied by JSB Yarns, Inc. The property consisted of about 25 acres, improved by a mill building and parking lot. Route 16 (known as Mendon Street) runs through the property. The portion on the south side of Mendon Street had approximately six acres, and included the mill building itself. That portion of the property was zoned for industrial use. On the north side of Route 16, the property consisted of nineteen acres of wooded land, zoned for residential use. The West River runs north to south through both sections of the property, with a dam, pond and canal leading to the mill building.

The Waucantuck Mill is listed on the National Register of Historic Places. The present mill building was built in 1838. It was used for over 150 years for the manufacture and dyeing of yarn and woolen cloth. Prior to the construction of the present mill building, the site had also been used for textile manufacturing, dating back to 1824.

Chiacchia inspected the Waucantuck Mill property and, after consultation with the Massachusetts Housing Finance Agency (MHFA), concluded that the site would be suitable for development of low and moderate income housing under a comprehensive permit (G.L.c. 40B, § 20 et seq.). Chiacchia had had some prior dealings with plaintiff James Kinkead, and he approached Kinkead to be his partner in the purchase and development of the mill property. Kinkead agreed.

*2 Chiacchia and Kinkead approached the Milford Savings Bank for financing of the acquisition and development of the mill property. The bank advised them that, in order to obtain financing, they would have to have the property inspected to determine whether there was oil or hazardous material that might give rise to liability for environmental clean-up (referred to as a "21E" investigation). The bank provided Chiacchia and Kinkead a list of firms that did such work. Defendant Lycott was one of the firms on that list.

Kinkead proceeded to contact Lycott to arrange for the 21E investigation. As was its custom, Lycott sent one of its employees to the site to meet with the client and to walk over the property to be studied. In late November 1986, a Lycott representative met with Chiacchia and Stanton Bubbins at the mill site. Chiacchia showed the Lycott representative around the site, including the wooded area

on the north of Route 16. On that north side, there was an abandoned dirt road leading into the woods that had no apparent destination or purpose. Witnesses described this old track as a "road to nowhere." Lycott's initial walking tour of the mill property began on that dirt road on the north section of the property.

After this walking tour of the entire site, Lycott sent a proposal to Kinkead, offering to evaluate the environmental condition of "the property located on Route 16 in Uxbridge, Massachusetts." Nowhere in that proposal did Lycott limit the scope of its evaluation to the property on the southern side of Route 16.

Kinkead and Chiacchia accepted Lycott's proposal and engaged Lycott to do the environmental assessment of the property. Lycott assigned three of its employees to the site assessment of the mill property. Two of those employees had been hired by Lycott only a month prior to undertaking the Waucantuck Mill assignment. The third employee had been with Lycott for longer than that, but had only been doing 21E investigations for about six months prior to the Waucantuck Mill assignment. At the time it undertook to do the 21E assessment for Chiacchia and Kinkead, Lycott was handling many site assessments and was expanding to respond to the increasing demands for such investigations. [FN1]

> FN1. The real estate market itself was very active in 1986, and lenders' demands for 21E certifications as a prerequisite to financing of industrial properties was driving an increased demand for 21E investigations. The court infers that Lycott, along with other environmental engineering firms, was under considerable time pressure to meet the demands of buyers, sellers and banks eager to get their 21E certifications and proceed with their real estate closings.

On December 1, 1986, Chiacchia and Kinkead entered into a purchase and sale agreement with JSB Yarns, Inc. to purchase the mill property. That agreement (and the necessary financing) was contingent on a satisfactory certificate from a professional environmental consultant certifying that there was no evidence of discharge of hazardous waste or materials that would threaten the community or the environment (known as a "21E certificate").

At Lycott's request, Kinkead furnished Lycott with what information he had about the site. Among other documents sent over to Lycott was a map of the site, prepared for insurance purposes. That map showed the mill building and its immediate environs, with arrows indicating that the land belonging to the insured extended beyond what was specifically depicted in that map. One such arrow pointed to the north across Route 16, with the legend indicating that the insured's property extended further in that direction.

