UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


BERWIND PROPERTY GROUP, INC. and    )
NEWTON INVESTORS LIMITED            )
PARTNERSHIP,                        )
Plaintiffs                          )
                                    )
v.                                  )  DOCKET NO.
                                    )  04-11411-NMG
ENVIRONMENTAL MANAGEMENT GROUP,     )
INC. d/b/a EMG,                     )
Defendant                           )

_____


DEPOSITION OF:


Sandra Terepka Hoffman


The deposition of Sandra Terepka Hoffman was taken

on behalf of the Plaintiffs on Thursday, March 31,

2005, commencing at 9:06 a.m. at DLA Piper Rudnick

Gray Cary US, LLP, 6225 Smith Avenue, Baltimore,

Maryland before Lynne Livingston, a Notary Public.

1    will have a significant impact on its

2    continued operations."

3              Did I read that correctly?

4        A    Yes.

5        Q    And do you recall how you came to

6    learn that that was the primary interest of

7    Berwind Property Group?

8        A    No, I don't recall.  But this is a

9    typical statement for an equity-based

10   report.

11       Q    Okay.  This wasn't something that

12   somebody specifically told you?

13       A    No.  It's common to equity

14   evaluations.

15       Q    How did you initially become

16   involved in the project?

17       A    I don't recall specifically.  But

18   typically it would have been placed on my

19   schedule and I would have been sent

20   information on the property.  And this

21   appears to have been faxed to me.  Some

22   email, but based on what was in the field

23   notes it appears that the CAR was initially

68

1   faxed.

2        Q    Is there anything that would

3   refresh your recollection as to who

4   initially contacted you about the project?

5        A    No.

6        Q    Can you tell me what information

7   was provided to you about the scope of work?

8        A    From the notes in the file I have,

9   a copy of the scope of work was provided to

10  me before the on-site, and what we call a

11  CAR, a customer action request that has

12  information about the property also, and the

13  project.

14       Q    Is what's been marked as Exhibit 4,

15  the first page of that exhibit, was this the

16  first information you would have received?

17       A    No, I don't think I received this.

18       Q    This was not sent to you?

19       A    I don't think so.  It doesn't

20  appear to be, this page.

21       Q    Do you know who prepares these

22  forms which is the first page of Exhibit 4?

23       A    No.

72

1              Do you recognize that handwriting?

2        A     No, that handwriting, the meet John

3    Stewart, that's not mine.  The Design

4    Continuum and Dexter Shoes, that's mine.

5        Q     Okay.  What is that a reference to,

6    if you recall?

7        A     It looks like that's where I'm

8    supposed to meet the site contact.

9        Q     Were Design Continuum and Dexter

10   Shoes --

11       A     I don't know what that has to do

12   with.

13       Q     Okay.  And after receiving this

14   CAR, what did you do next?

15       A     I don't remember.

16       Q     Is there anything that would

17   refresh your recollection as to what you did

18   next?

19       A     No.

20       Q     You don't have any notes as to what

21   you did next?

22       A     No.

23       Q     Did this form give you enough

1  information from EMG before performing the

2  PCE?

3      A      The rest of the information in

4  these field notes and in this package, the

5  questionnaire and document checklist, and it

6  looks like multiple copies.  It looks like

7  it has scope of work, some sort of

8  acceptance and authorization, a physical

9  description of the property.  It looks like

10  an area map.

11      Q      Did you need clarification of any

12  of the information that was contained in the

13  CAR?

14      A      I don't know.

15      Q      Is there anything that would

16  refresh your recollection whether you did?

17          Would you have any notes whether

18  you needed any clarification?

19      A      No, it doesn't looks like I did.

20      Q      Okay.  Are there any notes that

21  would indicate whether you spoke with anyone

22  at EMG before performing the PCE?

23      A      No, there are no notes.

1    Q    Did you take any notes at the time

2    that would indicate whether you spoke with

3    anyone at EMG?

4    A    Not that I know of.

5    Q    It says on the front of the CAR,

6    "Phase I, one day on-site, one day write

7    PCE, two days on-site, two days write."

8         Do you see where it says that?

9    A    Yes.

10   Q    Did you perform the phase I?

11   A    No.

12   Q    Do you know who performed the phase

13   I?

14   A    No.

15   Q    Is there anything that would

16   refresh your recollection as to who

17   performed the phase I?

18   A    No.  It's not on the CAR, no.

19   Q    Did you go to the property with

20   anyone else?

21   A    I don't know.

22   Q    Is there anything that would

23   indicate whether you went to the property

79

1    visit.  I asked for it when I arrived at the

2    site.

3        Q    Okay.  So you had not seen this

4    before you got to the site?

5            MR. BOLOTIN:  Objection.

6            THE DEPONENT:  I had seen this

7    before I went to the site.  But many times I

8    ask for it when I get to the site, so if it

9    was not provided ahead of time, I ask for it

10   when I arrive.  And that is my

11   responsibility.

12           In this case, it appears to have

13   been faxed to me before I ever went.

14           BY MS. UPTON:

15       Q    Prior to going to the property did

16   you take any steps to determine whether

17   there were any structural deficiencies in

18   the building, or other deficiencies in the

19   building?

20       A    I don't know.

21       Q    Is there anything that would

22   refresh your recollection as to whether you

23   did?

1           THE DEPONENT:  Can you restate the

2    question?  Could you state that a full

3    description?  What do you mean by a full

4    description?

5           BY MS. UPTON:

6      Q    Well, that's actually an EMG term.

7    If you look at the contract, which I think

8    has been marked as Exhibit 6.

9           Perhaps I should have you tell me

10   what a full description means since it's an

11   EMG term.

12     A    What's the question again?

13     Q    Sure.  Based on EMG's standards,

14   can a full description of a property be

15   provided in a property condition evaluation

16   without a review of the architectural plans

17   and specifications for the structures that

18   are being evaluated?

