COPY

1

**VOLUME I**
**PAGES:** 1-191
**EXHIBITS:** 14-39

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
DOCKET NO. 04-11411-NMG

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
BERWIND PROPERTY GROUP, INC.          *
and NEWTON INVESTORS LIMITED          *
PARTNERSHIP,                          *
                        Plaintiffs    *
vs.                                   *
                                      *
ENVIRONMENTAL MANAGEMENT              *
GROUP, INC., d/b/a EMG,               *
                        Defendant     *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**DEPOSITION OF ROY C. PERRY**, a witness
produced by Berwind Property Group, Inc., taken
pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure 30(b)(6),
before Linda Horne, CSR #114593, Registered
Professional Reporter and Notary Public within
and for the Commonwealth of Massachusetts, at the
Law Offices of Hinckley, Allen & Snyder LLP,
28 State Street, Boston, Massachusetts, on
Tuesday, April 26, 2005, commencing at 10:16 a.m.

EPPLEY COURT REPORTING, LLC
Post Office Box 382
Hopedale, Massachusetts 01747
(508) 478-9795        (508) 478-0595 (Fax)
leppley@msn.com

1          Q.    Between April 16, 1999, when the third

2    amendment was signed, and May 11, 1999, when

3    Berwind terminated the purchase and sale

4    agreement, did Berwind retain EMG to perform any

5    services, other than those relating to the

6    environmental services for the Newton property?

7          A.    I can't recall.

8          Q.    Referring your attention to the property

9    condition evaluation which is Exhibit No. 28.

10         A.    Okay.

11         Q.    Specifically to Page No. 3 of that

12   report, the page beginning, 1.3, General Physical

13   Conditions.

14         A.    Right.

15         Q.    Do you see there is a series of bullet

16   points?

17         A.    Yes.

18         Q.    The first bullet point says, "Retain

19   structural engineer to review parking garage

20   drainage and structure."

21         A.    That's correct.

22         Q.    Did Berwind retain a structural engineer

23   to review the parking garage drainage and

24   structure from the period of April 6, 1999

1    through the time that the purchase and sale

2    agreement was completed?

3         A.    I think you have to read that and the

4    entire Section 1.3.  It says that any bullet

5    points below are described in more detail on the

6    various sections of this report.  The parking

7    garage damage structure, it talked about

8    discussing that in Section 7.

9         Q.    The question, sir --

10             MR. EISENBERG:  I don't think he's done

11    with his answer.

12             MR. BOLOTIN:  He's yet to answer the

13    question.

14             MR. EISENBERG:  Let him finish.

15        A.    Section 7 states under the first

16    observations and comment, "We recommend that the

17    storm drains be cleaned and videotaped.  The

18    drainage system should be evaluated by a local

19    professional engineer and repaired as necessary.

20    A nominal budget for video taping and an

21    engineering evaluation is included in the

22    Immediate Repairs Cost Estimate."  So I believe

23    we did do that.

24        Q.    Okay.  Is that the only reference to a

1     further study suggested in Section 7 of the

2     report?

3         A.    Under the second bullet, "We recommend

4     that the drainage be reviewed on the upper decks

5     of the garage and corrections be made to allow

6     proper storm drainage from upper decks."  I

7     believe we looked at that as well.

8         Q.    Are those two the only references to

9     further reports recommended by EMG in

10    Section 7?

11        A.    I don't see it anywhere else.

12        Q.    Referring you back to Page 3, the first

13    bullet point, where on that page does it indicate

14    that the reference to retain a structural

15    engineer to review parking garage drainage and

16    structure refers to Section 7?

17        A.    Up above it says that all these points,

18    "They are described in more detail in the various

19    sections of this report."

20        Q.    Does it say specifically that this is

21    relevant to Section 7 only?

22        A.    No, but when you talk about the parking

23    garage, that's Section 7.

24        Q.    So it's your belief that by fixing the

1    storm drainage clogging that you were complying

2    with the suggestion identified in Bullet Point

3    No. 1?

4        A.    Yes.   If there were any other items that

5    needed to be repaired under the garage, I would

6    suspect that they would have mentioned them in

7    the specific section dealing with the parking

8    structure.

