# EXHIBIT B

ORIGINAL

1

**VOLUME I**
**PAGES:** 1-191
**EXHIBITS:** 14-39

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
DOCKET NO. 04-11411-NMG

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
BERWIND PROPERTY GROUP, INC.                    *
and NEWTON INVESTORS LIMITED                    *
PARTNERSHIP,                                    *
                         Plaintiffs             *
vs.                                             *
                                                *
ENVIRONMENTAL MANAGEMENT                        *
GROUP, INC., d/b/a EMG,                         *
                         Defendant              *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


**DEPOSITION OF ROY C. PERRY**, a witness
produced by Berwind Property Group, Inc., taken
pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure 30(b)(6),
before Linda Horne, CSR #114593, Registered
Professional Reporter and Notary Public within
and for the Commonwealth of Massachusetts, at the
Law Offices of Hinckley, Allen & Snyder LLP,
28 State Street, Boston, Massachusetts, on
Tuesday, April 26, 2005, commencing at 10:16 a.m.



EPPLEY COURT REPORTING, LLC
Post Office Box 382
Hopedale, Massachusetts 01747
(508) 478-9795     (508) 478-0595 (Fax)
leppley@msn.com

1    I take it that is what it sounds like, a group

2    dedicated toward acquiring property?

3        A.    Correct.

4        Q.    Does Berwind limit the type of property

5    that it acquires?

6        A.    We have acquisition criteria.

7        Q.    What are the acquisition criteria

8    currently in effect?

9            MR. EISENBERG:  To the extent it's not

10   confidential to the company.

11           MR. BOLOTIN:  If it's confidential, just

12   tell me that it's confidential, and it will be

13   designated as such on the transcript, pursuant to

14   our confidentiality agreement.

15           MR. EISENBERG:  If he has a sensitivity

16   to it.

17       A.    We are acquiring currently for our seven

18   investment funds.  It has $585,000,000 of equity

19   product types designated as office, industrial,

20   retail, and development.

21           MR. EISENBERG:  For the record, we have

22   a confidentiality stipulation in the case to the

23   extent that information calls for him to answer

24   the question which is, in your view, confidential

1    business information.  You can say so and we'll

2    mark the transcript accordingly.

3              THE WITNESS:  Okay.

4         Q.    Back in 1999, was the investment

5    criteria different?

6         A.    No, more or less the same.

7         Q.    What fund was Berwind acquiring property

8    for back in 1999?

9         A.    I don't remember.

10        Q.    Is there any document that you're aware

11   of that would identify which fund it was?

12        A.    Sure.

13        Q.    What documents would those be?

14        A.    I couldn't tell you specific documents,

15   but there are documents to document the funds.

16        Q.    With respect to the materials that you

17   reviewed prior to the deposition, do any of those

18   materials identify which fund it was?

19        A.    No.

20        Q.    What did the asset management group do

21   or what does it do currently?

22        A.    Adds value to the property after

23   acquisition.

24        Q.    How does it do that?

1    Each property condition assessment, third-party

2    contractor, as well as each environmental

3    third-party contractor must be acceptable to the

4    lender.

5        Q.    Typically, does Berwind have the

6    third-party consultants do their services after

7    the lender has been chosen for a particular

8    acquisition?

9        A.    No.

10       Q.    How do you know whether or not they

11   would be acceptable to the lender?

12       A.    We do this all the time.  We know that

13   national firms will be generally acceptable to

14   lenders.

15       Q.    Typically, Berwind relies on national

16   firms to do the environmental and property

17   condition analysis?

18       A.    I would say historically that's been

19   true, yes.

20       Q.    How did you personally first come to

21   learn of EMG?

22       A.    Other people in the firm used EMG and

23   knew they were a national organization acceptable

24   to most lenders.

130

1      Q.    This is a document that came from your

2   files, correct?

3      A.    Correct.

4      Q.    Is this an acceptance and authorization

5   to proceed with the work identified in

6   Exhibit No. 24?

7      A.    Yes, it is.

8      Q.    That's dated March 17, 1999?

9      A.    Correct.

10      Q.    Between the time that Berwind received

11   Exhibit No. 24, which is dated March 3, 1999, and

12   your execution of the acceptance and

13   authorization form dated March 17, 1999, did you

14   personally speak to anyone at EMG regarding the

15   proposal for services?

16      A.    I don't recall.

17      Q.    Do you have any documents indicating

18   whether or not you spoke to anybody --

19      A.    No.

20      Q.    -- at EMG?

21           Did you speak to anyone at Berwind

22   regarding the proposed services to be performed

23   by EMG?

