## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BERWIND PROPERTY GROUP, INC. and NEWTON INVESTORS LIMITED PARTNERSHIP, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | DOCKET NO. 04-11411-NMG |
| v. | ) ) | |
| ENVIRONMENTAL MANAGEMENT GROUP, INC. d/b/a EMG, | ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Berwind Property Group, Inc. and Newton Investors Limited Partnership

(collectively, "Berwind") submit this Opposition to the Motion for Partial Summary Judgment

filed by Defendant Environmental Management Group, Inc. d/b/a EMG ("EMG"). In further

support of their Opposition, the Plaintiffs incorporate, by reference, the Affidavits of Albert

Corr, Paul L. Kelley, and Lauren Timoney Upton, and Plaintiffs Rule 26(a)(2) Expert Disclosure,

filed herewith.

## I.     INTRODUCTION

This action arises out of a property condition evaluation performed by EMG on certain

improvements to real property in Newton, Massachusetts (the "Contract") which Berwind was, at

that time, considering purchasing and which Berwind subsequently purchased. Berwind filed

suit against EMG alleging negligence and gross negligence, negligent misrepresentation and

grossly negligent misrepresentation, breach of contract, fraud in the inducement, and violation of Mass. Gen. Laws c. 93A.  In its Motion for Partial Summary Judgment, EMG's principal contention is that a contractual limitation of liability clause between the parties limits Berwind's recovery on its claims of Gross Negligence (Count I), Grossly Negligent Misrepresentation (Count II), Breach of Contract (III), and Violation of Mass. Gen. Laws c. 93A (Count V).  EMG also contends that there is an absence of evidence to support Berwind's claims for negligence and gross negligence, negligent and grossly negligent misrepresentation, fraud in the inducement (Count IV), and violation of Mass. Gen. Laws c. 93A.  EMG's arguments, however, wholly lack merit.

As an initial matter, contrary to EMG's contentions, the limitation of liability clause contained in the Contract does not limit Berwind's recovery on its contract or its tort claims, where, as here, EMG fraudulently induced Berwind into entering the Contract, thereby making the contract voidable, which, in turn, vitiates the limitation of liability provision.  Even assuming, *arguendo*, that the limitation of liability clause were not vitiated, said clause would not limit EMG's liability for its grossly tortious conduct and its statutory violations.  Finally, genuine issues of material fact exist in this matter which preclude the entry of summary judgment.  EMG's Motion must, therefore, be denied.

## II.    **STATEMENT OF FACTS**

Berwind incorporates herein by reference Plaintiffs' Rule 56.1 Statement of Material Facts in Support of Their Opposition to the Defendant's Motion for Partial Summary Judgment filed herewith.

## III.    ARGUMENT

### A.    Summary Judgment Standard.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; see also Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1121 (1st Cir. 1995). In ruling on a motion for summary judgment, the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party. Oliver v. Digital Equip. Corp., 846 F.2d 103,105 (1st Cir. 1988); Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983) (citing Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975), cert. denied, 425 U.S. 904 (1976)). Courts are particularly cautious about granting summary judgment where, as here, the state of mind of one of the parties is crucial to the outcome of the case. Roadmaster Industries, Inc. v. Columbia Mfg. Co., Inc., 893 F.Supp. 1162, 1165 (D.Mass. 1995) ("where intentionality or other state of mind issues are contained in an element of a claim, 'summary judgment is vested with more than the usual difficulty.' Typically, resolution of such issues involves credibility determinations for the jury or factfinder.") citing Stepanischen, 722 F.2d at 928; see also Oliver, 846 F.2d at 109.

Where, as here, there is abundant evidence that EMG, in fact fraudulently induced Berwind to enter into the Contract; was grossly negligent in performing its services under the Contract; and/or made -- in conscious disregard of Berwind's rights -- material representations to Berwind, knowing that those representations were false, which representations Berwind relied

upon to its detriment, EMG cannot meet its burden of proving its entitlement to summary

judgment in this action. EMG's motion must therefore be denied.

**B.    Where, as Here, EMG Fraudulently Induced Berwind to Enter
Into the Contract, the Limitation of Liability Clause Contained
in the Contract Was Vitiated**.

As an initial matter, EMG argues that it is entitled to partial summary judgment because

the limitation of liability clause contained in the Contract limits Berwind's recovery on both its

contract and tort claims. EMG, however, has put the cart before the horse. While the Contract

does contain a limitation of liability clause, that provision, like the Contract in which it is

contained, was vitiated by EMG's fraudulent inducement of Berwind to enter into the Contract.[1]

**1.    EMG fraudulently induced Berwind to enter into
the Contract.[2]**

To establish fraud in the inducement, a plaintiff must establish the elements of common

law deceit. See Elias Bros. Restaurants, Inc. v. Acorn Enterprises, Inc., 831 F.Supp. 920, 922

(D.Mass. 1993); Nash v. Trustees of Boston University, 946 F.2d 960, 962-963 (1st Cir. 1991).

To establish a cause of action for intentional misrepresentation under Massachusetts law, the

---

[1] It is noteworthy that the Contract does not contain a so-called "Integration Clause."

[2] EMG argues at length that the choice-of-law clause contained in the Contract dictates that Maryland law governs "all claims arising from the performance of the contract." See Defendant's Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment at pp. 3-5. However, where plaintiff's claim "concerns the validity of the formation of the contract [rather than an alleged breach], it cannot be categorized as one involving the rights or obligations arising under [said] contract." Computer Sales International, Inc. v. Lycos, Inc., Slip Copy, 2005 WL 3307507 (D.Mass.) quoting Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Company, 986 F.2d 607, 611 (1st Cir. 1993). In such circumstances, a plaintiff's claims alleging fraud and deceit in the formation of the contract are said "to fall outside the contracts choice-of-law provision." Id. citing Jacobson v. Mailboxes Etc. U.S.A., Inc., 419 Mass. 572 (Mass. 1995) (forum-selection clause does not apply where claims allege misleading conduct that induced the agreement; such pre-contract violations of Mass. Gen. Laws 93A fall outside the choice-of-law provisions).

