**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BERWIND PROPERTY GROUP, INC. and NEWTON INVESTORS LIMITED PARTNERSHIP, <br><br> Plaintiffs, <br><br> v. <br><br> ENVIRONMENTAL MANAGEMENT GROUP, INC. d/b/a EMG, <br><br> Defendant. | DOCKET NO. 04-11411-NMG |

**PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF THEIR OPPOSITION TO**
**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiffs Berwind Property Group, Inc. and Newton

Investors Limited Partnership (collectively, "Berwind"), hereby submit the following statement

of material facts in support of their Opposition to the Motion for Partial Summary Judgment filed

by Defendant Environmental Management Group Inc. d/b/a EMG ("EMG"). Except to the

extent that EMG's Statement of Material Facts comports with Berwind's Statement of Material

Facts as set forth below, Berwind hereby affirmatively controverts EMG's Statement of

Materials Facts.

I.    **Plaintiff's Response to Defendant's Statement of Undisputed Facts**

1.    Berwind does not dispute that Berwind and EMG entered into a contract pursuant

to which EMG was to perform, *inter alia*, a property condition evaluation on certain

improvements to real property in Newton, Massachusetts (the "Contract"), the terms of which Contract speak for themselves.

2.      Berwind does not dispute that it is currently acquiring property for its seven investment funds, and that it had, at the time of Mr. Perry's deposition, $585,000,000 of equity product types designated at office, industrial, retail and development. Berwind denies the remaining statements contained in Paragraph 2.

3.      Berwind does not dispute that its criteria for acquisition of a property remained "more or less" consistent between 1999 and 2005.

4.      In response to the allegations set forth in Paragraph 4, Berwind states that on or about March 1, 1999, Berwind contacted EMG to discuss retaining EMG to perform a Phase I Environmental Analysis and an Enhanced Property Condition Evaluation (the "Services") of the buildings located at 1210-1230 Washington Street in Newton, MA (the "Property"). See Affidavit of Albert Corr, filed herewith, at ¶ 2.

5.      Berwind does not dispute that the Property consisted of two structures - an office building and a three-story parking garage.

6.      Berwind does not dispute the allegations set forth in this Paragraph.

7.      Berwind does not dispute the allegations set forth in this Paragraph.

8.      Berwind does not dispute that EMG sent Berwind a proposal for the requested Services, on or about March 2, 1999. In further response, Berwind states that the terms of the Proposal speak for themselves.

9.      Berwind does not dispute the allegations set forth in this Paragraph.

10.     In its initial contact with EMG, Berwind expressed to EMG that Berwind had concerns about the systems and structures of the Property due to the age of the Property, due to

the proximity of the Property to adjacent railroad tracks and the Massachusetts Turnpike, and, specifically in relation to the parking garage located on the Property, due to the Garage's exposure to the elements and to road salts.  Because of these concerns, Berwind requested that, in addition to the "standard" review of the Property, EMG also perform a MEP analysis of the Property.  See Corr Affidavit at ¶ 3.  Notwithstanding EMG's assertion to the contrary, Berwind's request for an MEP analysis was not a direction to EMG to dispense with its review of the structures of the Property or a waiver of EMG's obligation to evaluate the structures of the Property.  See Corr Affidavit at ¶ 3.

11.    Berwind does not dispute that Mr. Dillis testified that he "would not have booked an MEP analysis unless it was requested by Berwind."  In further response to the allegations set forth in Paragraph 11, Berwind states that, Mr. Dillis's deposition testimony notwithstanding, Berwind lacks sufficient information to either affirm or deny that Mr. Dillis, or any other EMG representative, would have "booked an MEP analysis unless it was requested by Berwind."

12.    Berwind does not dispute that Mr. Dillis testified that an "an Enhanced PCE" referred to a request by the customer (Berwind) that EMG provide a specific individual or discipline to perform the requested service, but no change in the scope of the services to be performed."  In further response to the allegations set forth in Paragraph 12, Berwind states that, Mr. Dillis's deposition testimony notwithstanding, Berwind lacks sufficient information to either affirm or deny that the term "Enhanced PCE" had the same meaning for all employees of EMG. Notwithstanding EMG's assertion to the contrary, Berwind's request for an MEP analysis was not a direction to EMG to dispense with its review of the structures of the Property or a waiver of EMG's obligation to evaluate the structures of the Property.  See Corr Affidavit at ¶ 3.

13.    Berwind denies the allegations set forth in this Paragraph.  In further response, Berwind incorporates herein by reference its response to Paragraph 10.

