UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BERWIND PROPERTY GROUP, INC. and )<br>NEWTON INVESTORS LIMITED )<br>PARTNERSHIP, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>ENVIRONMENTAL MANAGEMENT GROUP, )<br>INC. d/b/a EMG, )<br>)<br>Defendant. ) | DOCKET NO. 04-11411-NMG |

## AFFIDAVIT OF ALBERT J. CORR

I, Albert J. Corr, being duly sworn, hereby depose and state as follows:

1.      I am a Vice President at BPG Properties, Ltd., in Philadelphia, PA, and I have been employed at BPG Properties, Ltd. for 10 years. I state the following based upon my own personal knowledge.

2.      On or about March 1, 1999, I contacted EMG to discuss retaining EMG to perform a Phase I Environmental Analysis and an Enhanced Property Condition Evaluation (the "Services") of the buildings located at 1210-1230 Washington Street in Newton, MA (the "Property"). I spoke with Matt Dillis.

3.      I informed Mr. Dillis that Berwind had concerns about the systems and structures of the Property due to the age of the Property, due to the proximity of the Property to adjacent railroad tracks and the Massachusetts Turnpike, and, specifically in relation to the parking garage located on the Property, due to the Garage's exposure to the elements and to road salts. Because of these concerns, I requested that, in addition to the "standard" review of the Property, EMG

also perform a MEP analysis of the Property. EMG then provided a Proposal, a true and accurate copy of which is attached hereto as Exhibit 1.

4. I did not instruct EMG to dispense with its review of the structures of the Property. I, in fact, advised Mr. Dillis specifically that Berwind was also concerned about the structural integrity of the buildings on the Property because of the proximity of the Property to adjacent railroad tracks and the Massachusetts Turnpike.

5. I was never advised by Mr. Dillis, nor any other EMG representative that there was only one individual on EMG's staff competent to evaluate the structural integrity of reinforced concrete parking garages and similar structures, or that that individual might not be assigned to the Project.

6. Based upon EMG's representations, it was my understanding that EMG would assign an individual capable of providing an opinion as to the Property's structural integrity, and based upon those representations, Berwind was induced to enter into a contract with EMG on or about March 17, 1999. A true and accurate copy of the Contract is attached hereto as Exhibit 2.

7. After purportedly inspecting and evaluating the Property, including the structures on the Property, EMG provided a Property Condition Evaluation to Berwind, which stated, among other things, that "[o]pinions are rendered at to [the Property's] structural integrity."

8. Because the Property Condition Evaluation then specified fairly minor items in the Garage that required inexpensive correction, Berwind was led to understand that there were no observed material costs or potential material costs related to the Building.

9. Based on EMG's representations that it would provide a qualified engineer, based on Berwind's understanding that a qualified engineer had prepared the Report, and based on

Berwind's understanding that there were no observed material costs or potential material costs, Berwind decided to purchase the Property for $11.7 million.

10. Had Berwind known that the Garage actually suffered from significant structural problems and waterproofing deficiencies, Berwind would not have purchased the Property for $11.7 million as it did, or Berwind would have purchased the Property for a lower price, taking into account the additional costs of repairing the Garage.

**FURTHER YOUR AFFIANT SAYETH NOT.**

**SIGNED UNDER THE PENALTIES OF PERJURY.**

_____