*3 At the time Lycott undertook to do this particular investigation, it was good and customary practice for an environmental engineer to confirm the boundaries of the area to be studied. Lycott currently contends that it was engaged to study only that portion of the mill property lying to the south of Route 16. The evidence is overwhelmingly to the contrary. Nothing in Lycott's proposal to Chiacchia and Kinkead limits the proposed investigation to the southerly side of Route 16. That proposal simply identified the property, correctly, as "located on Route 16 in Uxbridge, Massachusetts." The maps provided to Lycott expressly stated that the extent of the property owned by the insured (i.e., by the seller) extended to the north of Route 16. Moreover, Lycott has not disputed that the initial site visit to review the area to be studied included (and indeed began with) a walk over the parcel to the north of Route 16. Since the entire purpose of that visit was to familiarize Lycott with the area to be studied so that Lycott could formulate its proposal, there could be no question that Chiacchia and Kinkead were buying the entire property and that they expected both the north and south sides to be included in Lycott's 21E certification. Accordingly, the court finds that Lycott knew that its assessment of the mill property for Chiacchia and Kinkead was to include both the north and south parcels. [FN2]

> FN2. To the extent that there was any ambiguity as to the precise boundaries of the site being assessed, it was good and customary practice, and thus incumbent on Lycott, to resolve that ambiguity before issuing any 21E certificate on a site that was not clearly defined. At the very least, the exercise of ordinary diligence on Lycott's part would have

confirmed that its assessment was intended by all parties to cover the entirety of the premises being purchased, including that portion of the mill property that lay to the north of Route 16.

In its proposal to Chiacchia and Kinkead, Lycott had agreed to gather and provide a history of the mill property. Among other things, Lycott specifically agreed to contact the Board of Health and to contact abutters to the property for their knowledge of the past uses and practices at the site.
It was good and customary practice, at the time of this site assessment, for an environmental engineer to investigate the history of the site. Particularly on a site with a known industrial use, gathering information about that use-- the activities, the chemicals and materials used, and the methods of disposing of those chemicals or materials--was especially important. The history of the site was necessary for the engineer to determine where samples should be taken from, what types of sampling would be necessary, and what tests should be performed. A 21E assessment does not consist of digging up the entire property and testing it for every hazardous substance known to mankind. Rather, based on the information gleaned from the site history, it consists of taking samples from the areas most likely to be contaminated and testing for the materials that are most likely to be present. As such, the thoroughness and accuracy of the site history is critical to the reliability of the certification that the environmental engineer ultimately renders. [FN3]

> FN3. A thorough site history would also include gathering information about adjacent properties Knowledge of what chemicals or materials were being or had been disposed of in the immediately surrounding areas would alert the engineer to the possibility that those chemicals or materials might have migrated to the site being studied. Where there is an obvious
>
> method by which substances can migrate onto the property being studied (such as a river), the concern about possible hazardous substances on adjacent property would be correspondingly heightened. As such, even if the area to the north of Route 16 had not been part of the site that Lycott was to assess, an environmental engineer doing a 21E investigation of the mill property to the south of Route 16 would, in the exercise of ordinary prudence, have sought to identify the past uses of the property immediately across the street and upriver.

Despite its contractual agreement to obtain a site history and despite the standard in the industry requiring that a thorough site history be obtained as the first step in a 21E assessment, Lycott did not investigate the history of the Waucantuck Mill site or of the adjacent properties. Lycott did not contact the Board of Health. Lycott did not contact any abutters. Lycott did not check for any information at the Uxbridge Public Library. These and other readily available sources had pertinent information about the Waucantuck Mill, the chemicals that had been used there, and the Mill's past waste disposal practices. [FN4]

> FN4. At no point has Lycott argued that information about the mill's past use was not available to it through the sources regularly used for
>
> conducting a site history. Indeed, this particular site had more historical material more readily available than most industrial sites. From the fact that the Waucantuck Mill was on the National Register of Historic Places, the court infers that there was an abundance of information, available through public sources, to anyone wishing to research the mill's history. Information about its history must have been gathered and documented to get the building on the National Register in the first place. The mill's size and historical importance would certainly have led the Town of Uxbridge to preserve documents and records pertaining to the mill. Beyond archival preservation of records, the mill's significance to the Town over the last century and three quarters would make it part of

the Town's oral history. The court infers that there was extensive information about this particular site, readily available to Lycott through either formal research or through merely asking around the Town, had Lycott sought to uncover it.