19     A    Yes.

20     Q    At any time did you inform Berwind

21   that your review of the plans and

22   specifications did not include a review of

23   the as-built plans?

98

1        A     I don't recall.

2        Q     Is there anything that would

3    refresh your recollection as to whether you

4    informed them?

5        A     No.

6        Q     Going back to what's been marked as

7    Exhibit 8, the property condition document

8    checklist, the checklist indicates that

9    certain documents were not provided in the

10   third column, I believe --

11           MR. BOLOTIN:  I think you're

12   referring to another exhibit.

13           THE DEPONENT:  This one

14   (indicates)?

15           BY MS. UPTON:  Yes, Exhibit 9.

16       Q     Certain documents were not provided

17   to you.  And among those documents were

18   property maintenance records.

19           If you look at the second page, do

20   you see where it lists what's not provided?

21       A     Yes.

22       Q     Did you request, during your tour

23   of the site, the property maintenance

1   records?

2        A    I typically do that.

3        Q    Do you recall if you did it in this

4   instance?

5        A    I don't recall.

6        Q    Do you have any notes that would

7   indicate whether you requested them?

8        A    No.

9        Q    And would you say that a full

10  description of the property could be

11  provided without a review of the property

12  maintenance records?

13       A    Yes.

14       Q    Did you inform Berwind that you

15  were unable to review the property

16  maintenance records?

17       A    I don't recall.

18       Q    Is there anything that would

19  refresh your recollection as to whether you

20  informed them?

21       A    Only in the report.

22       Q    Okay.  Outside of the report?

23       A    No.



1       Q       Going back for a moment, when did

2    you receive the documents that were

3    requested by EMG prior to the PCE?  Did you

4    receive them before going to the site?

5       A       Which documents?

6       Q       The documents that EMG requested

7    pursuant to the property documents, that

8    checklist.

9       A       It appears from these notes that I

10   reviewed them at someone's office during the

11   time I was in Massachusetts for this site

12   visit.

13      Q       Do you recall whether you reviewed

14   them prior to touring the property?

15      A       I don't recall.  No, I do not

16   recall.

17      Q       Is there anything that would

18   refresh your recollection as to when you

19   reviewed the documents?

20      A       No.

21      Q       Were there other documents that you

22   would like to have reviewed prior to

23   performing the property condition evaluation

109

```
 1          BY MS. UPTON:
 2      Q    Did you ever have any contact with
 3  the RVP on this contract?
 4      A    I don't recall.
 5      Q    Is there anything that would
 6  refresh your recollection as to whether you
 7  had any contact with the RVP on this
 8  contract?
 9      A    No.
10      Q    Do you ever have any contact with
11  Barbara Wojcik with regard to this contract?
12      A    I don't recall.
13      Q    Is there anything that would
14  refresh your recollection as to whether you
15  had any contact with Barbara Wojcik?
16      A    Not that I know, but I've gone
17  through all these documents.  I don't
18  remember that name.
19      Q    Do you know who she is?
20      A    No.
21      Q    It is my understanding based on
22  Mr. Jarosinski's testimony yesterday that
23  when a proposal comes in from a client there
```

110

1   is a team assigned to it that would involve

2   an account manager, a technical manager and

3   a field manager, and that Barbara Wojcik was

4   the account manager and Michael Collins was

5   the technical manager.

6          Do you recall who the field manager

7   was on this?

8          A     No.

9          Q     Do you know what a field manager

10  is?

11         A     No.  Titles have changed at EMG

12  over the years.  I'm more familiar with what

13  people do than their exact titles.

14         Q     Okay.  Fair enough.

15         You had communications with Michael

16  Collins with regard to this contract; is

17  that correct?

18         A     I don't recall.

19         Q     Is there anything that would

20  refresh your recollection as to whether you

21  had any communications with Mr. Collins?

22         A     No, not that I saw in the field

23  notes.

111

1        Q        Do you recall speaking with anyone

2    at EMG with regard to this contract?

3        A        No.

4        Q        Is there anything that would

5    refresh your recollection as to whether you

6    had contact with anyone at EMG with regard

7    to this contract?

8        A        Other than what's in the notes, no.

9        Q        And is there anything in the notes

10   that would indicate you had communications

11   with anyone at EMG?

12       A        No, not that I know of.

13       Q        Would you like to take a look and

14   see whether there's any indication that you

15   had communication with anyone at EMG with

16   regard to this contract?

17       A        Okay.

18               (Pause to review documents)

19               THE DEPONENT:    It doesn't look like

20   there is.

21               BY MS. UPTON:

22       Q        Forgive me if I'm repeating myself.

23   You indicated that an enhanced property

115

1        A    In the text of the report I appear

2    to have had discussions with the site

3    contact regarding work that was done, and so

4    there are, I think, more than one reference

5    that would make me think that I did, but I

6    don't have any specific recollection.

7        Q    And other than the report, is there

8    anything that would refresh your

9    recollection as to whether you did request

10   documents?

11       A    No.

12       Q    Looking at what's been marked as

13   Jarosinski Exhibit 4, the first page, there

14   are references to various what appear to be

15   master documents.    There's a report master

16   document, there's a tables master document.

17            Do you see where that reference is?

18       A    Yes.

19       Q    Do you know whether you used those

20   master documents in performing this property

21   condition evaluation?

22       A    No, I don't.

23       Q    Is there anything that would

1    refresh your recollection as to whether you

2    used those master documents?

3         A    No.

4         Q    What was the first thing you did

5    when you got to the property to begin

6    performing the PCE?