9        Q.    So when the report on Page 36 states,

10    "The framing, walls and decks of the parking

11    structure appeared to be in fair condition.

12    Small areas of spalled concrete and minor rust

13    stains were observed, indicating initial

14    corrosion of the steel reinforcing in the

15    ceilings of the garage.   There were also mineral

16    deposits noted in several locations from water

17    penetration through the joints in the garage

18    decks.   There were some areas where prior repairs

19    were evident.   The Property Manager reported that

20    there were repairs made to the parking garage

21    prior to the current owner's acquisition of the

22    property, but he was not aware of the extent of

23    the repairs.   Cleaning and patching the areas of

24    spalled concrete with an epoxy concrete patch is

1    required within the next year." That didn't

2    indicate to you that there were issues with

3    respect to the structure of the parking garage?

4        A.    No.

5             MR. EISENBERG:  Why don't you read the

6    last sentence?  "The cost of this work is

7    included in the Short Term Repairs Cost Estimate

8    (Table 2)."

9             MR. BOLOTIN:  Yes.  That's there as

10   well.

11       Q.    Referring you back to Page 3.  The

12   second to last of the first set of bullet points.

13   It says, "Determine cause of repeated storm drain

14   structure clogging."  Do you see that?

15       A.    Right.

16       Q.    You didn't think that there was

17   something separate with respect to the first

18   bullet point and the third to last bullet point

19   because they were identified separately?

20       A.    No.  If there was, it should have been a

21   little more clearly defined in the section

22   dealing with the parking garage.

23       Q.    Let's look at Page 5.  The first bullet

24   point says, "Significant signs of ponding water,

173

1   inadequate drainage, efflorescence on the

2   exterior brick, mineral deposits, and minor

3   concrete deterioration due to water intrusion

4   were observed in the parking garage, requiring

5   additional evaluation by a local Professional

6   Engineer, as discussed in Section 7.  The cost of

7   this work is included in the Immediate Repairs

8   Cost Estimate (Table 1)."

9          Did you hire somebody to look at ponding

10  water, inadequate drainage, efflorescence on the

11  exterior brick, mineral deposits and minor

12  concrete deterioration due to water intrusion in

13  the parking garage?

14     A.   Let's look at Table 1.

15     Q.   No, sir.  Let's answer the question.

16  Did you hire somebody to do that?  It's a yes or

17  no.

18     A.   Yes.

19     Q.   Who did you hire to do that?

20     A.   We hired the person under Section 7

21  where it said to discuss with the drainage.

22  That's who we -- that's the work we had done with

23  the drainage.  It's mentioned here on this Page

24  5.  In my opinion, it has to do with the drainage

174

1    problem.  That's what we did.  That's what we

2    took care of in the third amendment to the

3    purchase and sale agreement.

4        Q.    Actually, sir, under the third amendment

5    to the purchase and sale agreement, you didn't

6    hire the person.  The owner did, correct?

7        A.    It was done.

8        Q.    How do you know?

9        A.    We had somebody follow up on it.

10       Q.    And you know exactly what was done in

11   order to fix that?

12       A.    The drainage was cleared when we

13   purchased the property.

14       Q.    And what about the issues of ponding

15   water, what was done to rectify that by the

16   consultant hired by the seller?

17       A.    I assume the ponding water occurred from

18   the clogged drainage systems.

19       Q.    You don't know that one way or another?

20       A.    If it wasn't the way the report is

21   written, if they thought there were additional

22   problems, it should have been mentioned in the

23   report.

24       Q.    It is mentioned in the report.  It says,

175

1    "Significant signs of ponding water, inadequate

2    drainage."  Obviously, they are two separate

3    ideas, aren't they?

4        A.    "As discussed in Section 7."

5        Q.    It says, "Requiring additional

6    evaluation by a local Professional Engineer, as

7    discussed in Section 7"?

8        A.    Right.  In Section 7 it talks about the

9    drainage system being clogged.  Then it says, "a

10   nominal budget for video taping and an

11   engineering evaluation is included in the

12   Immediate Repairs Cost Estimate," which is

13   $1,500.