24      A.    I don't specifically recall.

132

1    Berwind who had retained EMG in the past to

2    perform property condition evaluations had

3    expressed to EMG that it was Berwind's practice

4    to have a particular type of professional perform

5    the property condition evaluation services?

6        A.    No.    I'm not specifically aware of any

7    such conversation.

8        Q.    Are you aware that no such conversation

9    occurred?

10       A.    I'm not aware that a conversation did

11   not occur.

12       Q.    You don't know one way or the other?

13       A.    Correct.

14       Q.    Looking at the third page of Exhibit 16,

15   about the middle of the page on the right side

16   there is some handwriting.    Do you see that?

17       A.    Yes.

18       Q.    It says, "Need MEP analysis."    Do you

19   see that?

20       A.    Yes.

21       Q.    What is your understanding as to what

22   that means?

23       A.    First of all, I don't know who wrote

24   that on here.    Second of all, that would mean to

1    me that we were requesting additional information

2    on the systems.

3        Q.    Mechanical, electrical, and plumbing

4    systems?

5        A.    Right.

6        Q.    With respect to the property condition

7    evaluation as opposed to the environmental

8    testing, did Berwind ask EMG to do any additional

9    services beyond what was set forth in the

10    proposal marked as Exhibit 24?

11        A.    Prior to closing, you mean?

12        Q.    Prior to closing.

13        A.    Yes.

14        Q.    What additional property condition

15    evaluation services did Berwind ask EMG to

16    perform?

17        A.    I'm sorry.  I misunderstood the

18    question.  I thought you asked if we had the

19    seller do any.

20        Q.    My apologies if I wasn't clear.  We'll

21    get to that.  I do understand where you are

22    going.

23            My question was:  Prior to closing, did

24    Berwind ask EMG to perform any additional

134

1   services in connection with the property

2   condition evaluation as opposed to the

3   environmental study?

4       A.    No.

5       Q.    As part of its property condition

6   evaluation, did Berwind ask EMG to do any

7   engineering testing, destructive testing?

8       A.    No.

9       Q.    Were you aware, as of the time that you

10  executed the acceptance and authorization, that

11  EMG was able to do additional engineering

12  services beyond that identified on Page 20 of

13  Exhibit No. 24, specifically as referenced in the

14  "Please Note" section at the bottom of that page?

15      A.    Yes.

16      Q.    What was your understanding as to what

17  building systems EMG was supposed to observe as

18  part of its property condition evaluation?

19      A.    They were supposed to observe all the

20  systems, mechanical, electrical, plumbing,

21  structural, and the site.

22      Q.    Does that also include elevators and

23  life safety?

24      A.    Yes.

1    Q.    And life safety includes the fire system

2    as well and fire suppression systems?

3    A.    I don't believe they were supposed to do

4    a full analysis of that, but, yes, we expected

5    they'd observe that.  That should have been part

6    of the report.

7    Q.    The report was of their visual

8    observations of the property?

9    A.    Yes.

10    Q.    Is that your understanding?

11    A.    Yes.

12    Q.    Referring you still to Exhibit No. 24,

13    the document that's Page 22, particularly to the

14    Paragraph No. 8, Professional Liability.  Do you

15    see that?

16    A.    Yes.

17    Q.    Did you review that paragraph before

18    executing the acceptance and authorization?

19    A.    I'm assuming I did review that.  Yes.

20    Q.    Did you refer that paragraph or the

21    document to anyone else for review prior to

22    executing the acceptance and authorization?

23    A.    No.

24    Q.    Did you direct EMG to make any changes

136

1       to the proposal marked as Exhibit 24 prior to

2       executing the acceptance and authorization?

3            A.    No.

4            Q.    Were you aware as to whether or not EMG

5       included a provision similar to Paragraph No. 8

6       on Page 22 in its other contracts with Berwind?

7            A.    I'm not.  I don't know the answer to

8       that question.

9            Q.    Well, as we've gone through before, EMG

10      was involved in a lot of projects for Berwind

11      that you were not part of, correct?

12           A.    Correct.

13           Q.    So you wouldn't have had an opportunity

14      or any reason to review its proposals or

15      contracts with respect to those projects,

16      correct?

17           A.    Correct.

18           Q.    Looking at the third page of Exhibit

19      No. 16, it identifies a price for the enhanced

20      property condition evaluation.  Do you see that,

21      about the middle of the page?