The foregoing notwithstanding, resolution of a choice-of-law determination between Maryland and Massachusetts substantive law would not alter the disposition of Berwind's Fraud in the Inducement claim: both Maryland and Massachusetts courts have held that a party that has been fraudulently induced into entering a contract can rescind the contract. See discussion, infra, at Section B.2.; see also Brooks v. Euclid Systems Corporation, 827 A.2d 887, 906 (Md.App. 2003); Greenfield v. Heckenbach, 797 A.2d 63, 78 (Md.App. 2002). Accordingly, the Court need not decide which body of law controls, and, for simplicity's sake, Berwind will refer herein to Massachusetts case law. See Okmyansky v. Herbalife International of America, Inc., 415 F.3d 154, 158 (1st Cir. 2005).

plaintiff must show (1) that the defendant made a false representation of a material fact (2) with knowledge of its falsity (3) with the purpose of inducing the plaintiff to act thereon and (4) that the plaintiff relied upon the representation to his detriment. Sebago, Inc., et al. v. Beazer East, Inc., 18 F.Supp.2d 70, 85 (D.Mass. 1998) citing Danca v. Taunton Savings Bank, et al., 385 Mass. 1, 8 (1982). In general, only statements of fact, not statements of opinion, future conditions, or matters promissory in nature, are actionable as fraud. Rodowicz v. Massachusetts Mutual Life Ins. Co., 192 F.3d 162, 175-176 (1st Cir. 1999). However, a statement that is promissory in nature -- i.e., that EMG would provide a qualified engineer to perform the services under the Contract -- is actionable where the defendant misrepresents his actual present intent to perform a future act. Id.; Bolen v. Paragon Plastics, Inc., 754 F.Supp. 221, 226 (D.Mass. 1990); McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709 (1990) citing Barrett Assoc. Inc. v. Aronson, 346 Mass. 150, 152 (1963). It is also well settled under Massachusetts law that "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party." V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 414 (1st Cir. 1985); 940 C.M.R. 3.16; accord Adams v. Hyannis Harborview, Inc., 838 F.Supp. 676, 694 (D.Mass.1993), aff'd on other grounds, 73 F.3d 1164 (1st Cir.1996); Barden v. Harpercollins Publishers, Inc., 863 F.Supp. 41, 43 (D.Mass.1994).[3]

---

[3] In addition, it is clear that a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party to avoid liability under Mass. Gen. Laws c. 93A. See Mass. Gen. Laws c. 93A; 940 C.M.R. 3.16. Section 3.16 of 940 C.M.R. specifically provides that "a failure to disclose to a buyer or prospective buyer 'any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction' is a violation of c. 93A, § 2." Homsi v. C.H. Babb Co., 10 Mass.App.Ct. 474, 479 (1980), quoting from the regulation. See also Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703, 322 N.E.2d 768 (1975); Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 626-627, n. 3, 382 N.E.2d 1065 (1978). "Although there may be 'no duty imposed upon one party to a transaction to speak for the information of the other ... if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading ... as active misrepresentation, and half-truths may be as actionable as whole lies...." Kannavos v. Annino, 356 Mass. 42, 48 (1969) citing Harper & James, Torts, § 7.14; RESTATEMENT OF TORTS § 529; Williston, Contracts (2d ed.) §§ 1497-1499. Cf. Nei v. Boston Survey Consultants,

The evidence establishes that EMG knowingly and willfully misrepresented the scope of work it would perform and the qualifications of the person(s) who would perform the work at the time it induced Berwind to enter into the Contract, and that these misrepresentations were intended to induce, and did induce, Berwind to enter into the Contract. More specifically, after such time as Berwind informed EMG that Berwind was interested in hiring EMG to provide a property evaluation of a 100-year old property, that was located next to railroad tracks and the Massachusetts Turnpike, EMG specifically represented that it would, *inter alia*:

- ***Provide a full description of the property and improvements, with descriptions of*** in-place systems ***and commentary on observed conditions, to include*** site, architectural, ***structural,*** mechanical, electrical, plumbing, fire and life/safety, interior, exterior, ***and other systems.***

- ***Identify those components that are exhibiting deferred maintenance issues and provide estimates for*** "immediate" (90-day), "short term" (1 year) and "replacement reserve" (10-year) ***costs based on the observed conditions,*** available maintenance history ***and industry-standard useful life estimates.*** (the "Services")(emphasis added)

<u>See</u> Contract between Berwind and EMG dated March 17, 1999, a true and accurate copy of which is attached as Exhibit 2 to the Affidavit of Al Corr, filed herewith. In addition, EMG represented to Berwind that a qualified professional engineer -- that is, one that would "us[e] that degree of care and skill ordinarily exercised under similar conditions by reputable members of EMG's profession practicing in the same or similar locality at the time of service" -- would inspect and evaluate the Property. <u>Id.</u> Such representations "can scarcely be characterized as a mere prediction of future conduct, nor as a statement whose truth could not be ascertained at the

---

Inc., 388 Mass. 320, 322 (1983) ("[T]here is no suggestion that the defendants made a partial disclosure or stated a half truth which may be tantamount, under certain conditions, to a falsehood if there is no further expatiation.")

time it was made." <u>Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.</u>, 764 F.2d 928, 937 (1st

Cir. 1985).