14.    Berwind does not dispute the allegations set forth in this Paragraph.

15.    Berwind denies the allegations set forth in this Paragraph.  In further response, Berwind states that, upon being shown a document upon which was written the words "Needs MEP analysis," and upon being asked "what is your understanding as to what that means," Mr. Perry testified "First of all, I don't know who wrote that on here.  Second of all, that would mean to me that we were requesting additional information on the systems." See Defendant's Statement of Undisputed Facts, Exhibit C at pp. 132-133.  In further response, upon being asked "what was your understanding as to what building systems EMG was supposed to observe as part of its property condition evaluation," Mr. Perry testified "They were supposed to observe all systems, mechanical, electrical, plumbing, structural and the site." Id. at p. 134.

16.    In response to the allegations set forth in Paragraph 16, Berwind states that the terms of the proposed contract between Berwind and EMG speak for themselves.

17.    In response to the allegations set forth in Paragraph 17, Berwind states that the terms of prior contracts between Berwind and EMG speak for themselves.

18.    At his deposition, Mr. Perry testified that he "assume[d]" that he had reviewed Paragraph 8 of the Contract before executing same.  Except as aforesaid, the allegations of this Paragraph are denied.

19.    Berwind does not dispute the allegations set forth in this Paragraph.

20.    In response to the allegations set forth in Paragraph 20, Berwind states that the terms of the contract between Berwind and EMG speak for themselves.

21.    Berwind does not dispute the allegations set forth in this Paragraph.

22.    In response to the allegations set forth in Paragraph 22, Berwind states that it did

not alter a proposal from Schofield Brothers, which proposal related to the provision of services

relating to the purchase of the Property. Berwind denies the remaining allegations set forth in this

Paragraph.

23.    In response to the allegations set forth in Paragraph 23, Berwind states that, based

upon EMG's representations (see Paragraph 24, infra), Berwind was induced to enter into a

contract with EMG on or about March 17, 1999.

24.    Denied.  In response to the allegations set forth in this Paragraph, Berwind states

that EMG represented, at p. 20 of the Proposal/Contract, in pertinent part, as follows:

> Based on on-site observations, interviews, and review of available documentation,
> EMG *shall*:
>
> - *Provide a full description of the property and improvements,*
>   *with descriptions of* in-place systems *and commentary on*
>   *observed conditions, to include* site, architectural, *structural,*
>   mechanical, electrical, plumbing, fire and life/safety, interior,
>   exterior, *and other systems.*
>
> - *Identify those components that are exhibiting deferred*
>   *maintenance issues and provide estimates for* "immediate"
>   (90-day), "short term" (1 year) and "replacement reserve"
>   (10-year) *costs based on the observed conditions,* available
>   maintenance history *and industry-standard useful life*
>   *estimates*. (the "Services") (emphasis added)

The Contract further provided that EMG would perform said Services in accordance with

industry-accepted due diligence practice, and using that degree of care and skill ordinarily

exercised under similar conditions by reputable members of EMG's profession practicing in the

same or similar locality at the time of service. See Proposal for Services attached as Exhibit 1 to

the Corr Affidavit.  The Proposal did not specify that EMG would perform an MEP analysis

only, but that it would perform an evaluation encompassing each of the aforementioned systems.

Id. EMG also represented to Berwind that a *qualified* professional would inspect and evaluate the Property.

25.    Berwind does not dispute the allegations set forth in this Paragraph.

26.    Berwind does not dispute the allegations set forth in this Paragraph.

27.    Berwind does not dispute the allegations set forth in this Paragraph. Berwind further states, however, that Hoffman was not a structural engineer, nor had Hoffman ever received any meaningful training in structural engineering (see Excerpts from the 3/30/05 Deposition Transcript of Sandra Terepka Hoffman, a true and accurate copy of which is attached as Exhibit 2 to the Affidavit of Lauren Timoney Upton, filed herewith, at pp. 6-9, 20-23, 250-251), and EMG was fully aware that Hoffman was not qualified to perform the Services -- i.e., to provide an opinion as to the Property's structural integrity -- as represented. See Excerpts from the 4/01/05 Deposition Transcript of Michael Collins, a true and accurate copy of which is attached to the Upton Affidavit as Exhibit 1, at pp. 51-52 (in which Collins, Hoffman's supervisor, testified that he was "keenly aware" of Hoffman's training and experience, having reviewed Hoffman's resume and having worked with her on others projects).

28.    Berwind does not dispute that, in or around March 1999, Sandra Terepka Hoffman ("Hoffman") visited the Property, and inspected the parking garage (the "Garage") located on the Property. See Excerpts from the 3/30/05 Deposition Transcript of Sandra Terepka Hoffman, a true and accurate copy of which is attached as Exhibit 2 to the Upton Affidavit, at p. 173. Berwind further states that Hoffman was the only EMG employee to visit or inspect the Garage. Id.