**\*4** Despite the fact that the mill's history dating back to its construction in 1838 was readily available from various sources, Lycott's investigation of the site's history was so superficial that it mistakenly thought that the mill had been built in the 1930's. The mill had in fact been built a hundred years earlier in 1838, and the site had been used for textile manufacturing for fourteen years prior to the construction of the present mill building. During the century of textile manufacturing operations at the site that Lycott failed to uncover, the textile industry had used a variety of hazardous chemicals, including dyes and solvents containing heavy metals. Since the potential dangers of such materials were not known or appreciated until relatively recently, it was also common practice during the prior century for manufacturers to dispose of such hazardous materials on site. On an old industrial site, an abandoned road that seems to lead to nowhere is a potential track leading to a former disposal area. The existence of such an abandoned track on a nineteenth century industrial site should be of concern to any environmental engineer assessing that site.

Lycott did not take any soil or water samples from the wooded parcel to the north of Route 16. Lycott did nothing to determine where the abandoned dirt road on the north parcel went to or what its purpose had been. On the southern side of Route 16, Lycott did nothing to test for any of the chemicals commonly used in textile weaving and dyeing. Lycott took no soil or water samples from the mill's dye house. No samples were taken from the sediments in the West River.

Lycott was aware of the fact that a fuel oil spill from a storage tank had been reported back in 1978. Lycott installed three monitoring wells immediately adjacent to that tank and spill. Otherwise, Lycott did no physical testing or sampling from the property.

On January 6, 1987, Lycott sent Chiacchia and Kinkead its report on the mill property. The report gave the results from the three monitoring wells in the vicinity of the 1978 fuel oil spill. The report concluded that "there is no remaining evidence of discharge of hazardous waste or materials on this site which would threaten the community or the environment."

At trial, the president of Lycott, Mr. Lee Lyman, testified that Lycott's investigation had in fact uncovered reports that the property on the north of Route 16 contained an old dump site. He also testified that he knew that Chiacchia and Kinkead were purchasing property on the north side of Route 16. No information about any dump site, or even any reference to it, appears in Lycott's report. Mr. Lyman claimed that this information about a possible contaminated site was not transmitted to Chiacchia or Kinkead because Lycott had only been engaged to study the six acres to the south of Route 16.

The court does not find this testimony credible. The current claim to have in fact uncovered information about dumping on the premises, a claim nowhere corroborated by any of Lycott's documentation, appears to be made to avoid liability for the failure to conduct an adequate site history. The alleged reason for not including this information in the report is wholy unpersuasive. As discussed above, Lycott knew or at least should have known that it was to conduct a 21E investigation on the entire property that it had been shown in its initial site visit. Regardless of whether Lycott correctly understood the scope of its assignment, Lycott knew that Chiacchia and Kinkead were purchasing the land on the north side of Route 16. If Lycott had uncovered information that a client was about to purchase land that had a dump site on it, Lycott would at least have passed the information on to the client and would have taken pains to point out that the 21E certification being rendered did *not* include any representation as to the condition of that potentially contaminated portion of the property being purchased. Lycott did neither. It did not pass on the information it now says it had, and it did not do anything to clarify that its certification was limited to the six acres to the south of Route 16. The court finds it far more probable that Lycott simply did not receive any information about dumping, as Lycott did not do the site history that would have alerted it to the mill's disposal practices. [FN5]

> FN5. Of course, if Mr. Lyman's version were believed, it avails Lycott nothing. If Lycott had this information at the time, its conduct in not telling the client, not specifying for the client that the certification it was giving did not include that additional portion of the

property the client was purchasing, and not at least clarifying whether the client intended it to investigate that other portion of the property would amount to gross negligence.

*5 Lycott argued at trial that Chiacchia and Kinkead knew or should have known that the certification in the report pertained only to the southern section of the property, not to the portion north of Route 16. The evidence does not support such a conclusion, and indeed is overwhelmingly to the contrary. Lycott first argues that since Chiacchia and Kinkead knew that the only monitoring wells dug were on the southern portion, they knew there had been no physical testing on the northern parcel. While it is true that plaintiffs knew the locations of the test wells on the southern parcel, that did not indicate and would not reasonably indicate that the certification applied only to the areas that were physically tested. As described above, the environmental engineer determines from visual inspection of the surface and from site history what areas of the property need physical testing in order to render an opinion as to its environmental condition. A Lycott representative had walked the northern section with Chiacchia at the outset of the project. Chiacchia and Kinkead were entitled to assume that Lycott had done the investigation of site history as promised. Whether that surface inspection and site history warranted physical testing on the northern portion of the property, or on any other particular location, was left up to Lycott in its expert judgment.