7         A    I don't recall.

8         Q    Is there anything that would

9    refresh your recollection as to what the

10    first thing was that you did?

11        A    No.

12        Q    Do you recall whether you met first

13    with the property manager?

14        A    No.

15        Q    Is there anything that would

16    refresh your recollection as to whether you

17    met with the property manager?

18        A    I met with the site contact.

19        Q    For ease of reference, I think

20    we're talking about the same person John --

21        A    John Stewart.   I met with John

22    Stewart.

23        Q    Okay.   And do you recall whether

117

1    you met with John Stewart before you toured

2    the property or after?

3        A    I don't recall.

4        Q    In 1999, did EMG have a standard

5    checklist that was to be used when you were

6    interviewing a person?

7        A    I don't recall.

8        Q    Is there anything that would

9    refresh your recollection as to whether in

10   1999 EMG had a standard checklist of

11   questions to be asked during the course of a

12   property condition evaluation interview?

13       A    Not in this file.

14       Q    Okay.  There isn't anything in this

15   file but is --

16       A    No, not that I know of.

17       Q    There isn't anything of which

18   you're aware?  Okay.

19            When you are performing a PCE, is

20   there a particular person who should be

21   interviewed?

22       A    There is a person who is provided

23   as a site contact.

118

1      Q    Does EMG inform the client as to

2  who the person should be?

3      A    That's my understanding.

4      Q    Okay.  And does EMG advise the

5  client --

6      A    I'm sorry, can we back up?

7      Q    Absolutely.

8      A    Does EMG --

9      Q    Does EMG advise the client as to

10  who the client contact person should be?

11      A    I don't know.  I don't know what

12  advice they give to the client.

13      Q    Does EMG have a protocol as to

14  whether you, the project manager, should

15  interview the site contact before or after

16  touring the property?

17      A    No.

18      Q    Does EMG have a protocol as to

19  whether you should review the documents

20  before or after you tour the property?

21      A    No.

22      Can you rephrase as to the

23  protocol?

123

1    questions that you asked the site contact

2    during a PCE?

3         A    No.

4         Q    Do you have a checklist that you

5    use when you're conducting a PCE?

6         A    Me?

7         Q    Yes.

8         A    Yes.

9         Q    You do have a checklist of things

10   that you use, of questions that you ask

11   during an interview?

12        A    Yes, on some.

13        Q    Did you in 1999?

14        A    Yes.

15        Q    Okay.  Did you use a checklist of

16   questions when you were conducting the

17   interview of the site contact on this

18   contract?

19        A    I don't recall.

20        Q    Is there anything that would

21   refresh your recollection as to whether you

22   used a checklist of questions in 1999?

23        A    No.

124

1    Q    Where would this checklist be?  If

2    you used one in 1999 on this contract, where

3    would it be?

4        A    In the file.

5        Q    So if it's not in the file, would

6    you say that you didn't use one?

7        A    No.

8        Q    You wouldn't?

9        A    I'd say that it's not in the file.

10        Q    Okay.  And you have no recollection

11    of whether you used one or not?

12        A    That's correct.  I have no

13    recollection.

14        Q    When you were completing a PCE, do

15    you provide all of the documents that you

16    have taken notes to EMG corporate when you

17    are completed with the project?

18        A    Yes.

19        Q    Okay.  So if you had used a

20    checklist, would you have provided it to EMG

21    in 1999?

22        A    Yes.

23        Q    But you don't recall whether you

126

1     A     You're asking me if I'm asking

2 questions about the site contact regarding

3 the contract, and I'm answering them as if

4 they were questions posed with regard to the

5 property.

6          I actually never ask questions

7 regarding the contract. That's not in my

8 realm of responsibility. I only ask

9 questions with regard to the property.

10     Q     I appreciate the clarification.

11 You interpreted it correctly, whether you

12 were asking any questions of the site

13 contact with regard to the property in

14 question.

15          I'd like to see if asking the

16 questions refreshes your recollection.

17          Do you recall whether you asked Mr.

18 Stewart, the site contact, about the extent

19 and location of any distress in the property

20 in 1999?

21     A     I don't recall.

22     Q     Is there anything that would

23 refresh your recollection whether you asked

127

1    him about the extent and location of

2    distress in the building in 1999?

3         A    No.

4         Q    And do you recall whether you asked

5    Mr. Stewart whether there was any

6    deterioration in the parking garage in 1999?

7         A    No.

8         Q    Is there anything that would

9    refresh your recollection as to whether you

10   asked Mr. Stewart about any deterioration in

11   the parking garage in 1999?

12        A    Yes.

13        Q    And where would that be?

14        A    In the report.

15        Q    Other than in the report, is there

16   anything that would indicate whether you

17   asked Mr. Stewart about any deterioration in

18   the parking garage?

19        A    No.

20        Q    Can you show me where in the report

21   it indicated you asked Mr. Stewart about

22   deterioration in the parking garage?

23        A    One place is page 35.  No, wait a

128

1    minute, wrong subject.

2            Page 36.  "The project manager

3    reported that there were repairs made to the

4    parking garage prior to current owner's

5    acquisition of the property, but he was not

6    aware of the extent of the repairs."

7        Q    Do you recall whether you asked Mr.

8    Stewart whether he had any documentation

9    that reflected the repairs that were made to

10   the garage?

11       A    I do not recall.

12       Q    Is there anything that would

13   refresh your recollection as to whether you

14   asked him whether he had any documents that

15   reflected the repairs to the garage?

16       A    No.

17       Q    Do you recall asking Mr. Stewart

18   whether there was any leakage in the garage

19   in 1999?

20       A    No.

21       Q    Is there anything that would

22   refresh your recollection as to whether

23   there was any leakage in the garage in 1999?