14       Q.    It was $1,500 to do the videotaping.

15   That is what was estimated?

16       A.    That's correct.

17       Q.    Okay.  Let's look at Table 1 of the

18   report.  Do you see the first item, 1.6?

19       A.    Yes.

20       Q.    Structural Engineer Review & Report,

21   correct?

22       A.    Review parking garage drainage and

23   structure.

24       Q.    What is the cost identified there?

1      A.   $2,500.

2      Q.   Then let's look down to where it says

3  Section 7.0.

4      A.   Uh-huh.

5      Q.   And that says, "Determine cause of

6  repeated clogging."  Correct?

7      A.   Correct.

8      Q.   That's $1,500?

9      A.   That's correct.

10     Q.   That's $1,500 to address the videotaping

11  and the storm drain structure, correct?  That's

12  what you identified.  That's what you did,

13  correct?

14     A.   It says, "Determine cause of repeated

15  clogging."  Then it says, "Parking garage

16  drainage and structure $2,500."

17     Q.   So they're two separate items.  One is

18  addressing the storm drains clogging, and the

19  other is reviewing the drainage and the

20  structure?

21     A.   No.  I see that as one item.  One is a

22  cost of 1,500 to video and inspect the system.

23  The other one is $2,500 to have the damaged

24  system reviewed.

177

```
 1        Q.    Just the drainage system, not the

 2   structure?

 3        A.    I don't see anywhere in this report

 4   where it talks about structure, other than in

 5   Section 7, where it's referring to the drainage

 6   system.

 7        Q.    Doesn't Section 7 also talk about

 8   various concrete problems?

 9        A.    It talks about spalled, which is not

10   uncommon in a garage.  If it talks about excess

11   spalling, that might be a different issue.

12        Q.    Okay.  It talks about rust as well;

13   doesn't it?  Is that common in garages to see

14   rust coming through the decks?

15             MR. EISENBERG:  Let's see what it

16   actually says.

17        Q.    It says, "Minor rust stains were

18   observed."

19             MR. EISENBERG:  Minor rust stains.

20        A.    The reason that we have these reports

21   done is for them to tell us if there are any

22   problems.  I have to tell you small areas of

23   spalled concrete and minor rust stains do not

24   tell me that there could potentially be problems
```

```
 1  │  in this parking garage.
 2  │         If they felt there were potential
 3  │  problems in the parking garage, they should not
 4  │  have been spelled out as small areas of spalled
 5  │  concrete and minor rust stains.
 6  │     Q.   Isn't the person supposed to identify
 7  │  what it is they see?
 8  │     A.   That's correct.
 9  │     Q.   And if this is what the inspector saw,
10  │  then that's correctly identified in the report?
11  │     A.   And then --
12  │         MR. EISENBERG:  Objection.
13  │     Q.   You can answer.
14  │     A.   Further down it says, "Cleaning and
15  │  patching the areas of spalled concrete within an
16  │  epoxy concrete patch is required within the next
17  │  year.  The cost of this work is included in the
18  │  Short Term Repairs Cost Estimate (Table 2)."
19  │     Q.   Let's get back to the question I had
20  │  earlier, which was:  Are the appearance of minor
21  │  rust stains in a parking garage deck common?
22  │     A.   I'm not an engineer.  I don't know.
23  │     Q.   Did you ask?
24  │     A.   No.  I had an engineer go out and do the
```

179

1    study.  They did not comment or if there was a

2    problem, I would expect it to be spelled out in a

3    report.

4        Q.    It's your position that by telling you

5    that a professional engineer should be hired to

6    investigate the drainage and structure of the

7    garage was not clearly spelled out to you?

8              MR. EISENBERG:  Objection.  You can

9    answer the question.

10       A.    In my opinion, the way that report was

11   issued, the recommendation of that engineer was

12   referring to the drainage system.  In a later

13   bullet, they talk about minor spalling and small

14   patches of spalling and minor rust stains.

15             Once again, in my opinion -- and I am

16   not an engineer -- if that was an issue or a

17   problem, they should have said there that that

18   was an issue or a problem, not that patching

19   could be done.

20       Q.    Do you know whether or not Berwind

21   retained a local professional engineer to perform

22   the additional services with respect to the

23   drainage?

24             MR. EISENBERG:  Objection.  Asked and