22           A.    Yes.

23           Q.    There is a fee of $6,800?

24           A.    Yes.

# EXHIBIT C

ORIGINAL

VOLUME  I
PAGES: 1-148
EXHIBITS: 40-41, 43-46

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
DOCKET NO. 04-11411-NMG

BERWIND PROPERTY GROUP, INC.                )
and NEWTON INVESTORS LIMITED                )
PARTNERSHIP,                                )
                                            )
            Plaintiffs                      )
                                            )
vs.                                         )
                                            )
ENVIRONMENTAL MANAGEMENT GROUP,             )
INC., d/b/a EMG,                            )
                                            )
            Defendant                       )

**DEPOSITION OF ALBERT J. CORR, III,** a
witness called on behalf of the Defendant, pursuant
to the Massachusetts Rules of Civil Procedure, before
Karrie Smith, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at Hinckley, Allen & Snyder LLP,
28 State Street, Boston, Massachusetts, on Monday,
May 2, 2005, commencing at 10:09 a.m.

EPPLEY COURT REPORTING, LLC
Post Office Box 382
Hopedale, Massachusetts 01747
(508) 478-9795   (508) 478-0595 (Fax)
leppley@msn.com

1    contract?

2            MR. EISENBERG:  Objection.

3        A.   I would say based upon our history and

4    dealings with EMG and a certain level of trust that

5    was there, if they had given us a number to do

6    something they would have done it and we would have

7    paid them.  I don't know if specifically they would

8    have moved forward without a signed proposal.

9        Q.   With respect to the proposal marked as

10   Exhibit 41, the document Bates numbered EMG 03024,

11   which is the third page in, there's a section there

12   marked "Documents to be furnished by client."

13       A.   Uh-huh.

14       Q.   I'm sorry, is that a yes?

15       A.   Yes.

16       Q.   Who was responsible for compiling the

17   documents to be furnished by client?

18       A.   In this particular instance, it may have

19   been our potential joint venture partner.

20       Q.   You don't recall?

21       A.   I don't recall because I don't think at

22   that time I had that information.

23       Q.   Would you have been the person

24   responsible for coordinating who it was that was to

1        Q.    So you weren't involved in soliciting a

2    proposal from Schofield Brothers for a title

3    insurance survey of the Newton property?

4        A.    No.

5        Q.    Now, at some point, did Berwind ask EMG

6    to submit a proposal to perform services in

7    connection with the Newton property?

8        A.    Yes.

9        Q.    When was that?

10       A.    I probably contacted EMG, I would say

11   late February, early March, to submit a proposal to

12   do services for Newton which would have been a

13   property condition report and a Phase 1.

14       Q.    You don't remember specifically when your

15   first communication was with EMG about the Newton

16   property?

17       A.    It would have been after we were awarded

18   the project, so it would have been after February 5th

19   and prior to, I guess, the date of the proposal.

20       Q.    Reviewing Exhibit 40, which is your

21   notes, does that refresh your memory as to when it

22   was that you first contacted anyone at EMG regarding

23   the Newton property?

24       A.    The first page has Matt Dillis's phone

1      A.   No, I do not.

2      Q.   Did you send EMG some information

3   regarding the Newton property in order to get a

4   proposal from them?

5      A.   I assume that I probably would have sent

6   the property description from the offering memorandum

7   to him.  Either I would have faxed it to him or I

8   would have verbalized it to him on the phone.  I

9   don't recall what I did, but that's typically how we

10  worked with EMG at that time.

11     Q.   Let me refer your attention to

12  Exhibit Number 23.

13     A.   Yes.

14     Q.   And I will represent to you that these

15  are pages from a fax which is identified as having

16  been sent on March 1, 1999, which was a Monday, at

17  9:57 from Berwind Property-Legal.

18         At that time, did you occasionally use a

19  fax machine from the legal department to send things

20  out?

21     A.   Yes.

22     Q.   And that would have the fax banner

23  Berwind Property-Legal on it?

24     A.   Yes.  My office was directly attached  --

1    or next to the legal department and their fax was the

2    closest to my office so I used their fax

3    frequently.

4         Q.   Does this refresh your memory as to

5    whether or not you sent a portion of the offering

6    memorandum to Mr. Dillis on March 1?

7         A.   Yes.

8         Q.   Do you recall whether or not there was a

9    cover sheet attached to this?

10         A.   There probably was because there's a

11    Page 2 on here, so I assume that there was.

12         Q.   Do you have any specific memory as to

13    what was on the first page of this facsimile?