Contrary to its specific representations that it would provide a qualified professional

engineer -- one who was capable of providing the above referenced services, including, but not

limited to, the provision of "a *full* description of the property and improvements, with

descriptions of in-place systems and commentary on observed conditions, to include …

*structural* … systems;" identification of "those components that are exhibiting deferred

maintenance issues;" the provision of estimates for "immediate" (90-day), "short term" (1 year)

and "replacement reserve" (10-year) costs based on the observed conditions -- EMG sent a

mechanical engineer, and <u>only</u> a mechanical engineer, who was unable to perform the above-

described tasks. <u>See</u> Plaintiffs Rule 26(a)(2) Expert Disclosure, attached as Exhibit 1 to the

Affidavit of Paul L. Kelley, filed herewith.[4]  Hoffman was not a structural engineer, nor had

Hoffman ever received any meaningful training in structural engineering (<u>see</u> Excerpts from the

3/30/05 Deposition Transcript of Sandra Terepka Hoffman, a true and accurate copy of which is

attached as Exhibit 2 to the Affidavit of Lauren Timoney Upton, filed herewith, at pp. 6-9, 20-

23, 250-251), and EMG was fully aware that Hoffman was not qualified to perform the Services

-- i.e., to provide an opinion as to the Property's structural integrity -- as represented. <u>See</u>

Excerpts from the 4/01/05 Deposition Transcript of Michael Collins, a true and accurate copy of

which is attached to the Upton Affidavit as Exhibit 1, at pp. 51-52 (in which Collins, Hoffman's

supervisor, testified that he was "keenly aware" of Hoffman's training and experience, having

---

[4] EMG contends that Berwind elected to have a mechanical engineer, instead of an engineer qualified to evaluate structure, inspect and evaluate the Property.  EMG utterly fails, however, to cite to any evidence in support of this allegation.  Berwind, conversely, categorically denies that it instructed EMG to dispense with its review of the structures of the Property.  Berwind, in fact, advised EMG specifically that Berwind was concerned about the structural integrity of the buildings on the Property because of the proximity of the Property to adjacent railroad tracks and the Massachusetts Turnpike. <u>See</u> Corr Affidavit at ¶ 4.

reviewed Hoffman's resume and having worked with her on others projects). Moreover, at the time that EMG made these representations, there was, apparently, only one individual on EMG's staff competent to evaluate the structural integrity of reinforced concrete parking garages and similar structures. See Upton Affidavit, Exhibit 1 at pp. 21-22. Nevertheless, EMG never advised Berwind that it would almost certainly send an engineer who was not qualified to perform a structural and waterproofing inspection and evaluation of the Garage as required by the terms of the Contract and who was not capable of providing a complete description of the structures on the Property as had been represented. Accordingly, the evidence establishes that EMG made affirmative representations to Berwind concerning the Services it would provide and the qualifications of the person(s) who would be performing those Services, and that EMG did so without intending to actually provide the Services as represented and/or without advising Berwind that EMG would almost certainly not provide those Services which had been promised to Berwind.

The evidence also establishes that Berwind reasonably relied upon EMG's willful non-disclosure and/or false representation of the scope of the Services it would provide and the qualifications of the person(s) who would be performing those Services in deciding to enter into the Contract with EMG. EMG, and only EMG, was in the position to know what person or persons it would designate to evaluate the Property as represented to Berwind. It would have been virtually impossible for Berwind to verify, through investigation or otherwise, whether EMG's intention to provide a qualified engineer were truly what EMG said it was, but even if this were possible, Berwind would have been under no duty to do so.[5] Moreover, in view of the

---

[5] "Certainly where a defendant has willfully made false representations with intent to deceive he ought not to be relieved of liability because of his victim's lack of diligence." Yorke v. Taylor, 332 Mass. 368, 373 (1955); see also Kannavos v. Annino, 356 Mass. 42, 50 (1969).

long-standing relationship between the parties, Berwind could reasonably take EMG's statements at face value and credit them. Bond Leather Co., Inc., 764 F.2d at 937.

Even if EMG were to argue that it had simply offered an opinion as to the qualifications of the person(s) that it would designate to inspect and evaluate the Property, "[a] statement of opinion [is] actionable when the speaker possesses superior knowledge concerning the subject matter to which the representations relate, or where the opinion is 'reasonably interpreted by the recipient to imply that the speaker knows the facts that justify the opinion.'" Stolzoff v. Waste Systems International, Inc., 58 Mass.App.Ct. 747, 760 (2003)(internal citations omitted) (emphasis added). Here there can be no cavil that EMG possessed superior knowledge (or purported to) concerning the subject matter to which the misrepresentations relate -- that is, that EMG would be designating an engineer qualified to perform a structural evaluation. Accordingly, Berwind was entitled to rely on EMG's representations.

The evidence also establishes that Berwind relied upon EMG's misrepresentations to its detriment. Based on EMG's representations that it would provide a qualified engineer, and based on Berwind's understanding that a qualified engineer had prepared EMG's Property Condition Evaluation, Berwind decided to purchase the Property. See Corr Affidavit at ¶ 9. Had Berwind known that the Garage suffered from more than $900,000 worth of structural problems and waterproofing deficiencies, Berwind would not have purchased the Property for $11.7 million as it did, or Berwind would have negotiated a purchase of the Property for a lower price, taking into account the likely additional costs of repairing the Garage. See Corr Affidavit at ¶ 10.

Finally, it is self-evident that all statements made by EMG were intended to induce, and did induce, Berwind to enter into the Contract. Accordingly, the evidence establishes that EMG knowingly and willfully made fraudulent representations to Berwind concerning the Services

that EMG would provide and the qualifications of the person(s) who would be performing those

Services; that EMG intended to induce, and did induce, Berwind to rely on those representations;

and that Berwind reasonably relied upon those representations to its detriment.[6]

**2.    Because EMG fraudulently induced Berwind to enter into the Contract, the Contract, and the limitation of liability clauses contained in the Contract, are voidable.**

Where, as here, EMG knowingly and willfully misrepresented, at the time it induced

Berwind to enter into the Contract, the scope of work it would perform and the qualifications of

the person who would perform the work, the Contract is voidable. See Nash v. Trustees of

Boston University, 946 F.2d 964-966 (1st Cir. 1991); Shaw's Supermarkets, Inc. v. Delgiacco,

410 Mass. 840, 842 (1991). It is well established that "the public policy of permitting avoidance

of a promise procured by fraud is not to be circumvented 'by means of contractual devices.'"

Elias Bros. Restaurants, Inc. v. Acorn Enterprises, Inc., 831 F.Supp. 920, 924 (D.Mass. 1993),

citing Turner v. Johnson & Johnson, 809 F.2d 90, 96 (1st Cir. 1986); Armstrong v. Rohm & Haas

Co., 349 F.Supp. 2d 71, 76 (D.Mass. 2004)("It is well-settled that, as a general matter, parties

may not use contractual language to avoid a claim of fraud in the inducement.") citing Bates v.