29.    Berwind does not dispute the allegations set forth in this Paragraph.

30.    Berwind does not dispute the allegations set forth in this Paragraph.

31.     Berwind does not dispute the allegations set forth in this Paragraph.

32.     Berwind does not dispute the allegations set forth in the first sentence of this Paragraph.  Berwind disputes the second sentence of this Paragraph.  In further response, Berwind states EMG never advised Berwind-- at the time Berwind was in discussion with EMG concerning the performance of the Services -- that Hoffman was not trained or qualified to evaluate or inspect the structure of the Garage or that there was only one individual on EMG's staff competent to evaluate the structural integrity of reinforced concrete parking garages and similar structures, or that that individual would likely not be assigned to the Project.  See Upton Affidavit, Exhibit 1 at pp. 21-22.  Nor did EMG ever advise Berwind that it would almost certainly send an engineer who was not qualified to perform a structural and waterproofing inspection and evaluation of the Garage as required by the terms of the Contract and who was not capable of providing a complete description of the structures on the Property as had been represented.

33.     Berwind denies that any material potential problems with the parking Garage were identified in the Report, and the implication that it was recommended that a "local structural engineer" evaluate anything other than the Garage base slab drainage.  Berwind further states that EMG's Property Condition Evaluation (the "Report"), which was initially prepared by Hoffman, failed to note any signs of structural distress, such as the serious topside cracking around columns, and sagging of the elevated structural decks, despite the fact that none of these conditions required measurement, calculation, and/or testing to detect.  See Plaintiffs Rule 26(a)(2) Expert Disclosure, attached as Exhibit 1 to the Affidavit of Paul L. Kelley, filed herewith

More specifically, EMG's Report states only as follows:

>The framing, walls and decks of the parking structure appeared to be in fair condition. ***Small*** areas of spalled concrete and ***minor*** rust stains were observed, indicating initial corrosion of the steel reinforcing in the ceiling. ... Cleaning and patching the areas of spalled concrete with an epoxy concrete patch is required within the next year.
>
>The ground level of the parking garage had areas of cracking in the concrete slab. ... Sealing cracks is considered to be a part of routine maintenance. ***No additional action is required***. (emphasis added)

See Excerpts from EMG's Report, a true and accurate copy of which is attached to the Upton Affidavit as Exhibit 3, at pp. 35-36.

The Report also failed to note the open and obvious lack of deck waterproofing membranes, and failed to discuss the importance of deck membranes in garages. See Kelley Affidavit, Exhibit 1. Moreover, EMG clearly failed to adequately evaluate the costs attendant to the necessary repairs of the deficiencies in the Garage. See Kelley Affidavit, Exhibit 1.

The Report indicated only that Berwind would need to expend approximately $4,000.00 in immediate costs (that is, in the inspection and evaluation of the drainage system in the Garage, which EMG recommended be performed within 90 days) and $26,000.00 in short term costs (that is, in the recommended repairs of the Garage's drainage system and spalled concrete and the application of sealant to the exterior walls, which EMG recommended be performed within one year). See Upton Affidavit, Exhibit 3 at p. 5 and Tables 1 - 2. The Report also failed to indicate that Berwind would incur any additional costs for "repairs, replacement and significant maintenance items ... over the evaluation period (12 years)." See Upton Affidavit, Exhibit 3 at p. 5 and Table 3.

The fact that the Report states that "Opinions are rendered at to [the Property's] structural integrity," and that EMG then specified fairly minor items in the Garage that required inexpensive correction, led Berwind to understand that there were no observed material costs or

potential material costs related to the Building.  See Corr Aff. at ¶ 7; Upton Affidavit, Exhibit 3

at p. 10.  These budgets were, however, grossly inadequate measures of the maintenance needs

of the garage at the time of EMG's 1999 inspection. See Kelley Affidavit, Exhibit 1.

In addition, a review of the Report demonstrates that the references to an evaluation by a

professional engineer relate to drainage – and not structural – issues in the Garage.  For example,

at Section 1.6, Recommendations for Equity Investors, EMG states "the intended purchaser

should consider having the following studies performed on the Property prior to settlement":

> Significant signs of ponding water, inadequate drainage, efflorescence on
> the exterior brick, mineral deposits and minor concrete deterioration due
> to water intrusion were observed in the parking garage, requiring
> additional evaluation by a local professional engineer, as discussed in
> Section 7.  The cost of this work is included in the Immediate Repairs
> Cost Estimate ("Table 1)".