On the southern side of the property, which Lycott agrees was the subject of its certification, Lycott had not done physical testing over the entire six acres. Its three wells and samples came from only a single area near the 1978 fuel oil spill. Lycott does not suggest that its certification applies only to the precise area where those wells were dug. Rather, its certification inherently opines that, in its judgment, those were the only wells that needed to be dug to render an opinion as to the environmental condition of at least those six acres to the south of Route 16. The same should be true with respect to the northern parcel. To Chiacchia and Kinkead, the fact that there were no test wells dug to the north of Route 16 merely meant that Lycott, in its expert judgment, had found no reason to suspect contamination on that portion of the property and no reason to test it further. It did not mean that the northern parcel was not covered in the 21E opinion rendered by Lycott.

Lycott next argues that the written report itself should have alerted Chiacchia and Kinkead that the certification pertained only to the southern portion. Nothing in the written report suggests such a limitation on the scope of Lycott's certification.

The report states that the site is "located on the southeast side of Mendon Street, and is to the northwest of the West River Road/Mendon Street intersection." The reference to "southeast side of Mendon Street" would accurately describe the six-acre portion of the property on which the mill building sits. The reference to "northwest of the West River Road/Mendon Street intersection" does not describe any portion of the property in question, either as alleged by Lycott or by plaintiffs. At trial, Lycott conceded that the reference to "northwest" was a typographical error. If that typographical error were corrected to read "northeast of the West River Road/Mendon Street intersection," it could describe the location of the wooded nineteen-acre portion lying north of Route 16. At trial, Lycott contended that it should be corrected to read "southwest," which could correspond to the six-acre parcel south of Route 16. The correction of the typographical error that Lycott is now supplying was not provided to Chiacchia or Kinkead at any earlier time. The report as sent out indicated that the property being studied included something lying to the "north" of Route 16 (Mendon Street). While a careful reading of the property description could have alerted someone to the fact that the "northwest" reference was inaccurate, there was nothing in the report to suggest that the error would not be corrected to read "northeast," a direction that corresponded to Chiacchia's and Kinkead's original understanding of what was being studied.

*6 The report contains no map showing the actual boundaries of the property that had been studied. [FN6] The report does contain a map showing the locations of the three monitoring wells, but that map does not purport to depict the geographic boundaries of the property itself. There is a map showing a larger portion of Uxbridge with a circle to depict generally the location of the site within the town, but that circle does not purport to be the boundaries of the site itself. Thus, there was nothing in the report itself that alerted, or that should have alerted, Chiacchia or Kinkead to any possibility that Lycott had investigated anything less than the entire mill property that they were purchasing. [FN7]

> FN6. This s not surprising, as Lycott had never ascertained the boundaries.

> FN7. Kinkead himself did not read the report other than to flip through it and get to the "bottom line" certification that the property was free of contamination. Since there was nothing in the report, even on a careful reading, that would have changed Kinkead's understanding of the scope of the study, there is no arguable significance to his failure to read the report in its entirety.

At the time they received the report, Chiacchia and Kinkead reasonably believed that it pertained to the entire premises. The entire premises had been shown to Lycott on Lycott's initial visit to the site. Nothing that they had said to Lycott, and no document that they had sent to Lycott, since that first visit had instructed or even suggested to Lycott that the area to be studied was something less than the entire parcel that they had walked over. They were buying the entire mill property, there had never been any discussion of buying less than the entire mill property, and everyone understood that the bank itself would need a 21E certification for the entirety of the premises being purchased. Chiacchia sent copies of Lycott's report to the bank and to his attorney. In reliance on the certification in that report, and reasonably believing that it applied to the entirety of the property they were purchasing, Chiacchia and Kinkead proceeded to a closing on the mill property. On January 30, 1987, Chiacchia and Kinkead, as Trustees of the Woolen Mill Restoration Trust, took title to the Waucantuck Mill property. The price was $425,000. To finance the purchase and the initial development work, Chiacchia and Kinkead borrowed $600,000 from the bank, secured by a first mortgage on the property and personally guaranteed by Chiacchia and Kinkead.