129

1        A     No.

2        Q     With the exception of the reference

3    on page 36 that we just spoke about, with

4    regard to prior repairs to the parking

5    garage, do you recall whether you asked Mr.

6    Stewart whether there had been any

7    historical deterioration to the parking

8    garage prior to 1999?

9        A     No.

10       Q     Is there anything that would

11   refresh your recollection as to whether you

12   asked Mr. Stewart as to any deterioration

13   prior to 1999?

14              MR. BOLOTIN:    Let's go through the

15   whole report if need be, because I want you

16   to be comfortable and see if there's

17   anything in the report that refreshes your

18   memory.

19              THE DEPONENT:    When she says other

20   than a reference on page 35 and so --

21              MR. BOLOTIN:    The question is, is

22   there anything that would refresh your

23   recollection.    I don't know what could



130

1    refresh your recollection, so if it's in

2    this report, perhaps if there's something

3    else that's not here, we don't know about

4    that.

5             I want you to be comfortable that

6    you've had an opportunity to go through this

7    report and if there's something that

8    refreshes your recollection, you know,

9    looking at this, I must have said something.

10   I want you to have that opportunity.

11            The DEPONENT:  Well, looking at the

12   report I had a discussion with the property

13   manager.  That was on page 35.

14            And your question was?

15            BY MS. UPTON:  I'll repeat it.

16   Q       Other than the reference on page 35

17   of the report, is there anything that would

18   refresh your recollection as to whether you

19   had a conversation with Mr. Stewart about

20   deterioration to the property prior to 1999?

21   A       No.  Is there anything that would

22   refresh my recollection?  No.

23   Q       Do you recall discussing with Mr.

133

1    manager regarding ponding in the garage.

2            This is referring to a drainage

3    system.

4        Q    Do you recall having a conversation

5    with Mr. Stewart in which you asked about

6    whether there were any problems with the

7    waterproofing in the garage prior to 1999?

8        A    No.

9        Q    Is there anything that would

10   refresh your recollection as to whether you

11   had a conversation with Mr. Stewart in which

12   you discussed whether there had been a

13   problem with waterproofing prior to 1999?

14       A    Yes.

15       Q    Yes.  And what is the reference?

16       A    On page 36, same reference.  The

17   property manager reported repairs made to

18   the parking garage, talking about water

19   intrusion.

20       Q    Is there a reference to

21   waterproofing then?

22       A    Not specifically but just a general

23   topic.

1    Q    Okay.

2    A    Specific conversations, I don't

3    recall.

4    Q    But that refreshes your

5    recollection that there was a discussion of

6    waterproofing?

7    A    I don't recall the conversation.

8    Q    My question to you is, is there

9    anything that would refresh your

10   recollection as to whether you had a

11   conversation with Mr. Stewart as to whether

12   there had been a problem with waterproofing

13   prior to 1999, and you said yes.

14            And I said what indicated to you

15   that you had a conversation with Mr. Stewart

16   about waterproofing problems prior to 1999,

17   and you pointed me to page 36.

18            Now, my question for you is, what

19   about that section that you just read to me

20   indicates to you that you had a conversation

21   with Mr. Stewart that indicated that there

22   was a waterproofing problem prior to 1999?

23   A    The described damage in this report



135

1    has to do with water penetration, and I

2    indicate that I had a conversation with

3    property manager and parts of what the

4    property manager reported are stated there.

5    The specifics of the conversation, I do not

6    recall.

7        Q    Is there anything that would

8    refresh your recollection as to whether you

9    had a conversation with Mr. Stewart as to

10   whether there had been any problems with the

11   waterproofing prior to 1999?

12       A    No.

13       Q    Do you recall having a conversation

14   with Mr. Stewart in which you asked if there

15   were any other problems with the parking

16   garage structure prior to 1999?

17       A    No.

18       Q    Is there anything that would

19   refresh your recollection as to whether you

20   had a conversation with Mr. Stewart in which

21   you discussed whether there were any other

22   problems with the parking garage structure

23   prior to 1999?

1      A     No.

2      Q     Do you recall approximately how

3   many hours you spent on the interview?

4      A     No.

5      Q     Is there anything that would

6   refresh your recollection as to how many

7   hours you spent interviewing Mr. Stewart?

8      A     No.

9           MR. BOLOTIN:  Are we getting to a

10  breaking point because we might want to take

11  a lunch break.

12          MS. UPTON:  Yes.

13          MR. BOLOTIN:  If now's a good time.

14          MS. UPTON:  That's fine.

15               (Off the record)

16          BY MS. UPTON:

17     Q     Looking at what's been marked as

18  Exhibit 6, the contract or the signed

19  proposal, on page 20 of that proposal down

20  at the bottom it says that, "An EMG enhanced

21  property condition evaluation is intended to

22  provide a current evaluation of the subject

23  property's general condition in accordance

151

1    with regard to performing this property

2    condition evaluation for Berwind in 1999

3    that there were certain documents that were

4    requested from the site contact; is that

5    correct?

6        A    Yes.

7        Q    And I'd like to go through that

8    list.  I believe it's Exhibit 9.

9            Going through Exhibit 9, with

10   regard to topic number 1, were the documents

11   that are listed in Exhibit 9, item number 1,

12   are those the kind of documents that would

13   have been requested in a 1997 property

14   condition survey?

15       A    Yes.

16       Q    And looking at item number 2, are

17   those documents that would have been

18   requested in a 1997 survey?

19       A    Yes.

20       Q    And looking at Exhibit 9, item 3,

21   are those documents that would have been

22   requested in a 1997 survey?

23       A    Yes.

167

1    to the extent that you know.

2           THE DEPONENT:  I don't know.

3           BY MS. UPTON:

4       Q    Is there anything that would

5    refresh your recollection as to whether EMG

6    required a project manager to use a

7    checklist when performing its visual

8    observations?