14         A.   It was a cover sheet to Matt's attention.

15         Q.   Following your communications with

16    Mr. Dillis on March 1st, did EMG send a proposal

17    regarding services for the Newton property?

18         A.   Yes.

19         Q.   Let me draw your attention to Exhibit 24.

20         A.   Yes.

21         Q.   With the exception of the second-to-last

22    page being already completed, filled out, is this the

23    proposal that you received from EMG on or about

24    March 3, 1999?

1          A.   It appears to be.

2          Q.   And did you review this proposal when it

3    came to your attention?

4          A.   To the extent that I was looking at the

5    amount of the professional fees, no.

6          Q.   Did you review it for any purpose other

7    than to determine the amount of the professional

8    fees?

9          A.   No.

10         Q.   So you didn't review the substance of the

11   proposal and the services being offered?

12         A.   No.  The only thing I did was the -- I

13   filled out the property questionnaire and the

14   documentation checklist in the back.

15         Q.   So that's your handwriting?

16         A.   It is.

17         Q.   After being provided Exhibit Number 24 by

18   EMG, what did you do with that document?

19         A.   I would have given it to Mr. Perry.

20         Q.   Do you recall whether or not, following

21   receipt of this proposal from EMG, Exhibit Number 24,

22   you contacted EMG to ask them anything regarding the

23   content of the proposal?

24         A.   No.  We had had conversations with Matt

1    previously to his submission of this proposal because

2    we had actually asked for an enhanced PCE as opposed

3    to just a normal PCE.  So once I confirmed the

4    pricing for the enhanced PCE, that was really all I

5    was looking for.

6         Q.   And that enhanced PCE was for an MEP

7    analysis; is that correct?

8         A.   Yes, that's correct.

9         Q.   So after you confirmed that the proposal

10   marked as Exhibit 24 represented an MEP analysis, you

11   had no further involvement in reviewing the proposal;

12   is that correct?

13        A.   Yes, other than filling out the property

14   questionnaire and sending that over to Matt Dillis.

15        Q.   Did you have any conversations with

16   Mr. Perry about the proposal provided by EMG?

17        A.   Other than to tell him what the cost was,

18   no.

19             MR. BOLOTIN:  I have five of one.  Can we

20   take a lunch break now?

21             MR. EISENBERG:  Fine with me.

22             MR. BOLOTIN:  Frankly, I need the break.

23             (Recess taken, 1:01 p.m. - 2:16 p.m.)

24             MR. BOLOTIN:  Back on the record.

1      A.   Yes.

2      Q.   Do you know whether or not Mr. Perry had

3  this faxed to EMG on or about March the 18th of 1999?

4      A.   That seems to make sense since this fax

5  number is his assistant's fax number.

6      Q.   And is that consistent with your

7  understanding as to what occurred?

8      A.   I would assume so based on this fax

9  stamp.

10     Q.   Can you please tell me, sir, what dates

11 between March 1 of 1999 and March 17, 1999, that you

12 spoke with anybody from EMG with respect to the

13 Newton property?

14     A.   I know I spoke with Matt on March 1st.  I

15 have in my notes that I was trying to, I guess, set

16 up a lunch with Matt for March 18th on 3/15 --

17 I'm sorry, what was the end date again?

18     Q.   The date that the acceptance and

19 authorization was signed, so March 17th, 1999.

20     A.   So between March 1st and March 17th?

21     Q.   Correct.

22     A.   It would have been on the 1st, to solicit

23 the proposal, and then I may have spoken to him one

24 or two times to coordinate getting him out to tour

1    the property.  But to the extent that they wouldn't

2    give him access until we signed the purchase and

3    sale, I don't know the date of that.

4              MR. BOLOTIN:  Let's mark this as the next

5    exhibit, please.

6              (Exhibit No. 45, Fax Dated 3/16/99, so

7    marked.)

8         A.   So I may have had conversations with Matt

9    to coordinate getting out there, but based upon my

10   notes, I probably talked to him a few times trying to

11   set up a lunch with him on the 18th.

12        Q.   But you have no specific memory of any

13   conversations with him during that period of time?

14        A.   Other than the first conversation to

15   solicit the proposal and based on what we wanted done

16   -- or, I'm sorry, what we wanted the scope of work to

17   be within the proposal for a new price, but other

18   than that I can't recall.

19        Q.   Let me show you what's been marked as

20   Exhibit Number 45, and I'm going to ask you do you

21   recognize that document?

22        A.   Yes.

23        Q.   And is that your handwriting?

24        A.   Yes, it is.