Southgate, 308 Mass. 170, 182-183 (1941); McEvoy Travel Bureau, Inc. v. Norton Co., 408

Mass. 704, 712-13 (1990)(same). Massachusetts common law has long instructed that a party

"may rescind a contract which he has been induced to enter into in reliance upon false and

fraudulent representations as to material facts." Elias Bros. Restaurants, at 927, quoting McGrath

---

[6] Even assuming, *arguendo*, that the evidence adduced to date did not demonstrate unequivocally that EMG fraudulently induced Berwind into entering into the Contract, it is well settled that whether a party's statements constitute misrepresentation is a question of fact. Loomis v. Pease, 234 Mass. 101, 104 (1919); Baker v. A.W. Chesterton Co., 1998 WL 1285612, at * 2 (Mass.Super. 1998). Accordingly, summary judgment is not appropriate.

v. C.T. Sherer Co., 291 Mass. 35, 38 (1935).[7] See also RESTATEMENT (Second) Contracts § 164(1) (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."). While contracts induced by fraudulent misrepresentations are not void *ab initio*, they are voidable at the election of the party who justifiably relied on the misrepresentations. Shaw's Supermarkets, 410 Mass. at 842; RESTATEMENT (SECOND) OF CONTRACTS § 164 (1981). Accordingly, where, as here, Berwind was fraudulently induced into entering the Contract, it may avoid the Contract (see, e.g., Computer Sales International, Inc. v. Lycos, Inc., Slip Copy, 2005 WL 3307507 (D.Mass. 2005); Armstrong v. Rohm & Haas Co., 349 F.Supp. 2d 71, 76 (D.Mass. 2004)), thereby rendering the limitation of liability provision contained therein void, which, in turn, makes summary judgment inappropriate.

3.   **The limitation of liability clause, in any event, is inapplicable to Berwind's Chapter 93A claim as it relates to Berwind's Fraud in the Inducement claim.**

As noted, *supra*, the Contract does not state that all of the rights of the parties are to be governed by Maryland law, but only that "the agreement is to be governed by the laws of the State of Maryland." The choice-of-law clause does not purport to bar the application of Mass. Gen. Laws c. 93A to the parties' dealings in Massachusetts, and the clause is, therefore, inapplicable to Berwind's Chapter 93A claim as it relates to Berwind's Fraud in the Inducement claim. See Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F.2d at 609-611 (while the plaintiff's Chapter 93A claims based on contract violations were covered by the

---

[7] Similarly, the Maryland courts have held that a party to a contract cannot escape liability for fraud. See, e.g., Greenfield *et ux.* v. Heckenbach, *et al.*, 797 A.2d 63 (Md.App. 2002)("A rogue cannot protect himself from liability for his fraud by inserting a printed clause in his contract.")(internal citation omitted).

contractual choice-of-law provision stating that the rights and obligations of parties under the agreement were governed by the laws of California, plaintiff's Chapter 93A claims relating to allegations of fraud concerning formation of contract fell outside the contract's choice-of-law provisions).  Moreover, it is clear that common law fraud can be the basis for a claim of unfair or deceptive practices under Mass. Gen. Laws c. 93A.  McEvoy Travel Bureau, Inc. v. Norton Company, 408 Mass. 704, 714 (1990); PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass 593, 596 (1975).  Accordingly, where, as here, Berwind has adduced sufficient evidence to demonstrate that it was fraudulently induced into entering in the Contract, summary judgment is inappropriate with regard to Berwind's claim that EMG violated Chapter 93A.

> **C.    Even Assuming, *Arguendo*, That the Contract, and the Limitation of Liability Clause Contained Therein, Were Valid, the Limitation of Liability Clause Would Be Unenforceable Where, As Here, EMG's Conduct Constitutes Gross Negligence and Grossly Negligent Misrepresentation.**

Even assuming, *arguendo*, that EMG were determined not to have fraudulently induced Berwind to enter into the Contract, and that the limitation of liability clause were to survive, EMG's contention that the limitation of liability clause contained within the Contract would act to limit recovery by Bewind on its claims of Gross Negligence, Grossly Negligent Misrepresentation, and Violation of Mass. Gen. Laws c. 93A claims is simply incorrect as a matter of law.  It is axiomatic under Maryland law that, while parties may use a contract to limit liability for their own acts of negligence, a limitation of liability clause will not insulate a party from liability for extreme forms of negligence such as the grossly tortious conduct of EMG. See Wolf v. Ford, 335 Md. 525, 528 (1994)(Court held that gross negligence, fraud, and willful misconduct are exceptions to enforcing exculpatory agreements); Boucher v. Riner, 514 A.2d 485, 48 (Md.App. 1986)("A waiver of a right to sue … is ineffective to shift the risk of a party's

own willful, wanton, reckless or gross conduct."); <u>Winterstein v. Wilcom</u>, 293 A.2d 821, 824-25 (Md.App. 1972) ("Exculpatory agreements otherwise valid are not construed to cover the more extensive forms of negligence -- willful, wanton, reckless or gross.").

When considering the enforceability of exculpatory contract clauses, the Maryland courts have emphasized four elements in their analyses of the existence of gross negligence: 1) the defendant's intentional conduct; 2) the defendant's knowledge that his conduct will create a risk of harm; 3) defendant's knowledge of facts such that he or she should have appreciated the extent of potential risk to the plaintiff; and 4) the objectively unreasonable nature of his or her conduct. Where, as here, EMG's conduct satisfies each of these elements, the limitation of liability clause does not limit Berwind's recovery on its claims.