See Upton Affidavit, Exhibit 3, at p. 4.  However, looking at Section 7, it is clear that the

recommendation for professional engineer evaluation relates to the drainage system below the

ground floor of the garage and its tendency to clog.  See Upton Affidavit, Exhibit 3, at p. 35.

The only reference to a recommendation that an engineer review the structure of the Garage is in

the context of the Garage's drainage system, suggesting that it was the structure of the drainage

system that EMG was recommending be analyzed). See Upton Affidavit, Exhibit 3 at Table 1.

Put simply, there is no reference in the body of the Report concerning any issue of possible

structural instability of the Garage.

34.    Berwind denies the allegations set forth in Paragraph 34.

## II. Plaintiffs' Statement of Additional Facts In Dispute

1.      EMG was aware that Hoffman was not qualified to perform a structural evaluation of the Property as represented in EMG's Proposal. Michael Collins, Hoffman's supervisor, has testified that he was "keenly aware" of Hoffman's training and experience, having reviewed Hoffman's resume and having worked with her on others projects. See Upton Affidavit, Exhibit 1, at pp. 51-52. Hoffman, as EMG was aware, was not a structural engineer, nor had Hoffman ever received any meaningful training in structural engineering. See Upton Affidavit, Exhibit 2, at pp. 6-9, 20-23, 250-251.

2      Hoffman clearly failed, because she lacked training or experience evaluating or inspecting reinforced concrete structures, to observe and/or appreciate the significance of open and obvious structural and waterproofing deficiencies in the Garage. See Exhibit 1 to the Affidavit of Paul Kelley, filed herewith.

3.      Berwind has since learned that other engineers who had performed visual inspections of the Property *prior* to and subsequent to Hoffman had readily observed that the Garage exhibited significant, open and obvious structural problems and waterproofing deficiencies. These deficiencies included, *inter alia*, the following:

- slab deflections;

- extensive cracking around reinforcement steel;

- through-slab cracks with florescence and active water leakage;

- concrete delamination along the through-slab cracks;

- slab delamination, scaling and popouts;

- slab cracking around the column base;

- unsealed slab construction joints;

- widespread slab cracks; and

- absence of vehicular-traffic bearing waterproofing on the decks.

See, e.g., Memorandum from SGH dated February 3, 1997, attached as Exhibit 2 to the Kelley Affidavit.

4.    EMG's Property Condition Evaluation (the "Report"), which was initially prepared by Hoffman, failed to note any of these signs of structural distress, such as the serious topside cracking around columns, and sagging of the elevated structural decks, despite the fact that none of these conditions required measurement, calculation, and/or testing to detect. See Kelley Affidavit, Exhibit 1.

5.    Berwind has incurred in excess of $900,000.00 in necessary structural repairs to and installation of waterproofing membranes in the Garage. Id.

6.    In addition to EMG's negligence in failing to detect these open and obvious deficiencies, and to provide even marginally accurate cost estimate for the necessary repairs, EMG also failed to advise Berwind of material deficiencies of which it was aware, despite knowing that Berwind was going to rely on the Report of such deficiencies (or lack thereof) in connection with its decision to purchase the Property.  For example, Hoffman has testified that she had "significant concern" about "issues" relating to the Garage, and that there were "extensive problems [with] the Garage." See Upton Affidavit, Exhibit 2, at pp. 181, 186-187. However, nothing in the EMG Report conveyed to Berwind the seriousness of these concerns regarding observed structural issues and of the waterproofing deficiencies present in the Garage. See Kelley Affidavit, Exhibit 1.

7     In addition, Hoffman now claims that she knew that "the rust stains [she] describe[d in the Report] … indicat[ed] that there's corrosion of the reinforcing rods in the

concrete," and she recommended cleaning and patching the areas of spalled concrete within a year. See Upton Affidavit, Exhibit 2, at pp. 171-172.  However, Hoffman acknowledged during her deposition that cleaning and patching would not remedy the initial corrosion she observed, and she acknowledged that she made no recommendation that the corrosion be evaluated by an engineer. Id. at p. 225.  She also acknowledged that she did not indicate in the Report how the corrosion might affect the useful life of the Garage. Id.

8       Hoffman also now claims that she knows that in the absence of waterproofing on an elevated concrete garage slab, "water penetrating the slab can cause corrosion on the reinforcing steel, and the corrosion expands causing concrete to fail, and you have spalled concrete and you can have severe damage to the parking garage, to the structure, if it's not addressed." See Upton Affidavit, Exhibit 1, at pp. 199-200.