After acquiring the mill property, Chiacchia and Kinkead entered into a contract with the Rosenthal Group, Ltd., a corporation with considerable experience in development of multi-family affordable housing. Under that agreement, the Rosenthal Group would purchase the mill property from Chiacchia and Kinkead, subject to obtaining a comprehensive permit and financing from MHFA. Chiacchia and Kinkead, now backed by the Rosenthal Group, proceeded with their applications for a comprehensive permit.

During the spring and summer of 1988, the Town of Uxbridge held public hearings on the permit application for the development of the mill property as multi-family affordable housing. Many Uxbridge residents opposed the project, and the permit application faced vociferous opposition from many townspeople. Under the developer's plan presented to the Town, much of the housing development was to be constructed on the property to the north of Route 16. At one of the public hearings in late May 1988, a town resident who lived across the street from the mill property voiced his objections to the project. Among other things, he questioned how the development could proceed on the north side, as he alleged that there was an abandoned dump site at that location.

*7 At the time, neither Chiacchia nor Kinkead took this accusation seriously. They had their 21E certification from Lycott telling them that the property was free of contamination. They interpreted the neighbor's statement as a wild, uninformed accusation intended to block the development of affordable housing in the neighborhood. As such, they simply added this item to a growing list of things that would need to be refuted in order to obtain their permit.

With hearings still underway, Chiacchia and Lycott remained optimistic that a permit would eventually be obtained. Anticipating the eventual conveyance to the Rosenthal Group, Chiacchia and Kinkead contacted Lycott in the summer of 1988 asking Lycott to do an updated 21E report that Rosenthal would need. [FN8] At the same time, Kinkead asked Lycott to investigate the alleged dump site on the north parcel for the purpose of proving to the Uxbridge authorities that the neighbor's accusations were untrue. [FN9] Lycott again visited the site, walked the area, and sent Kinkead a proposal on August 3, 1988.

> FN8. It was standard practice for institutional lenders to require an up to date 21E certification on the property being purchased. Lycott's 21E certificate dating from January 1987 would not be sufficient for a conveyance to Rosenthal in late 1988 or early 1989.

> FN9. Lycott argues that plaintiffs' ordering the updated 21E study and the specific work on the north parcel signifies that plaintiffs understood that the original 21E report did not cover the north parcel. That is not what the ordering of these further studies indicates. The specific requests for study of the north parcel were made so as to gather the physical evidence necessary to refute what Chiacchia and Kinkead thought were spurious accusations of contamination. Chiacchia and Kinkead knew that Lycott had not dug any wells or test pits on the north parcel in its original assessment of the property. They reasonably believed that Lycott had not done so because Lycott had determined, in the application of its expertise, that such physical testing was not necessary to certify the
>
> premises as containing no hazardous materials. Once the accusations about the dump site were raised, Chiacchia and Kinkead wanted to be armed with test results from the alleged dump site. Asking for such testing does not signify that Chiacchia and Kinkead "knew" that the north parcel had not even been included in Lycott's earlier opinion.

Before authorizing Lycott to proceed, Kinkead waited to see whether the town authorities or MHFA would require any further information. In September 1988, MHFA informed the Rosenthal Group that the project was eligible for a permit and funding, but that various issues needed to be addressed, including the issue of possible waste dumping on the site. In October 1988, the Uxbridge Zoning Board of Appeals requested additional information on the project, including a report on possible contamination in the "former landfill area."

In October 1988, Chiacchia and Kinkead again asked Lycott for proposals to update its original 21E certification (for purposes of the anticipated sale to the Rosenthal Group) and to investigate the alleged dump site (for purposes of satisfying MHFA and the Uxbridge zoning authorities). Lycott provided a further proposal, and Chiacchia and Kinkead authorized Lycott to proceed.

On November 4, 1988, Lycott dug several test pits in the area that the neighbor claimed was an abandoned dump. As the pits were dug, buried glass and layers of burned material became visible. The neighbor's accusations turned out to be true, and the dirt road to "nowhere" turned out to be the road to the mill's former disposal site. At the site, Lycott tested for volatile organic compounds, but found none. Soil samples were taken for further laboratory analysis.

In early January 1989, Lycott notified Chiacchia by telephone that the laboratory tests showed high concentrations of lead. Lycott advised Chiacchia verbally over the phone that the concentrations were such that the contaminated soil would have to be removed, with the estimated cost at "several hundred thousand dollars." Chiacchia then notified the Rosenthal Group of the lead contamination. As a result, the agreement to sell the mill property to the Rosenthal Group was terminated.