9       A    Not that I'm aware of.

10      Q    Do you know if you used a checklist

11   when you were performing your visual

12   observations for the 1999 contract with

13   Berwind?

14      A    I don't recall.

15      Q    Is there anything that would

16   refresh your recollection as to whether you

17   used a checklist of your visual

18   observations?

19      A    Not that I'm aware of.

20      Q    In 1999, do you know if EMG had

21   checklists for visual observations of

22   different structures?

23           MR. BOLOTIN:  Objection.  Answer if

168

1    you know.

2              THE DEPONENT:  I don't know.

3              BY MS. UPTON:

4         Q     Is there anything that would

5    refresh your recollection as to whether

6    there were or not?

7         A     Not that I'm aware of.

8         Q     When you performed the visual

9    inspection of the Newton property did you

10   use any particular methodology in touring

11   the parking garage structure?  And by

12   methodology, did you review it in a grid

13   pattern or any other systematic approach?

14        A     I don't recall.

15        Q     Is there anything that would

16   refresh your recollection as to how you may

17   have toured the property?

18        A     Not that I'm aware of.

19        Q     In 1999, did EMG have any standard

20   methodology that was used by project

21   managers in touring the property?

22              MR. BOLOTIN:  Objection.  You can

23   answer.

1          THE DEPONENT:   Not that I'm aware

2     of.

3          BY MS. UPTON:

4     Q     Can you describe for me what you

5     did when you were touring the property in

6     1999 to perform this evaluation?

7     A     No.

8     Q     Is there anything that would

9     refresh your recollection as to what you did

10    when you were performing this evaluation?

11    A     Not that I'm aware of.

12    Q     Looking at pages 35 and 36 of

13    Exhibit 7, the report, specifically at the

14    top of page 36, first line states, "The

15    framing, walls and decks of the parking

16    structure appeared to be in fair condition.

17    Small areas of spalled concrete and minor

18    rust stains were observed, indicating

19    initial corrosion of the steel reinforcing

20    in ceiling of garage."

21          Did I read that correctly?

22    A     Yes.

23    Q     And can you tell me how you would

1    Q    Going on further in that paragraph

2    it says, "Cleaning and patching the areas of

3    spalled concrete with an epoxy concrete

4    patch is required within the next year."

5         Did I read that correctly?

6    A    Yes.

7    Q    Would cleaning and patching areas

8    of spalled concrete remedy the initial

9    corrosion?

10   A    No.

11   Q    Do you know what would need to be

12   done to remedy that corrosion?

13   A    It depends.

14   Q    Did you make any recommendation as

15   to what should be done to remedy the

16   corrosion?

17   A    No.

18   Q    Did you discuss with Mr. Stewart

19   anything that should be done to remedy the

20   corrosion?

21   A    Not that I recall.

22   Q    Was Mr. Stewart with you when you

23   were actually touring the property?

1      A      From my report, yes.

2      Q      Did anyone else tour the property

3  with you?

4      A      Not that I recall.

5      Q      Is there anything that would

6  refresh your recollection as to whether

7  anyone was with you?

8      A      Not that I'm aware of.

9      Q      Did you indicate in the report how

10  the corrosion might affect the remaining

11  useful life or expected useful life of the

12  garage?

13         (Pause to review documents)

14         THE DEPONENT:  No.

15         BY MS. UPTON:

16      Q      Did you have any conversations with

17  Mr. Stewart as to how the corrosion might

18  affect the remaining useful life or expected

19  useful life of the garage?

20      A      I don't remember.

21      Q      Is there anything that would

22  refresh your recollection as to whether

23  you've had a conversation with Mr. Stewart?

1      A      No, not that I'm aware of.

2      Q      Did you have any conversations with

3   anybody as to how the corrosion might affect

4   the remaining useful life or the expected

5   useful life of the garage?

6      A      I don't recall.

7      Q      Is there anything that would

8   refresh your recollection as to whether

9   you've had such a conversation?

10     A      Not that I'm aware of.

11     Q      Looking at the next paragraph, it

12   says, "The ground level of the parking

13   garage had areas of cracking in the concrete

14   slab."

15            Then it goes on, "Sealing the

16   cracks is considered to be a part of routine

17   maintenance.  No additional action is

18   required."

19            Did I read that correctly?

20     A      You missed a sentence.

21     Q      "The cracks appeared to be tight,

22   and the property manager reported that the

23   condition was stable."

178

1    repair other than routine sealing and

2    maintenance would be required to deal with

3    the cracking that you observed on the ground

4    floor of the garage?

5         A    On the ground floor, no.

6         Q    Did you think that there would be

7    something other than routine sealing and

8    maintenance elsewhere in the garage?

9         A    Yes.

10        Q    Okay.  And what was that?

11        A    I was not in a position to make a

12   statement about that.

13        Q    But you believed that there was?

14        A    Yes.

15        Q    Why do you say you weren't in a

16   position to make a statement?

17        A    I didn't have sufficient

18   information to quantify the repairs that

19   were necessary.

20        Q    Okay.  And did you ask for the

21   information that you needed to make a

22   determination?

23        A    I don't recall.

182

1      Q      But these were all due to water

2    intrusion; is that correct?

3      A      They were various observations that

4    I saw in the parking garage indicating that

5    there could be further problems that I

6    couldn't quantify based on a visual

7    observation.

8      Q      That's not what it says though.  It

9    says that there is, "Significant signs of

10   ponding water, inadequate drainage,

11   efflorescence on the exterior brick, mineral

12   deposits and minor concrete deterioration

13   due to water intrusion."

14           That's what you observed?

15     A      Right.

16     Q      Okay.

17           Did you observe any slab

18   deflections?