<div style="margin-left:2em;">

**1.    EMG not only was negligent in its inspection and evaluation of the Property, but intentionally failed to perform its duty -- that is, to provide an accurate description of the structure and waterproofing conditions of the Property -- in <u>reckless disregard of the consequences</u>.**

</div>

It need hardly be argued that EMG was negligent in its performance of the inspection and evaluation of the Property, and in the misrepresentations that it made concerning the Property's structural integrity; the evidence of such negligence is overwhelming. As an initial matter, Hoffman clearly failed to observe and/or appreciate the significance of open and obvious structural and waterproofing deficiencies in the Garage which were appreciated by each and every qualified engineer who visited the Property, both **before** and after EMG issued its report. See, e.g., Kelley Affidavit, Exhibit 1; see also Memorandum from SGH dated February 3, <u>1997</u>, attached as Exhibit 2 to the Kelley Affidavit. Berwind has discovered -- and will demonstrate at trial -- that other engineers who had performed visual inspections of the Property both **before** and subsequent to Hoffman had readily observed that the Garage exhibited significant, open and

obvious structural problems and waterproofing deficiencies.  These deficiencies included, *inter alia*, the following:

- slab deflections;

- extensive cracking around reinforcement steel;

- through-slab cracks with florescence and active water leakage;

- concrete delamination along the through-slab cracks;

- slab delamination, scaling and popouts;

- slab cracking around the column base;

- unsealed slab construction joints;

- widespread slab cracks; and

- absence of vehicular-traffic bearing waterproofing on the decks.

See, e.g., Kelley Affidavit, Exhibit 2.

EMG's Property Condition Evaluation (the "Report") failed to note any of these signs of structural distress, such as the serious topside cracking around columns and the significant sagging of the elevated structural decks, despite the fact that none of these conditions required measurement, calculation, and/or testing to detect. Id.  More specifically, EMG's Report states only as follows:

> The framing, walls and decks of the parking structure appeared to be in fair condition. ***Small*** areas of spalled concrete and ***minor*** rust stains were observed, indicating initial corrosion of the steel reinforcing in the ceiling.  …  Cleaning and patching the areas of spalled concrete with an epoxy concrete patch is required within the next year.

> The ground level of the parking garage had areas of cracking in the concrete slab. … Sealing cracks is considered to be a part of routine maintenance.  ***No additional action is required***. (emphasis added)

See Excerpts from EMG's Report, a true and accurate copy of which is attached to the Upton Affidavit as Exhibit 3, at pp. 35-36. Similarly, the Report also failed to note the open and obvious lack of deck membranes, and failed to discuss the importance of deck membranes in garages. Id.

Moreover, EMG clearly failed to adequately evaluate and/or report the costs attendant to the necessary repairs of the deficiencies in the Garage. The Report indicated that Berwind would need to expend approximately $4,000.00 in immediate costs (that is, in the inspection and evaluation of the drainage system in the Garage, which EMG recommended be performed within 90 days) and $26,000.00 in short term costs (that is, in the recommended repairs of the Garage's drainage system and spalled concrete and the application of sealant to the exterior walls, which EMG recommended be performed within one year).[8] See Upton Affidavit, Exhibit 3 at p. 5 and Tables 1 - 2. The Report failed to indicate that Berwind would likely incur any additional costs for "repairs, replacement and significant maintenance items ... over the evaluation period (12 years)." See Upton Affidavit, Exhibit 3 at p. 5 and Table 3. These budgets were grossly inadequate measures of the maintenance needs of the garage at the time of EMG's 1999 inspection. See Kelley Affidavit, Exhibit 1. Berwind, in fact, has incurred in excess of $900,000.00 in necessary structural repairs to and installation of waterproofing in the Garage. Id. Accordingly, EMG's negligence is clear.

Under Maryland law, gross negligence is defined as "an intentional failure to perform a manifest duty in reckless disregard of the consequences affecting the life or property of another, and also implies a thoughtless disregard of the consequences without exertion of any effort to

---

[8] Berwind did, in fact, have the repairs recommended by EMG performed prior to purchase. See Excerpts from the 4/26/05 Deposition Transcript of Roy Perry, a true and accurate copy of which is attached to the Upton Affidavit as Exhibit 4, at pp. 173-174. EMG's grossly inadequate cost estimates deprived Berwind of knowledge that would have caused it to seek an additional discount in the purchase price or to walk away from the deal if the adjustment was not made. See Kelley Affidavit, Exhibit 1.

avoid them.  Stated conversely, a wrongdoer is guilty of gross negligence … when he … is so utterly indifferent to the rights of others that he acts as if such rights did not exist." <u>Romanesk v. Rose</u>, 248 Md. 420, 423 (1968) (emphasis added); <u>see</u> also <u>Boucher v. Riner</u>, 514 A.2d 485, 489 (Md.App. 1986) ("gross negligence … is the omission of that care 'which even inattentive and thoughtless men never fail to take of their own property'")(internal citation omitted).  Such was EMG's conduct here.  It is highly improbable that, were EMG purchasing the Property, it would have designated a person with no ability to evaluate the structural integrity of the garage structure inspect and evaluate the Property.

More specifically, EMG was grossly negligent in failing to send an inspector to the Property who was qualified to evaluate its structure or appreciate the significance of the aforedescribed open and obvious deficiencies -- while at the same time representing that it had done so -- and in failing to provide even marginally accurate cost estimates for necessary repairs. EMG also intentionally, or "with thoughtless disregard of the consequences," failed to advise Berwind of material deficiencies <u>of which it was aware</u>, despite knowing that Berwind was going to rely on the Report of such deficiencies (or lack thereof) in connection with its decision to purchase the Property.   Hoffman testified that she made "multiple observations…in the parking garage that caused [her] significant concern such that [she bulleted] the item under the additional recommendations to equity investors." <u>See</u> Upton Affidavit, Exhibit 2, at pp. 180-181.  Nothing in the Report, however, indicates this now-alleged concern with the serious structural deficiencies and lack of waterproofing in the Garage, nor the need for an engineer to evaluate those deficiencies. <u>See</u>, <u>e.g.</u>, Kelley Affidavit, Exhibit 1.[9]

---

[9] EMG argues vociferously that it advised Berwind to have the parking garage structure inspected by a structural engineer.  However, a review of the Report demonstrates that the references to an evaluation by a professional engineer relate to drainage – and not structural – issues in the Garage.  For example, at Section 1.6,