9       Despite Hoffman's claimed knowledge of the ramifications of the lack of a waterproofing membrane, and her despite having made notations of water penetration issues, the Report fails to indicate that there were no waterproofing membranes on the Garage slabs, and fails to indicate what the ramifications of that deficiency (and the attendant cost of repairing that deficiency) might be. See generally Upton Affidavit, Exhibit 2.

10.     Despite knowing that Hoffman was not qualified to evaluate, *inter alia*, the structural systems of the Property, EMG certified that the Services had been performed in accordance with the Contract requirements and, accordingly, "in accordance with industry-accepted due diligence practice." See Upton Affidavit, Exhibit 3 at pp. 45-46.

11.     In addition, EMG certified the contents of the Report knowing that no other qualified person (i.e., a structural engineer and/or an individual with appropriate structural training in garages) had performed the Services or reviewed the Report, while also knowing that

Berwind was going to rely on this Report in making its determination of whether to purchase the Property and at what price. Id.

12.     EMG's failure to provide this information to Berwind constituted not only a breach of the Contact's requirement of identifying deferred maintenance issues and estimating likely costs associated with them, while knowing that the Report would be provided to Berwind for its due diligence evaluation of the Property, but also a gross failure to comply with the customary professional standards of care. See Kelley Affidavit, Exhibit 1.

13.     When it entered into the Contract, EMG knew that Berwind was hiring EMG to assist Berwind with its due diligence activities for its acquisition of the Property. See Corr Affidavit, Exhibit 1 at p. 1.

14.     EMG acknowledged in its Report that:

> EMG was retained by the client to render an opinion as to the Property's current general physical condition as of the day of our site visit pursuant to our agreement dated March 2, 1999. It is EMG's understanding that the client intends to rely upon this Report for decisions related to the acquisition of the property.

Id. at p. 10.

15.     EMG also acknowledged that:

> It is our understanding that the primary interest of Berwind Property Group, Inc. is to locate and evaluate materials and building system defects which might significantly effect the property and to determine if the present Property has conditions which will have a significant impact on its continued operations.

Id. at p. 45.

16.     Knowing the foregoing, EMG represented in its Report that:

> Based on the observations, interviews and documents review outlined below, **this report identifies significant deferred maintenance issues, existing deficiencies,** and material code violations of record at municipal offices that effect the Property's

> use. **Opinions are rendered as to its *structural* integrity,** building system condition and the Property's overall condition.

Id. at p. 10 (emphasis added).

17.     Further, EMG certified that Berwind could rely on the representations set forth in the Report. Id. at pp. 45-46.

17.     Based on EMG's grossly false representations in the Report, Berwind decided to purchase the Property for $11.7 million. See Corr Affidavit at ¶ 7.

19.     Had Berwind known that the Garage actually suffered from significant structural problems and waterproofing deficiencies, Berwind would not have purchased the Property for $11.7 million as it did, or Berwind would have purchased the Property for a lower price, taking into account the additional costs of repairing the Garage. See Corr Affidavit at ¶ 8.

20.     EMG's assignment of Sandra Terepka Hoffman to perform a condition assessment of a garage in New England and its failure to provide special inspection and reporting protocols for a garage structure represent gross negligence. See Kelley Affidavit, Exhibit 1.

21.     The evaluation of the garage structure in EMG's Report, initially prepared by Hoffman, omits significant indications of structural distress, including serious topside cracking around columns, severe sagging of elevated structural decks, and indications of ongoing corrosion of reinforcing steel. See Kelley Affidavit, Exhibit 1.

22.     The immediate and short-term repair budgets for the garage presented in the Report are grossly inadequate measures of the maintenance needs of the garage at the time of EMG's 1999 inspection. See Kelley Affidavit, Exhibit 1.

23.     EMG's negligence and gross negligence, negligent and grossly negligent misrepresentations, and reckless and wanton breach of its duties to Berwind, directly,

proximately, and foreseeably caused Berwind to incur costs in excess of $900,000.00 in the

repair and remediation of the Garage. <u>See</u> Kelley Affidavit, Exhibit 1.

**BERWIND PROPERTY GROUP, INC. and NEWTON INVESTORS LIMITED PARTNERSHIP,**

By its attorneys,

/s/ Lauren Timoney Upton

Dated: August 16, 2006

_____
Eric F. Eisenberg, Esq.
BBO No. 544682
Lauren Timoney Upton, Esq.
BBO No. 565122
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA  02109
(617) 345-9000

<u>**CERTIFICATE OF SERVICE**</u>

I, Lauren Timoney Upton, Esq., hereby certify that on the date set forth above, I caused notice of the foregoing to be served upon all parties/counsel of record in the above-captioned matter.

/s/ Lauren Timoney Upton

Dated: August 16, 2006

_____