Chiacchia and Kinkead did not have sufficient funds to clean up the lead contamination. Unable either to sell the property or to proceed with the planned development, they were unable to repay the bank loan. Kinkead's debt was discharged in bankruptcy. Chiacchia still owes the $600,000 in principal plus interest.

*8 In 1991, the Massachusetts Department of Environmental Protection (DEP) contacted Lycott about reports of contamination at the Waucantuck Mill site. Lycott provided DEP with its original 21E report, its update of that report, and a report on its examination of the dump site. DEP thereupon placed the Waucantuck Mill property on its "Transition List of Locations to be Investigated." [FN10] Chiacchia, as owner of the property, thus became responsible for satisfying the reporting, assessment, and clean-up requirements of the Massachusetts Contingency Plan. 310 CMR 40.000. Under the Plan, Chiacchia has until August 1997 to submit a report on the property from a licensed site professional. Unless that engineer renders an opinion that the site poses "no significant risk" to human health or the environment, Chiacchia must conduct further assessment and remediation to the point where such an opinion of "no significant risk" can be given.

> FN10. The federal Environmental Protection Agency (EPA) also sent a contractor to the site in May 1991 to make a preliminary assessment. That contractor's report was not prepared until early 1994.

A licensed site professional exercising reasonable care and prudence could not at present conclude that the Waucantuck Mill site poses no significant risk to human health or the environment. Lycott's test pits at the former dump site indicated the presence of lead in concentrations higher than the maximum permitted by DEP. At least one test pit also had higher than permissible concentrations of zinc. Tests performed by Lycott and the EPA indicated the presence of methylene chloride in both soil samples from the dump site and water samples from a river back wash near the dump. [FN11] On the southern section of the property, Lycott's updated report from late 1988 indicated higher than permissible concentrations of cyanide in one monitoring well near the mill building, and another sample tested positive for methylene chloride. An abandoned oil storage tank near the mill building contains an oily residue floating on water, which means that the tank is probably leaking.

> FN11. From those tests, the experts are not certain whether the positive test results for methylene chloride are due to laboratory error, or whether they indicate that industrial solvents were also dumped on the north section of the mill property. Whether this is a laboratory error or evidence of further contamination, it is an additional item that needs to be resolved before a licensed site professional could opine that the site poses "no significant risk."

Beyond the tests that have confirmed the presence of hazardous substances on the property, there are significant sections of the mill property that have not been tested. Areas of the mill building where hazardous chemicals were known to have been used over an extended time period have not yet been tested. The parking lot immediately adjacent to the mill building on the south has not been tested. Soil samples from West River sediments have yet to be taken. A licensed site professional exercising reasonable care and prudence would need to investigate these areas in order to determine whether the site poses a significant risk to the environment, as the potential for contamination in these areas is readily apparent from the site history.

While defendant's expert witness questioned the extent of the additional work that would need to be done at the site, both sides' experts agreed that the site will require at least further assessment in order to satisfy DEP's requirements. Further sampling and monitoring will be required on the north section's dump site, on the parking lot area near the mill building, on other areas adjacent to the mill building where hazardous chemicals were used, and on sediments from the West River (from both the north and south sections).

*9 The full extent of remediation, and its costs, can not be known until after this further assessment is completed. However, the court credits plaintiff's expert that, based on what has been revealed in testing to date and on the information about chemicals used over a long period at the Waucantuck Mill, it is reasonably foreseeable that remediation will include removal and disposal of the lead contaminated soil from the abandoned dump site, removal and disposal of the underground storage tank near the mill and the surrounding soil contaminated by leaks from that tank, and filtering of contaminated ground water on the southern section of the property. The court further credits plaintiffs' experts' estimate that the costs of the additional assessment and remediation will be $1,337,000. [FN12]

> FN12. The expert explained, and the court credits her testimony, that the price of this work back in 1987 and 1988 would have been about the same. Although prices have generally increased, there has also been increased competition in the environmental services industry, which has tended to hold remediation costs down.