19     A      Not that I recall.

20     Q      Did you look for slab deflections?

21     A      Specifically?  No.

22     Q      Have you ever heard of slab

23   deflections expressed as a ratio of span to

184

1   photographs indicate that you looked at both

2   the topside and underside of the slabs in

3   the garage?

4       A    Well, 32 is the bottom side of the

5   deck and 36 is the topside of the deck.

6       Q    I'm sorry.   Number 32 is the

7   underside?

8       A    Underside, looking at it from

9   below, and 36 is looking at it from above.

10  So 37 is from above, and 34 is the ground

11  floor slab.

12      Q    Did you look for cracking around

13  the reinforcing steel grid, garage?

14          MR. BOLOTIN:   Objection.

15          THE DEPONENT:   I don't recall.

16          BY MS. UPTON:

17      Q    Is there anything that would

18  refresh your recollection?

19      A    Not that I'm aware of.

20      Q    Are you familiar with through slab

21  cracks?

22          Do you know what that is?

23      A    Yes.

185

1    Q    Okay.  Did you look for through

2    slab cracks?

3    A    I don't recall with this property.

4    Q    Is there anything that would

5    refresh your recollection as to whether you

6    looked for through slab cracks?

7    A    Not other than the photographs.

8    Q    Well, looking at the photographs,

9    is there anything that indicates whether

10   there was a through slab crack?

11   A    I don't have photographs of two

12   sides of a crack in this particular report.

13   That doesn't mean that I didn't look and see

14   them, they're just not particularly detailed

15   in this.

16   Q    If you had seen a through slab

17   crack, would you make a notation of it?

18   A    A note?  I don't know.

19   Q    Why not?

20   A    If that was the only thing I saw I

21   might have noted that.  In this particular

22   case there was so many things that were

23   happening in that garage that it required

193

1    exterior wall.

2        Q    And is there anything that would

3    refresh your recollection as to whether you

4    noted any prior repairs to either the

5    topside or the underside of the parking

6    garage slabs?

7        A    Not that I'm aware of.

8        Q    Did you look for delamination on

9    the parking garage slabs?

10       A    I do general observations of

11   conditions.

12       Q    In your general observations did

13   you look for concrete delamination?

14       A    Did I note it in this report?

15       Q    Yes.

16       A    No.

17       Q    Did you note it anywhere else?

18       A    Not that I'm aware of.

19       Q    Is there anything that would

20   refresh your recollection as to whether you

21   noted concrete delamination?

22       A    Not that I'm aware.

23       Q    Did you note scaling, or I believe

194

1   you used the term concrete deterioration

2   previously?

3       A    Not that I recall.

4       Q    Is there anything that would

5   refresh your recollection as to whether you

6   noted scaling or concrete deterioration?

7       A    Not that I'm aware of.

8       Q    Did you notice any cracking around

9   any of the column bases?

10      A    Not that I recall.

11      Q    Is there anything that would

12  refresh your recollection as to whether you

13  saw concrete cracking around the column

14  bases?

15      A    Not that I'm aware of.

16      Q    Did you notice the presence of any

17  waterproofing membrane on the concrete slab?

18      A    Not that I recall.

19      Q    Is there anything that would

20  refresh your recollection as to whether

21  there was waterproofing membrane on the

22  concrete slab?

23      A    Not that I'm aware of.

195

1      Q    Did you notice whether the slab

2 construction joints were sealed or unsealed?

3      A    I don't remember.

4      Q    Is there anything that would

5 refresh your recollection as to whether the

6 slab construction joints were sealed or

7 unsealed?

8      A    There are mineral deposits noted in

9 the report, I believe.

10        (Pause to review documents)

11        THE DEPONENT:  Through the joints.

12        BY MS. UPTON:

13      Q    And what did the mineral deposits

14 signify to you?

15      A    Failure of a seal.

16      Q    Failure of a seal?

17      A    Yes.

18      Q    Do you know how many hours you

19 spent on the property making a visual

20 observation of the property?

21      A    I don't remember.

22      Q    Is there anything that would

23 refresh your recollection as to how long you

1       A       That would have been the storm

2   water drainage, the follow up

3   recommendations, 1.6 at the top.

4       Q       So that reference to follow up

5   recommendations refers to table 1, item 1.6?

6       A       Table 1, item 1.6, correct.

7       Q       On what did you base your cost

8   estimate for the $1,500.00 for the video

9   taping? Where did that number come from?

10      A       I don't remember.

11      Q       Is there anything that would

12  refresh your recollection as to where that

13  number came from?

14      A       Not that I'm aware of.

15      Q       And looking at that 1.6, follow up

16  recommendations on the project at a glance

17  sheet, the $2,500.00, where did that number

18  come from?

19      A       I don't remember.

20      Q       Is there anything that would

21  refresh your recollection as to where that

22  number came from?

23      A       Not that I'm aware of.

212

1    needed to be made; is that correct?

2         A     Yes.

3         Q     And can you tell me how much you

4    estimated those repairs to be?

5         A     Yes, $10,000.00.

6         Q     Do you know what that was based on?

7         A     No.

8         Q     Is there anything that would

9    refresh your recollection as to what that

10   number was based on?

11        A     No.

12        Q     Do you know whether it was based on

13   a determination made by you that there had

14   been an improper design that would have to

15   be repaired?

16        A     I don't know.

17        Q     Is there anything that would

18   refresh your recollection as to whether it

19   was based on a determination by you that

20   there was a design that would need to be

21   repaired?

22        A     Not that I'm aware of.

23        Q     Do you know whether your

213

1    determination that the garage underground

2    storm drain repairs would cost $10,000.00

3    was based on a determination of faulty

4    installation of the existing underground

5    drainage?