> **2.    EMG knew that, by failing to provide an accurate
> description of the Property, it was creating a substantial
> risk of harm, and knew facts such that it should have
> <u>appreciated the extent of the risk.</u>**

As noted above, Hoffman testified at deposition that she made "multiple observations…

in the parking garage that caused [her] significant concern such that [she bulleted] the item under

the additional recommendations to equity investors." <u>See</u> Upton Affidavit, Exhibit 2, at pp. 180-

181. The first recommendation was that "the underground storm water drains be video inspected

to determine the cause of frequent clogging. The inspections should be review by a local

Professional Engineer to insure the system is not clogged…." <u>See</u> Upton Affidavit, Exhibit 3, at

p. 4. The second recommendation states "[s]ignificant signs of ponding water, inadequate

drainage, efflorescence on exterior brick, mineral deposits and minor concrete deterioration due

to water intrusion were observed in the parking garage, requiring additional evaluation by a local

Professional Engineer, as discussed in Section 7. The costs of this work are included in the

Immediate Repairs Cost Estimate (Table 1)." <u>Id.</u> at p. 5. As noted above, however, nothing in

the Report -- in Section 7 or elsewhere -- indicates the seriousness of the structural deficiencies

in the Garage or lack of waterproofing in the Garage, nor the need for an engineer to evaluate

---

<u>Recommendations for Equity Investors</u>, EMG states "the intended purchaser should consider having the following
studies performed on the Property prior to settlement":

> Significant signs of ponding water, inadequate drainage, efflorescence on the exterior
> brick, mineral deposits and minor concrete deterioration due to water intrusion were
> observed in the parking garage, requiring additional evaluation by a local professional
> engineer, as discussed in Section 7. The cost of this work is included in the Immediate
> Repairs Cost Estimate ("Table 1)".

<u>See</u> Upton Affidavit, Exhibit 3, at p. 4. However, looking at Section 7, it is clear that the recommendation for
professional engineer evaluation relates to the drainage system below the ground floor of the garage and its tendency
to clog. <u>See</u> Upton Affidavit, Exhibit 3, at p. 35. The only reference to a recommendation that an engineer review
the structure of the Garage is in the context of the Garage's drainage system, suggesting that it was the structure of
the drainage system that EMG was recommending be analyzed). <u>See</u> Upton Affidavit, Exhibit 3 at Table 1. Put
simply, there is no reference in the body of the Report concerning any issue of possible structural instability of the
Garage.

those deficiencies (as opposed to the clogged underground drain). See, e.g., Kelley Affidavit, Exhibit 1.

A review of the text of Section 7 of the Report reveals that the only recommendation for additional evaluation by a professional engineer is in relation to the drainage system.[10] Id. at p. 35-36. Moreover, EMG indicated that it was estimating a "nominal budget for [the] video taping and engineering evaluation" (Id. at p. 35)($4,000) which sum clearly would not be reflective of the costs of performing a structural evaluation of the scope EMG now claims it was recommending. In addition, while the Report makes note of "small areas of spalled concrete and minor rust stains ... indicating initial corrosion of the steel reinforcing in the ceilings of the Garage," the recommendation is for "cleaning and patching the areas of spalled concrete with an epoxy concrete patch ... within the next year." Id. at p. 35. Finally, while the Report makes note of cracking in the concrete, it goes on to note that "[s]ealing of the cracks is considered to be a part of routine maintenance. No additional action is required." Id. (emphasis added) There simply was no indication in the Report that EMG was advising Berwind of significant structural deficiencies in the Garage, the necessity of obtaining an additional evaluation of the overall structure of the Garage (as EMG now claims it advised), or the likely actual costs attendant to performing an evaluation of or repairs to the overall structure of the Garage. See Upton Affidavit, Exhibit 3, at pp. 168-179; Kelley Affidavit, Exhibit 1.

While Hoffman testified, at deposition, that "the rust stains [she] describe[d in the Report] mean ... that [she] saw some rust colored staining of the concrete, indicating that there's corrosion of the reinforcing rods in the concrete," EMG's sole relevant recommendation was a cleaning and patching of the areas of spalled concrete within a year. See Upton Affidavit, Exhibit 2, at pp. 171-172. However, Hoffman acknowledged, during her deposition, that cleaning and

---

[10] See n. 7, *supra.*

patching would not remedy the initial corrosion she observed, and acknowledged that she made no recommendation that the corrosion be evaluated by an engineer. Id. at p. 225. Hoffman also acknowledged that she did not indicate in the Report how the corrosion of reinforcing steel might affect the useful life of the Garage. EMG's failure to provide this material information to Berwind constituted not only a failure to identify deferred maintenance issues and estimate costs associated with them, while knowing that its Report was being provided to Berwind for use during its due diligence evaluation of the Property, but also a "thoughtless disregard of the consequences of [EMG's failure to disclose this information] without the exertion of any effort to avoid them." See, e.g., See Kelley Affidavit, Exhibit 1.

Similarly, even Hoffman -- as unqualified to evaluate structure as she was -- now claims to have known that, in the absence of waterproofing on an elevated concrete garage slab, "water penetrating the slab can cause corrosion on the reinforcing steel, and the corrosion expands causing concrete to fail, and you have spalled concrete and you can have severe damage to the parking garage, to the structure, if it's not addressed." See Upton Affidavit, Exhibit 2, at pp. 199-200. Despite Hoffman's claimed knowledge of the ramifications of the lack of a waterproofing membrane, and despite her having made notations of water penetration issues, EMG failed to indicate in the Report that there was no waterproofing membrane on the Garage slabs, and failed to indicate what the ramifications of that deficiency might be. EMG's failure to provide this information to Berwind constituted not only a failure to identify deferred maintenance issues and estimated costs (here, in excess of $900,000) associated with them, while knowing that its Report would be provided to Berwind for its due diligence evaluation of the Property, but also a "thoughtless disregard of the consequences of [its failure to disclose this information] without the exertion of any effort to avoid them." See, e.g., See Kelley Affidavit, Exhibit 1. It is -- in

addition to EMG's knowledge that their inspector was not qualified to evaluate the Garage's structure -- EMG's awareness of the aforedescribed risks that changes the nature of EMG's actions from merely negligent to reckless conduct. See Medina v. Meilhammer, 489 A.2d. 35, 41 (1985)(performance of an act of an unreasonable character in disregard of known or obvious risk that was so great as to make it highly probable that harm would follow, .. which … is usually accompanied by a conscious indifference to the consequences" constitutes "willful, wanton or reckless" conduct); see also Maryland State Dep't of Pers. v. Sealing, 471 A.2d 693, 670 (1984)(finding that an officer's conduct was wanton where he brought racist material to work, even though he "was then aware of his obligation to be extremely careful to avoid any conduct on his part that might proliferate existing problems.").