A real estate appraiser provided the court with an opinion as to the difference in value between the property in its current contaminated condition and the property in clean condition. The court credits that testimony. Assuming no contamination, the appraiser opined that the fair market value of the mill property was $425,000 (the price at which Chiacchia and Kinkead purchased it). To determine

the value of the property in its actual contaminated condition, the appraiser deducted from that figure the anticipated cost of assessment and remediation, an allowance for loss of use and lost rental during the clean-up, and an allowance for the uncertainty that is inherent in any property that has previously been contaminated. [FN13 ] With these deductions, the fair market value of the property in January 1987 is calculated at a negative number, minus $1,040,000. The difference between that negative number (-$1,040,000) and the positive fair market value of the property in clean condition (+$425,000) is $1,465,000.

> FN13. This final deduction recognizes that, no matter how thorough a remediation has been and no matter how emphatically an engineer opines that the property has been completely cleaned, the historical fact that there has been contamination will, by itself, depress the price that a buyer is willing to pay for the property.

Rulings of Law

To prevail on their claim under G.L.c. 93A, § 11, plaintiffs must establish that they and Lycott were engaged in trade or commerce, that Lycott used or employed an unfair or deceptive act or practice, and that plaintiffs lost money or property as a result.

There is no dispute that Lycott, Chiacchia and Kinkead were all engaged in trade or commerce within the meaning of G.L.c. 93A, § 2(a).

As to whether Lycott employed or used any unfair or deceptive practice, Lycott first argues that the court is bound by the jury's verdict on the underlying common law counts and may not render a verdict on Count IV that would be inconsistent with the jury verdict. The court is not bound by the jury's verdict on the counts for breach of contract, negligence and misrepresentation, and may render a verdict on a G.L.c. 93A claim that is inconsistent with the jury's verdict. See *Velleca v. Uniroyal Tire Co.*, 36 Mass.App.Ct. 247, 251, 630 N.E.2d 297 (1993); *Wyler v. Bonnell Motors, Inc.*, 35 Mass.App.Ct. 563, 567-68, 624 N.E.2d 116 (1993); *Chamberlayne School & Chamberlayne Jr. College v. Banker*, 30 Mass.App.Ct. 346, 354-55, 568 N.E.2d 642 (1991); *Wallace Motor Sales, Inc. v. American Motor Sales Corp.*, 780 F.2d 1049, 1063-69 (1st Cir.1985).

*10 Lycott's misrepresentation to Chiacchia and Kinkead that there was no evidence of hazardous waste or materials on the mill property was negligently made. Indeed, the multiple ways in which Lycott's investigation of the property failed to conform to established standards in the industry lead the court to conclude that Lycott's negligence in this matter amounts to gross negligence. Lycott failed to verify the boundaries of what it was supposed to study, utterly failed to perform the requisite site history, failed to do the range of testing that even just the southern parcel required, and failed to do any investigation of the northern parcel whatsoever. At each step in the investigation that it was supposed to conduct, Lycott acted negligently in ways that only served to compound the negligence it had already committed. When it gave Chiacchia and Kinkead a certification that there was no evidence of hazardous substances on the property, Lycott had no basis for such an opinion. Rendering an expert opinion without any basis for it amounts to gross negligence verging on recklessness.

The misrepresentation made by Lycott was material to the purchase Chiacchia and Kinkead were making. Indeed, Lycott itself knew that no sale would be made unless the property obtained a 21E certification certifying that there was no evidence of hazardous waste on the property. The environmental condition is not simply a matter that arguably affects the sale or some term thereof--it is an obvious "deal breaker" if the property is not clean. Buyers will not take on ownership of the property in the face of known hazardous waste, and lenders will not lend on such property. Had Lycott's work been competently performed, the hazardous wastes on the property would have been identified and disclosed to Chiacchia, Kinkead and the Milford Savings Bank, and that disclosure unquestionably would have led to Chiacchia and Kinkead declining to purchase the property. Chiacchia and Kinkead have suffered monetary damage as a result of Lycott's grossly negligent misrepresentation. They incurred debt of $600,000 to purchase the property that they otherwise would not have incurred. The property is now worthless, and Chiacchia is faced with liability for investigating and remediating the site, a liability that will be on the order of $1.3 million.

Negligent misrepresentation can be an unfair and deceptive act within the meaning of G.L.c. 93A, § 2(a). *Glickman v. Brown*, 21 Mass.App.Ct. 229, 235, 486 N.E.2d 737 (1985); *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 714, 563 N.E.2d 188 (1990); *Sheehy v. Lipton Industries, Inc.*, 24