6        A    I don't know.

7        Q    Is there anything that would help

8    you to remember?

9        A    No, not that I'm aware of.

10       Q    Do you know whether your

11   determination that the garage underground

12   storm drain repairs would cost $10,000.00

13   was based on the determination of faulty

14   installation of the present, then-present

15   underground drainage?

16       A    Didn't you just ask that?

17       Q    Well, one was improper design, this

18   is faulty installation.

19       A    You did ask that.

20           MR. BOLOTIN:  You did design,

21   installation and installation again.

22           MS. UPTON:  I apologize.

23           MR. BOLOTIN:  It's all right.

214

1          BY MS. UPTON:

2      Q      Did you make a determination on the

3   quality of the original materials that would

4   have to be replaced?

5      A      Not that I remember.

6      Q      Is there anything that would

7   refresh your recollection?

8      A      Not that I'm aware of.

9      Q      Do you know whether your

10  determination of the underground storm

11  drainage repairs costing $10,000.00 was

12  based on a determination that the system had

13  realized or exceeded its expected useful

14  life?

15     A      No, I do not.

16     Q      Is there anything that would

17  refresh your recollection?

18     A      Not that I'm aware of.

19     Q      You also made a determination that

20  the parking garage upper deck drainage would

21  have to be repaired or replaced in the short

22  term; is that correct?

23     A      Yes.

215

1     Q     Do you recall what you based your

2   cost estimate on?

3     A     No, I do not.

4     Q     Is there anything that would

5   refresh your recollection as to what you

6   based your cost estimate on?

7     A     Not that I'm aware of.

8     Q     Do you know whether it was based on

9   a determination of improper design of the

10   upper deck drainage?

11     A     No, I do not.

12     Q     Is there anything that would

13   refresh your recollection as to whether it

14   was based on a determination of improper

15   design?

16     A     Not that I'm aware of.

17     Q     Do you know if it was based on a

18   determination of faulty installation of the

19   upper deck drainage?

20     A     No, I do not.

21     Q     Is there anything that would

22   refresh your recollection as to whether it

23   was based on a determination of faulty

216

1    installation?

2         A    Not that I'm aware of.

3         Q    Do you know whether it was based on

4    a determination of the quality of the

5    original materials of the original upper

6    deck drainage?

7         A    No, I do not.

8         Q    Is there anything that would

9    refresh your recollection as to whether it

10   was based on a determination of the quality

11   of the original materials?

12        A    Not that I'm aware of.

13        Q    Do you know if it was based on a

14   determination that the upper deck drainage

15   had realized or exceeded its expected useful

16   life?

17        A    No, I don't.

18        Q    Is there anything that would

19   refresh your recollection as to whether it

20   was based on a determination that the

21   original upper deck drainage had exceeded

22   its expected useful life?

23        A    Not likely.

217

1    Q    Is there anything that would help

2    you clarify?

3    A    It was 16 years old at the time.  I

4    don't see anything that indicates I had an

5    expected useful life ending at that point in

6    time.  No, I don't know.  It's not likely.

7    Q    The report also indicates that you

8    indicated that in the short term repairs

9    needed to be made to the exterior walls,

10   caulking and sealant; is that correct?

11   A    Yes.

12   Q    And that involved cleaning and

13   applying efflorescent checking sealant?

14   A    Yes.

15   Q    What is meant by checking sealant,

16   or efflorescent checking sealant?

17   A    It inhibits the efflorescence.

18   Q    Okay.  And you have a quantity

19   listed as 16,000 and then the unit is SF.

20   Is that square feet?

21   A    Yes.

22   Q    Okay.  And a cost of 75 cents.  Is

23   that per square foot?

218

1        A       Yes.

2        Q       And a total of $12,000.00; is that

3    correct?

4        A       Yes.

5        Q       On what did you base your cost

6    estimate?

7        A       I don't remember.

8        Q       Do you have anything that would

9    refresh your recollection as to what you

10   based your cost estimate on?

11       A       Not that I can be sure of.

12       Q       Do you know if there was an

13   efflorescent sealant on the walls at the

14   time you looked at them?

15       A       No, I do not.

16       Q       You also made a determination that

17   repairs needed to be made for minor spalling

18   of the interior walls and decks; is that

19   correct?

20       A       Yes.

21       Q       And that cost estimate was for

22   $2,000.00; is that correct?

23       A       Yes.

219

1      Q    On what did you base your cost

2 estimate?

3      A    I don't remember.

4      Q    Do you recall whether it was based

5 on a determination of improper design of the

6 walls or decks?

7      A    No.

8      Q    Do you know if the determination

9 was based on faulty installation of the

10 walls or decks?

11     A    No.

12     Q    Do you know if it was based on a

13 determination of the quality of the original

14 concrete in the walls and decks?

15     A    No.

16     Q    Do you know if it was based on a

17 determination the system had realized or

18 exceeded its expected useful life?

19     A    No.

20     Q    Do you have any notes or other

21 documents that would indicate whether you

22 obtained estimates from other contractors to

23 complete this work?

247

1    preparing an equity-based property condition

2    evaluation sometime before 1999.

3              Have you told me about all of the

4    other training that you may have received

5    with regard to the preparation of a property

6    condition evaluation report for EMG?

7         A    No.

8         Q    No.

9              Can you recall any other training

10   that you received from EMG in terms of the

11   preparation of a property condition

12   evaluation report?

13        A    Yes, I can.

14        Q    Okay.  Would you?

15        A    But I don't know the dates.

16        Q    Okay.

17        A    So we had annual meetings that did

18   not occur annually over the years.  I don't

19   remember even what year they were.  When we

20   had those meetings, they were typically at

21   least a day, or two or even more of training

22   in many different subject matters, including

23   equity reports, or different technical

248

1    subjects.  I cannot recall the dates of

2    those.