Moreover, EMG was "in possession of facts which would have indicated almost certain harm to others." Smith v. Gray Concrete Pipe Co., 297 A.2d 721, 734 (1972). In point of fact, other engineers who had performed visual inspections of the Property *prior to* EMG had readily observed that the Garage exhibited significant, material, open and obvious structural problems and waterproofing deficiencies. See, e.g., Kelley Affidavit, Exhibit 1. Accordingly, EMG should have reported the risks of which it was aware.[11] Even a decision not to issue the Report, made in light of Hoffman's observations and EMG's knowledge of Hoffman's lack of structural engineering training and experience, would have avoided harm to Berwind. EMG's failure to stop the Report or add a disclaimer -- in light of its knowledge -- constituted gross negligence *vis-à-vis* Berwind.

3.    **EMG's failure to provide a complete and accurate description of the Property was objectively grossly negligent.**

---

[11] EMG would, of course, have been more aware of more significant risks if it had made any effort to send a qualified inspector -- i.e., a structural engineer -- to look at the structure of the Garage.

In determining whether a defendant's conduct is objectively extraordinary or outrageous, courts consider three principal factors: 1) the probability and foreseeability of the risk; 2) the extent of the foreseeable harm that might result from undertaking the risk; and 3) the difference between the defendant's conduct and that of a similarly situated reasonable person. See, e.g., Maryland State Dep't of Pers. v. Sealing, 471 A.2d at 670. As discussed above, the evidence in this case amply demonstrates the difference between EMG's conduct and that of a similarly situated reasonable person: all of the qualified structural engineers who had performed visual inspections of the Property *prior to* and subsequent to EMG readily observed that the Garage exhibited significant, open and obvious structural problems and waterproofing deficiencies. See, e.g., Kelley Affidavit, Exhibit 1. As to the first two factors, Berwind would simply direct the Court's attention to the recent tragedy in the Central Artery/Tunnel Project. By failing to advise Berwind of the significant, open and obvious structural deficiencies in the garage, EMG deprived Berwind of the opportunity of making an informed decision to purchase a property which had significant structural deficiencies, including deficiencies which could have subjected Berwind to enormous liability had any of the concrete failed, fallen, and injured someone on the Property. Such conduct can only be deemed outrageous in light of the potential foreseeable harm to which EMG exposed Berwind.

Even assuming, *arguendo*, that the evidence did not demonstrate unequivocally that EMG was grossly negligent, it is well settled that a finding of gross negligence is a factual determination, and "unless the facts are so clear as to permit a conclusion as a matter of law, it is for [a] trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." Greenbelt Homes, Inc. v. Board of Educ., 248 Md. 350, 360 (1968). Accordingly, summary judgment is inappropriate in this action.

**D.    Genuine Issues of Material Fact Preclude the Entry of Summary Judgment on Berwind's Claim Against EMG For EMG's Violation of Mass. Gen. Laws c. 93A.**

EMG also argues that Berwind cannot prevail as a matter of law on its claim that EMG violated Mass. Gen. Laws c. 93A. EMG again puts the cart before the horse, basing its contention on the erroneous assumption that its conduct does not constitute fraud. As discussed in Sections B.1. and C., *supra*, the evidence demonstrates that EMG's conduct was fraudulent, and, moreover, a violation of Mass. Gen. Laws c. 93A. See <u>V.S.H. Realty, Inc. v. Texaco, Inc.</u>, 757 F.2d 411, 414 (1st Cir.1985); 940 C.M.R. 3.16 ("An act or practice is a violation of M.G.L. c. 93A § 2 if … any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction.").[12] Accordingly, Berwind's claim for damages arising out of EMG's violation of Mass. Gen. Laws. c. 93A cannot be dismissed on summary judgment. At a minimum, the evidence adduced during discovery raises material questions of fact as to the misrepresentations alleged, and summary judgment is therefore not appropriate.

**E.    <u>The Economic Loss Doctrine is Inapplicable to the Case at Bar.</u>**

Finally, EMG argues that the economic loss doctrine bars Berwind's claims. It is, however, clear as a matter of law that there is no such bar to Berwind's recovery for its claims of negligence and grossly negligent misrepresentation by EMG. Massachusetts courts[13] have long held that a plaintiff with a cause of action for negligence or negligent misrepresentation (much

---

[12] <u>See</u> fn. 3, *supra*.