3              I have also been at corporate on a

4    few other occasions that had to do with

5    training for different types of what we call

6    services or, you know, scopes of work.  And

7    I don't recall the dates of those either.

8    And they would have been more of a one day

9    or two day training.

10       Q    With regard to those annual

11   meetings, which I understand are not annual

12       - -

13       A    Yes.

14       Q    Are those mandatory for project

15   managers such as yourself?  Are you required

16   to attend?

17       A    I think that full time project

18   managers are requested to attend, I think.

19   I don't know.  I haven't missed one that's

20   been available to me.  They're great.

21       Q    Are you a full time project

22   manager?

23       A    No.

249

1      Q      You are not?

2      A      No.

3      Q      Okay.  What is your designation?

4      A      I'm a part time project manager.

5      Q      And what is the difference between

6  a part time and a full time project manager?

7      A      I'm not salaried.  I'm paid by the

8  job as an employee.

9      Q      You're paid by the job.

10            Do you receive benefits from EMG?

11      A      Yes, partial.

12      Q      And so if you were paid by the job

13  you --

14      A      I'm sorry, in 1999?

15      Q      In 1999.  In 1999, were you full

16  time or part time?

17      A      Full time.

18      Q      In 1999 you were full time?

19      A      Yes.

20      Q      Okay.  So you are presently part

21  time?

22      A      Yes.

23      Q      As a part timer do you have a

250

1    choice in your assignments?

2        A    Yes.

3        Q    But as a full time project manager

4    in 1999 you would be assigned?

5        A    Yes.  But we were talking about

6    training.  And I took all the training that

7    was available.

8        Q    Yes.  And with regard to the

9    training at the annual meetings that you

10   mentioned, you said that there was training

11   on various technical topics.

12           Do you recall whether there was any

13   training with regard to structural behavior

14   in an elevated parking garage?

15       A    I don't recall what topics were

16   covered.

17       Q    I'm going to go through a few

18   topics and see if that refreshes your

19   recollection as to any of them, and if it

20   doesn't, it doesn't.

21       A    Okay.

22       Q    Do you recall whether there was any

23   training on structural design at any of the

251

1    meetings that you attended?

2         A    No.

3         Q    Is there anything that would

4    refresh your recollection as to whether

5    there was any training?

6         A    The question, maybe I didn't answer

7    correctly.  Yes, I recall that none of the

8    training that I attended has addressed

9    structural design.

10             MS. UPTON:  Can you play back her

11   answer?

12            (Whereupon, the record was reviewed)

13             BY MS. UPTON:

14        Q    Okay.  Let me try this one more

15   time.  Do you recall whether any training

16   sessions that you have attended at EMG

17   between 1997 and 1999 addressed structural

18   design?

19        A    Yes.

20        Q    And did any of them address

21   structural design?

22        A    No.

23        Q    And do you recall whether any of

252

1    the technical topics covered in an annual

2    meeting addressed concrete design?

3        A    Yes.

4        Q    Did they?

5        A    No.

6        Q    And do you recall whether any

7    technical topics that were covered at annual

8    meetings between 1997 and 1999 covered

9    garage structure performance?

10       A    No.

11       Q    Did any of the topics cover garage

12   structure performance?

13       A    I don't know.

14       Q    Is there anything that would

15   refresh your recollection as to whether they

16   did?

17       A    Not that I'm aware of.

18       Q    Do you recall whether there were

19   any discussions of technical topics at

20   annual meetings that covered concrete

21   technology?

22       A    No.

23       Q    Were any?

253

1      A      Not that I remember.

2      Q      Is there anything that would

3    refresh your recollection?

4      A      Not that I'm aware of.

5      Q      Do you recall whether concrete

6    repair was ever discussed as a technical

7    topic at any of the annual meetings?

8      A      No.

9      Q      With regard to the visits to

10   corporate at which you testified various

11   scopes of work were discussed, that's where

12   we're going.

13          Was the structural behavior of an

14   elevated parking garage ever discussed?

15     A      Not that I'm aware of.

16     Q      Was the structural design of an

17   elevated parking garage ever discussed at a

18   corporate scope of work meeting?

19     A      Not that I recall.

20     Q      Is there anything that would

21   refresh your recollection?

22     A      No.

23     Q      Do you recall ever discussing

254

1  concrete design at a corporate meeting

2  regarding scope of work?

3       A    No.

4       Q    Do you recall ever discussing

5  garage structure performance at a corporate

6  meeting?

7       A    No, I don't.

8       Q    Do you recall ever discussing

9  concrete technology at a corporate scope of

10 work meeting?

11      A    No.

12      Q    Do you recall ever discussing

13 concrete repair at corporate scope of work

14 meetings?

15      A    No.

16      Q    Going back, not talking about your

17 experience at EMG but at any time, have you

18 ever taken course work concerning concrete

19 design?

20      A    No.

21      Q    At any time have you taken any kind

22 of course work or received any training with

23 regard to garage structure performance?

255

1      A      That specific topic, I don't

2   remember.

3      Q      Is there anything that would

4   refresh your recollection?

5      A      Not that I'm aware of.

6      Q      At any time did you receive any

7   training or take any course work in concrete

8   technology?

9      A      Not formally.  Possibly some

10   training.

11      Q      And where would that have been?

12      A      I think at Law Engineering there

13   was some training and we covered that

14   subject.  But I have no records of it.

15      Q      At any time did you have any course

16   work or training in concrete repair?

17      A      Not that I'm aware of.

18      Q      Do you know what a training listing

19   record is at EMG?

20      A      No.

21      Q      Going back to your records, you

22   said that you worked with BOMA and helped

23   draft a training manual; is that correct?