[13] Since EMG makes its economic loss argument only with respect to Berwind's claim of violation of Chapter 93A, citation to Maryland law is not necessary. The courts of Maryland, however, similarly hold that the economic loss rule does not preclude recovery for fraud and negligent misrepresentation. <u>See</u>, <u>e.g.</u>, <u>Cooper v. Berkshire Life Ins. Co.</u>, 810 A.2d 1045, 1070-71 (Md. App. 2002)(defendant had an independent duty not to be false or misleading in the representations that it made about the services that it offered, and the contract entered into between the plaintiff and defendant established "the contractual privity that suffices as the intimate nexus required to avoid application of the economic loss doctrine." <u>See also</u> fn. 2, as it relates to the application of Massachusetts law when the resolution of a choice-of-law determination would not alter the determination of the issue.

less grossly negligent conduct) in connection with the provision of professional services is entitled to recover for the economic harm he suffers as a result. See, e.g., Arthur D. Little Intern., Inc. v. Dooyang Corp., 928 F.Supp. 1189, 1205 (D.Mass. 1996)("The economic loss rule does not apply to harm caused by intentional misrepresentations")(citations omitted); Nota Construction Corporation v. Keyes Associates, Inc., 45 Mass.App.Ct. 15, 20 (1998); Craig v. Everett M. Brooks Co., 351 Mass. 497, 501 (1967) (court found civil engineer liable to contractor who relied on negligent placement of marking stakes where reliance was foreseeable).[14]

Under Massachusetts law, liability will be imposed for economic losses that result from the negligent furnishing of services if the defendant knows that the party will rely on those services.  Nota, 45 Mass.App.Ct. at p. 21 citing Craig v. Everett M. Brooks Co., 351 Mass. at 501.  The duty to a plaintiff arises from the foreseeability of the plaintiff's reliance on the defendant's performance of professional services. Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491, 495-496 (1998) citing Restatement (Second) Torts § 552 (1977)("One who, in the course of his business, profession or employment … supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."); cf. Josefek v. Loitherstein

---

[14] The Massachusetts courts have recognized the applicability of the exception to the economic loss doctrine in numerous cases involving a wide range of professions.  As applied to accountants, see, e.g., Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491, 495-496 (1998) and Reisman v. KPMG Peat Marwick LLP, 57 Mass.App.Ct., 100, 124-125 (2003); financial institutions, see, e.g., Danca v. Taunton Savings Bank, 385 Mass. 1, 9-10 (1982) and Golber v. BayBank Valley Trust Co., 46 Mass.App.Ct. 256, 258-259 (1999); insurers and insurance brokers, see, e.g., St Paul Surplus Lines Ins. Co. v. Feingold & Feingold Ins. Agency, Inc., 427 Mass. 372, 376 (1998) and Cole v. New England Mut. Life Ins. Co., 49 Mass.App.Ct. 296, 300 (2000); real estate brokers, see, e.g., Lawton v. Dracousis, 14 Mass.App.Ct. 164, 171 (1982). See also The Vitetta Group v. Town of Plymouth, 1996 WL 1132776 *1 (D.Mass. 1996).

Environmental Engineering, Inc., 2004 WL 3218004 *3 (Mass. Superior 2004)(environmental engineering firm hired by owner of subject property to provide a Response Action Outcome Statement, upon which purchasers of the property relied in making the determination to purchase the subject property, was liable for negligent misrepresentation); Gavett v. Roto-Rooter Services Company, 2001 WL 1688896 (D.Mass. 2001)(sewer inspection company that had provided sewer inspection report was liable to purchasers of home for which the company had issued a certificate of Title V compliance, where it was later determined that the home was not Title V compliant).

There is no dispute that EMG was aware of the purpose for which Berwind requested the Report and that Berwind would be relying on the accuracy of the statements contained therein. See Upton Affidavit, Exhibit 3 at pp. 1, 10, 45. In addition, the evidence demonstrates that EMG failed to exercise reasonable care or competence (and was, in fact, grossly negligent) in obtaining or communicating accurate information concerning the condition of the Garage. See Kelley Affidavit, Exhibit 1. Accordingly, where, as here, EMG certified the Report, having failed to exercise reasonable care or competence in obtaining or communicating the information contained therein, and knowing that Berwind was going to rely on the Report in connection with its decision to purchase the Property, Berwind's claims against EMG are not barred by the economic loss doctrine.

In addition, contrary to EMG's assertions, it is clear that liability under Chapter 93A may flow from negligent misrepresentations, and is not, therefore, precluded by the economic loss doctrine. See, e.g., Stolzoff, 58 Mass.App.Ct. at 765; Nota Construction, 45 Mass.App.Ct. at 21; Glickman v. Brown, 21 Mass.App.Ct. 229, 234-235 (1985). "Chapter 93A, § 11 has been held [specifically] applicable to instances of misrepresentation arising in the context of professional

services rendered to a client" such as in the circumstances presented in the case at bar. See, e.g.,

Chiacchia *et al.* v. Lycott Environmental Research, Inc., 1995 WL 1146824 at * 11 (Court,

noting that the defendant was "in the business of rendering opinions based on what is supposed

to be a professionally competent review of the sites it studies," held that by failing in multiple

ways to conform to established standards in the industry, including, *inter alia*, by failing to

perform the requisite analysis of the property and by ignoring and failing to investigate "obvious

'red flags' signaling potential [problems]...," and by "conducting a slipshod and woefully

inadequate investigation of what is known to be an old [] site and then providing the purchasers

and lender with a report that opines [that there were no problems with the property the defendant

committed] an unfair and deceptive trade practice.")  Accordingly, EMG's arguments are

without merit, and summary judgment cannot enter.

## IV.    **CONCLUSION**

As has been demonstrated herein, the limitation of liability clause contained in the

Contract does not limit Berwind's tort claims, contract claims, or statutory claims where, as here,

EMG fraudulently induced Berwind into entering the Contract, thereby, vitiating the limitation of

liability provision.  Even assuming, *arguendo*, that the limitation of liability clause were not

vitiated, said clause would not limit EMG's liability for its grossly tortious conduct or for

Berwind's statutory claims.  Finally, genuine issues of material fact exist in this matter which

preclude the entry of summary judgment.  EMG's Motion for Partial Summary Judgment must,

therefore, be denied.

**BERWIND PROPERTY GROUP, INC.
and NEWTON INVESTORS
LIMITED PARTNERSHIP,**

By its attorneys,

/s/ Lauren Timoney Upton

Dated: August 16, 2006

_____

Eric F. Eisenberg, Esq.
BBO No. 544682
Lauren Timoney Upton, Esq.
BBO No. 565122
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000

## CERTIFICATE OF SERVICE

I, Lauren Timoney Upton, Esq., hereby certify that on the date set forth above, I caused notice of the foregoing to be served upon all parties/counsel of record in the above-captioned matter.

/s/ Lauren Timoney Upton

_____